# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | |
|---|---|
| ASBURY AUTOMOTIVE GROUP, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE FEDERAL TRADE COMMISSION, *et al.*,<br><br>*Defendants*. | Civil Action No. 4:24-cv-00950-O |

## APPENDIX TO BRIEF IN SUPPORT OF OPPOSED EXPEDITED MOTION FOR PRELIMINARY INJUNCTION STAYING FTC PROCEEDING PENDING ADJUDICATION OF THE ASBURY PLAINTIFFS' CONSTITUTIONAL CLAIMS

Plaintiffs Asbury Automotive Group, Inc., et al. (the "Asbury Plaintiffs") submit this Appendix to its Brief in Support of its Opposed Expedited Motion for Preliminary Injunction Staying FTC Proceeding Pending Adjudication of the Asbury Plaintiffs' Constitutional Claims.

| **Document** | **Page(s)** |
|---|---|
| Declaration of Edward Burbach, dated October 14, 2024 | App.1-App.7 |
| Complaint, filed August 16, 2024 | App.8-App.21 |
| Scheduling Order issued on September 13, 2024 | App.22-App.33 |
| Excerpt from Asbury Automotive Group, Inc's 10-K SEC filing for period ending December 31, 2023 | App.34-App.36 |
| Civil Investigative Demand, dated August 1, 2022 | App.37-App.61 |

1

| | |
|---|---|
| Excerpt from Asbury Automotive Group, Inc's 10-Q SEC filing for period ending June 30, 2024 | App.62-App.64 |
| FTC's Acting Assistant General Counsel's response to FOIA request, dated March 11, 2024 | App.65-App.66 |
| Respondent's Answer and Affirmative Defenses, filed September 3, 2024 | App.67-App.98 |
| Protective Order Governing Confidential Material, dated August 21, 2024 | App. 99-App.102 |
| Excerpt from Complaint Counsel's Responses to Asbury First Requests for Production of Documents | App.103-App.109 |
| Complaint Counsel's Preliminary Proposed Fact Witness List, dated October 11, 2024 | App.110-App.122 |

Dated: October 14, 2024

Respectfully submitted,

FOLEY & LARDNER LLP

Todd A. Murray
(Texas State Bar No. 00794350)
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel: 214.999.3000
Fax: 214.999.4667
Email: tmurray@foley.com

By: /s/ Edward D. ("Ed") Burbach

Edward D. ("Ed") Burbach*
(Texas State Bar No. 03355250)
John Sepehri
(Texas State Bar No. 00797408)
Robert F. Johnson III
(Texas State Bar No. 10786400)
Brandon M. Livengood^
(Texas State Bar No. 24128022)
600 Congress Avenue, Suite 2900
Austin, Texas 78701
Tel: 512.542.7000
Fax: 512.542.7100
Email: eburbach@foley.com
Email: jsepehri@foley.com
Email: rjohnson@foley.com
Email: brandon.livengood@foley.com

Michael J. Lockerby^
Megan Chester^
Washington Harbour
3000 K Street N.W., Suite 600
Washington, D.C. 20007
Tel.: 202.672.5300
Fax: 202.672.5399
Email: mlockerby@foley.com
Email: mxchester@foley.com

_____
*Attorney in charge
^ *Pro Hac Vice* application forthcoming

*Counsel for the Asbury Plaintiffs*

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FT. WORTH DIVISION**

| | |
|---|---|
| ASBURY AUTOMOTIVE GROUP, INC., *et al.*,<br><br>           *Plaintiffs*,<br><br>    v.<br><br>THE FEDERAL TRADE COMMISSION, *et al.*,.<br><br>           *Defendants*. | No. 4:24-cv-00950-O |

**DECLARATION OF EDWARD D. ("ED") BURBACH**

Pursuant to 28 U.S.C. § 1746, I, Edward D. ("Ed") Burbach, declare as follows:

1.    I am a partner with the law firm of Foley & Lardner LLP|, counsel for the Asbury Plaintiffs.  I am an attorney admitted to practice law in the State of Texas and am a member of the Bar of the United States District Court for the Northern District of Texas.  I submit this declaration in support of the Asbury Plaintiff's Opposed Expedited Motion for Preliminary Injunction Staying FTC Proceeding Pending Adjudication of the Asbury Plaintiffs' Constitutional Claims.

2.    Leading up to the FTC Proceeding, the Commission's staff conducted a roughly two-year investigation beginning with the issuance of a civil investigative demand ("CID") on August 1, 2022 and during which Plaintiff Asbury Automotive Group, Inc. ("Asbury") produced nearly 10,000 documents in fifteen document productions during the period from August 31, 2022 through June 5, 2023.

3.    After completing its document productions, Asbury heard nothing from the FTC for more than eight months.  On February 8, 2024, the FTC sent a draft complaint, which the FTC threatened to file unless Asbury agreed to entry of its proposed "Agreement Containing Consent

Order" and a "Decision and Order" —the terms of which included payment in an amount Asbury considered to be exorbitant and unjustified—whereby Asbury could avoid the adverse publicity, expense, and diversion of management time defending a claim for alleged violations of Section 5 of the FTC Act and the Equal Credit Opportunity Act ("ECOA").  The FTC wrote:

> If you would like to request changes to the enclosed order, we will need a redline of the order showing all requested changes by February 15, 2024. If any such changes include changes to the monetary amount, we will need your clients' proposed framework for calculating harm, for us to consider reducing our demand, along with the redline by February 15, 2024. If there is a lack of meaningful progress in negotiations any time between now and the consent deadline (March 8, 2024), we will recommend that the Commission commence an enforcement action.

4.     Like the FTC's Complaint in the FTC Proceeding, its proposed consent order would have, among other things, prohibited the Asbury Plaintiffs from charging consumers for "ResistAll, any exterior or interior surface protective coating product, or any Add-on Product or Service" that the FTC believes "does not provide a benefit to consumers".[1]  It would have also required the Asbury Plaintiffs to "establish and implement, and thereafter maintain, a fair lending program" consisting of specific items required by the FTC.

5.     The proposed Decision and Order, despite *AMG Capital Management, LLC v. Federal Trade Commission*, 593 U.S. 67, 70 (2021), would have awarded significant "monetary relief"  to be used by the Commission "for relief, including consumer redress and any attendant expenses for the administration of any redress fund" or "[i]f a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed…for such other relief (including consumer information remedies) as it

---

[1] Notably, the potential injunctive relief in the FTC Proceeding would subject the Asbury Plaintiffs to contempt sanctions for selling "any Add-on Product or Service" that supposedly "does not provide a benefit to consumers."

App.2

determines to be reasonably related to Respondents' [the Asbury Plaintiffs'] practices alleged in the Complaint."[2]

6.      The proposed Decision and Order would also have required the Asbury Plaintiffs to "neither admit nor deny any of the allegations in the Complaint, except as specifically stated in the Decision and Order" but then later would have required the Asbury Plaintiffs to agree that "[t]he facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission to enforce its rights to any payment pursuant to this Order … ."

7.      The FTC's February 8, 2024 demand gave Asbury only a month to engage in "consent negotiations," imposing a deadline of March 8, 2024 to reach agreement on both injunctive and monetary remedies.  The FTC also gave Asbury only a week to make a counteroffer and the "framework for calculating harm."

8.      On March 7, 2024, Asbury made a counteroffer while also providing a red line with comments to the FTC's proposed Consent Order.  The next day, the FTC responded with a new proposed consent order rejecting virtually all the proposed edits and requiring a payment that—while slightly reduced—was in an amount that Asbury still considered to be exorbitant and unsupported.  Simultaneously, the FTC staff recommended commencing the FTC Proceeding.

9.       Importantly, for the months before the FTC filed the Complaint in the FTC Proceeding, the Asbury Plaintiffs sought in vain to learn the underpinning of the FTC's charges, including who was supposedly injured by alleged practices that are contrary to safeguards that Asbury and its affiliated dealerships have long had in place.  The FTC nevertheless claimed to

---

[2] Now that the FTC Proceeding is underway, the FTC's FILED Complaint similarly seeks "[a]ny other relief appropriate to correct or remedy the effects of Respondents' deceptive, unfair, or discriminatory practices or of any or all of the conduct alleged in the complaint."

App.3

have a "survey" of consumers reflecting that consumers from those dealerships were charged for "Add On" products without their consent, even though the consumers had repeatedly confirmed such purchases in writing.  It also claimed to have an "analysis" evidencing "disparate impact" discriminatory charges to "Blacks" and "Latinos."  The FTC refused, however, to provide its "survey," "analysis," or any details.

10.     In this regard, in individual virtual meetings held beginning April 17, 2024 and continuing through May 2, 2024, each individual Commissioner, including  Commission Chair Khan,  confirmed that the FTC has a unwritten "policy" to not share pre-suit the information supporting their proposed claims including, but not limited to, the identities of the allegedly injured consumers, the FTC's alleged "survey" or Asbury audits evidencing allegedly harmed McDavid Dealership consumers and/or the FTC's  alleged "disparate impact analysis" of discriminatory charges to "Blacks" and "Latinos."

11.     On April 29, 2024, Asbury submitted a white paper explaining the basis for its belief that it had not committed the violations alleged by FTC staff, asking for information that would support these allegations and allow Asbury to correct any actual violations, and urging the Commissioners to vote against filing a complaint. On May 7, 2024, Asbury also submitted a letter responding to questions raised during the meetings and against requested that "if the Staff will provide specific instances about which it is concerned we could have an informed dialogue that would result in a reasonable resolution, expedited relief to any actually injured consumers, and avoid unnecessary litigation." [3]

12.     On March 11, 2024, the FTC's Acting Assistant General Counsel responded to a FOIA request  confirming that the FTC had received no complaints from consumers about the

---

[3] Also on May 7, 2024, Asbury sent a detailed email declining a May 2, 2024 email request of Chair Khan's Attorney Advisor which demanded "correction" of alleged "distortions" of the Chair's comments referenced in the white paper.

4

dealerships in question in the FTC Proceeding during the preceding five years and only two complaints nationwide—both in Georgia—about Asbury Automotive Group, Inc.

13.    On August 15, 2024, the Commissioners voted to initiate the FTC Proceeding.  The FTC Complaint, issued the very next day, alleges that the Asbury Plaintiffs violated the Federal Trade Commission Act (the "FTC Act") and Equal Credit Opportunity Act ("ECOA") by (1) making false or misleading misrepresentations that consumers authorized charges for "add-ons" to sales contracts when in fact they did not do so, and that consumers were required to buy one or more add-ons that they were not required to buy; (2) charging consumers for add-ons without obtaining their express, informed consent; and (3) charging Black and Latino consumers more for add-ons than non-Latino White customers.  The Asbury Plaintiffs denied these allegations in their September 3, 2024 Answer and Affirmative Defenses.

14.    The FTC's Mandatory Initial Disclosures in the FTC Proceeding did not provide the identities of the allegedly injured consumers, the FTC's alleged "survey" or Asbury audits evidencing allegedly harmed McDavid Dealership consumers and/or the FTC's alleged "disparate impact analysis" of discriminatory charges to "Blacks" and "Latinos."  The Asbury Plaintiffs raised the deficiency at the September 12, 2024 scheduling conference.  However, even today, the FTC has yet to provide the Asbury Plaintiffs with basic information necessary to evaluate the merits of the complaint in the FTC Proceeding.  In its Responses and Objections to Asbury's First Set of Requests for Production regarding the FTC's alleged "survey", "analysis" (including but not limited to its data, modeling, computer code used to estimate race and/ ethnicity of the allegedly injured consumers, and how other factors could affect the cost of added-ons), it makes clear that it "will not produce documents responsive to [these] Request[s] citing to the FTC Commission  Rules

5

of Adjudicatory Practice ("FTCR"[4]).  See Responses at Requests 6,8-11.  Further, on October 11, 2024 the FTC served its "Preliminary Proposed Fact Witness List" which, rather than identifying the allegedly injured consumers, lists "Consumers who purchased vehicles at" the Respondent McDavid Dealerships as potential witnesses at trial.  Thus effectively listing thousands, if not hundreds of thousands, of potential witnesses.  Under the Scheduling Order the FTC does not have to provide its final proposed witness list until March 5, 2024 which is more than two weeks after the February 24, 2025 close of fact discovery.

15.    On September 13, 2024  the FTC ALJ issued a Scheduling Order that favored the FTC on issues ranging from expert witness disclosures to the trial date itself.  For example:

- FTCR 3.31A(a) and the Scheduling Order gives the Asbury Plaintiffs merely *fourteen days* (March 10, 2025) to receive, review, and provide expert reports responsive to the FTC's expert reports.  In contrast, the FTC's deadline for providing expert reports is February 24, 2025 (more than *six months* after the FTC Proceeding commenced and more than *two and a half years* after the FTC began its investigation).  The Asbury Plaintiffs' request for at least one more week was denied by the ALJ, citing FTCR 3.31A(a) and indicating a need to have all expert reports *a month* before the hearing (i.e. a non-jury trial).

- The Scheduling Order sets the hearing to begin April 16, 2025, a date on which counsel for the Asbury Plaintiffs already has a two-day trial scheduled to begin.  The ALJ denied an unopposed one week or any other extension citing FTCR 3.11(b)(4) granting the Commission sole authority to set the hearing.

- The ALJ denied the Asbury Plaintiffs' opposed request to obtain a deposition of the FTC's organizational representative citing FTCR 3.33(c)(1) expressly prohibiting organizational (or other) deposition(s) of the party making the claims—the FTC--while allowing similar deposition(s) of Respondents.

- The ALJ's Protective Order (at Attachment "A" para. 7) purports to prevent the attorneys defending the Asbury Plaintiffs from sharing information designated as "confidential material" with their own clients (including in-house counsel) but imposes no such restrictions on FTC Complaint Counsel. The ALJ's Protective Order makes clear it is a FTC form Protective Order which is part of FTCR 3.31(d). ("…the protective order set forth in the appendix to that section is attached verbatim as Attachment A and is hereby issued.").

---

[4] FTCR stands for Federal Trade Commission Rules of Practice for Adjudicative Proceedings, which may be found at: https://www.govinfo.gov/content/pkg/CFR-2024-title16-vol1/pdf/CFR-2024-title16-vol1-part3.pdf

App.6

16.    The Appendix to the Asbury Plaintiffs Brief in Support of Motion for Preliminary Injunction Staying FTC Proceeding Pending Adjudication of the Asbury Plaintiffs' Constitutional Claims contains true and correct copies of the following documents:

- The Commission's Complaint in the FTC Proceeding

- ALJ's September 13, 2024 Scheduling Order in the FTC Proceeding;

- Excerpt from Asbury's Form 10-K filed with the Securities and Exchange Commission on February 29, 2024;

- FTC's Civil Investigative Demand;

- Excerpt from Asbury's Form 10-Q filed with the Securities and Exchange Commission on August 9, 2024;

- March 11, 2024 Response to FOIA Request from the FTC's Acting Assistant General Counsel;

- Asbury Plaintiffs' September 3, 2024 Answer and Affirmative Defenses to FTC Complaint;

- FTC ALJ's August 21, 2024 Protective Order;

- Excerpts from the FTC's Objections to Respondents' Requests for Production; and

- Complaint Counsel's Preliminary Proposed Fact Witness List.


I declare under penalty of perjury that the foregoing Declaration is true and correct.


DATED:    October 14, 2024

By: /s/ Edward D. ("Ed") Burbach

PUBLIC

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:        Lina M. Khan, Chair
                            Rebecca Kelly Slaughter
                            Alvaro M. Bedoya
                            Melissa Holyoak
                            Andrew Ferguson

| | |
|---|---|
| In the Matter of<br><br>**ASBURY AUTOMOTIVE GROUP, INC.,**<br>a corporation,<br><br>**ASBURY FT. WORTH FORD, LLC,** a limited liability company, also d/b/a **DAVID MCDAVID FORD FT. WORTH,**<br><br>**MCDAVID FRISCO – HON, LLC,** a limited liability company, also d/b/a **DAVID MCDAVID HONDA OF FRISCO,**<br><br>**MCDAVID IRVING – HON, LLC,** a limited liability company, also d/b/a as **DAVID MCDAVID HONDA OF IRVING,** and<br><br>**ALI BENLI, individually and as an officer of ASBURY FT. WORTH FORD, LLC, MCDAVID FRISCO – HON, LLC,** and **MCDAVID IRVING – HON, LLC.** | **DOCKET NO. D-9436** |

## COMPLAINT

The Federal Trade Commission, having reason to believe that Asbury Automotive Group, Inc., Asbury Ft. Worth Ford, LLC, also d/b/a David McDavid Ford Ft. Worth, McDavid Frisco – Hon, LLC, also d/b/a David McDavid Honda of Frisco, McDavid Irving – Hon, LLC, also d/b/a David McDavid Honda of Irving, and Ali Benli, individually and as an officer of David McDavid Ford Ft. Worth, David McDavid Honda of Frisco, and David McDavid Honda of Irving (collectively, "Respondents") have violated the provisions of the Federal Trade Commission Act and the Equal Credit Opportunity Act and its implementing Regulation B, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1

PUBLIC

## Summary of Case

1.     Respondents sell cars and trucks at multiple dealerships in and around Dallas, Texas. In selling these vehicles, Respondents often charge consumers for additional items ("add-ons"), such as service contracts, maintenance contracts, or chemical coatings, on top of the price of the vehicle. But in many instances, Respondents add these charges without consumers' consent or misrepresent that the charges are required. And Respondents charge Black and Latino consumers more than non-Latino White consumers for add-ons, discriminatorily imposing higher costs on Black and Latino consumers. These add-on charges can amount to several thousand dollars, substantially increasing the cost of a vehicle—and Respondents' profits.

## Respondents

2.     Respondent Asbury Automotive Group, Inc. ("Asbury"), is a Delaware corporation with its principal place of business at 2905 Premiere Parkway, Suite 300, Duluth, GA 30097.  The individuals working at Asbury's dealership locations are all Asbury employees, paid through a separately created wholly owned subsidiary.

3.     Respondent Asbury Ft. Worth Ford, LLC, also d/b/a David McDavid Ford Ft. Worth ("McDavid Ford Ft. Worth"), is a Delaware limited liability company with its principal place of business at 300 West Loop 820 South, Ft. Worth, Texas 76108. McDavid Ford Ft. Worth is a wholly owned subsidiary of Asbury, and the individuals working at McDavid Ford Ft. Worth are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of McDavid Ford Ft. Worth, or has overseen such business functions, including human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Ford Ft. Worth, employed the personnel who worked at McDavid Ford Ft. Worth, and had control over the acts and practices of McDavid Ford Ft. Worth that are at issue in this Complaint.

4.     Respondent McDavid Frisco – Hon, LLC, also d/b/a David McDavid Honda of Frisco ("McDavid Honda Frisco"), is a Delaware limited liability company with its principal place of business at 1601 North Dallas Parkway (7200 State Highway 121), Frisco, Texas 75034. McDavid Honda Frisco is a wholly owned subsidiary of Asbury, and the individuals working at McDavid Honda Frisco are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of McDavid Honda Frisco, or has overseen such business functions, including human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Honda Frisco, employed the personnel who worked at McDavid Honda Frisco, and controlled the acts and practices of McDavid Honda Frisco that are at issue in this Complaint.

5.     Respondent McDavid Irving – Hon, LLC, also d/b/a David McDavid Honda of Irving ("McDavid Honda Irving"), is a Delaware limited liability company with its principal place of business at 3700 West Airport Freeway, Irving, Texas 75062. McDavid Honda Irving is a wholly owned subsidiary of Asbury, and individuals working at McDavid Honda Irving are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of

PUBLIC

McDavid Honda Irving, or has overseen such business functions, including payroll, human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Honda Irving, employed the personnel who worked at McDavid Honda Irving, and controlled the acts and practices of McDavid Honda Irving that are at issue in this Complaint.

6.     Respondent Ali Benli ("Benli") is the General Manager of McDavid Ford Ft. Worth and an employee of Asbury, and was the General Manager of McDavid Honda Irving and the General Manager of McDavid Honda Frisco. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving, including the acts and practices set forth in this Complaint. As general manager, Respondent Benli has had control and responsibility over day-to-day operations of McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving, including the implementation of financing and sales policies and the sale of add-on products and services. Respondent Benli has had knowledge of Respondents' unlawful practices, including

████████████████████████████████████████████████████

7.     Respondents Asbury, McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving (collectively, "Corporate Respondents") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Corporate Respondents have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, directors, business functions, employees, advertising, policies, and practices. Because Corporate Respondents have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

8.     At all times relevant to this Complaint, acting alone or in concert with others, Respondents have advertised, marketed, distributed, or offered vehicles to consumers for sale, and have regularly arranged for the extension of credit.

9.     The acts and practices of Respondents alleged in this Complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

### Respondents' Business Activities

10.     Asbury owns and operates a network of motor vehicle dealerships. It is the parent company and owner of the three dealership respondents—McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving—and it employs the individuals who work at these dealerships. In many instances, Respondents have charged consumers for add-ons they did not agree to, misled consumers into believing add-ons were required, and charged Black and Latino

PUBLIC

consumers more than non-Latino White consumers for the same products, including add-ons.

### Respondents' Unauthorized and Deceptive Add-On Charges

11.    Respondents charge consumers for an array of add-ons that are tacked on to the purchase of a vehicle, such as extended warranties, maintenance plans, chemical coatings, and dent protection. Under the policies set by Asbury, employees receive additional compensation for add-on charges, including bonuses that managers earn when a certain percentage of the dealer's sales include an add-on. Add-ons commonly cost consumers hundreds or thousands of dollars per transaction.

*Unauthorized Charges*

12.    In numerous instances, Respondents have added unwanted charges to vehicle sales contracts. One tactic Respondents use is getting a consumer to agree to a monthly payment that exceeds what they need to pay under the contract to purchase a vehicle, and then "packing" the sales contract with add-on charges to make up the difference. For example, a salesperson might represent that a consumer qualifies for financing with a monthly payment of $400, when the monthly payment for the vehicle under the contract is actually $350. The salesperson then includes, or "packs," the contract with add-ons to make up some or all of the difference between the two monthly payments, so that it appears the consumer is receiving a similar or smaller monthly payment.

13.    Many consumers have reported that Respondents, using this type of payment packing or other methods, charged them for add-ons the consumers never agreed to buy. For example, one consumer reported that McDavid Ford Ft. Worth charged him over $2,800 for products he never agreed to, including $1,200 for guaranteed asset protection ("GAP") agreement; $1,024 for ResistAll, a supposed microscopic chemical coating that claims to prevent damage to the vehicle's interior and exterior; and $584 for a key replacement service. Likewise, a David McDavid Honda Frisco consumer discovered that Respondents had charged her on multiple occasions for add-ons that she did not know about and never would have agreed to purchase, including $3,000 for a service contract and over $4,700 for a life insurance policy, a disability insurance policy, a maintenance plan, and a service contract.

14.    Consumers have reported that Respondents sometimes did not mention the add-on items at all. For instance,



4

PUBLIC

15.    Other consumers reported that they specifically declined add-on items only to discover that Respondents charged them anyway. For example,



16.    Consumers have reported that Respondents made it difficult for them to understand the terms of the transaction. One consumer described how a financing representative had the paperwork for the sale on his computer, but the screen was pointed in the direction of the representative so the consumer could not see it. She reported that the representative briefly described the document, and then asked her to sign on an electronic signature pad without viewing the document itself. And, not knowing that she had been charged for both a maintenance plan and service contract, she and her daughter paid for maintenance and repairs out of pocket. Similarly, a McDavid Honda Irving consumer signed his sales contract on a portable electronic device and was only shown the spots where he needed to sign and not the entire contract. Three weeks later, he discovered that the finance manager had added a $1,750 maintenance package and $609 key replacement package without permission.

17.    Many consumers may not discover that Respondents have charged them without consent until after the vehicle transaction is complete, if ever. For example, after buying a car, a McDavid Ford Ft. Worth consumer discovered that the dealer had extended what he thought was a 72-month financing agreement to 84 months without his consent so that the lower monthly payment under the longer term masked the increase from the hidden charges for unwanted add-ons. Another consumer likewise discovered that his loan had been changed from a 72-month to an 84-month term without his consent, masking not only hidden charges for unwanted add-ons, but also a vehicle price increase of more than a thousand dollars.

18.    Asbury has received directly many complaints from consumers reporting that they were charged for add-on products without consent. For example,
                                                                                                Other complaints Asbury has received include:

- 

- 

- 

5

PUBLIC



19. Mr. Benli has received direct notice of consumer complaints. In particular, he tracked public complaints and pressured consumers to take down negative reviews. ████████████████████████████████████ mong the complaints Mr. Benli received, in addition to those noted above:

- Consumer complaining he ████████████████████████████ ████



*Charges Misrepresented as Required*

6

PUBLIC

20.     In numerous other instances, Respondents falsely represent that consumers are required to purchase an optional add-on. These representations are false. Neither the finance companies nor the vehicle manufacturers require that the add-ons be sold.

21.     Many consumers have been charged thousands of dollars for add-ons that Respondents falsely claimed were required. For example, a David McDavid Ford Ft. Worth representative told one consumer that to finance the purchase of a truck, he had to purchase a bundle of add-ons—including a maintenance plan, chemical protection and warranty, windshield, extended vehicle warranty, and key replacement service—that ended up being more than $9,500. Asbury has received many complaints from consumers that they were falsely told that add-ons were required.  For example:



22.     Many consumers do not catch the dealers' misrepresentations before the paperwork is signed and the transaction is finalized. But even if consumers were to discover false representations or unauthorized charges mid-transaction, it is often unrealistic for consumers to walk away at that point. Buying a vehicle is a lengthy process involving complex, dense paperwork; it can take several hours or days to finalize, on top of the hours it can take to drive to and from a dealership. Consumers may need to take time off work or arrange childcare, and the immediate need for the vehicle for work, school, or other vital household reasons makes it infeasible to start the process anew at a different dealership.

7

PUBLIC

*Respondents' Add-on Misconduct Is Widespread*

23.    Respondents have added unwanted add-ons to vehicle sales without consumers' knowledge or consent, or misrepresented that an add-on was required, in numerous instances. According to a survey of consumers who Respondents charged for at least one add-on:

    a)    At least 58% of consumers who purchased a vehicle at McDavid Ford Ft. Worth were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.

    b)    At least 75% of consumers who purchased a vehicle at McDavid Honda Frisco were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.

    c)    At least 73% of consumers who purchased a vehicle at McDavid Honda Irving were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.

24.    Asbury periodically audits its dealerships for misconduct. Asbury's audit process relies on what the dealerships document in writing; Asbury does not contact consumers during the audit process to ask what employees at the dealership told them or what consumers understood about add-ons.

25.    Despite their limited nature, audits at each Respondent dealership have uncovered substantial evidence that consumers are charged for add-ons without consent: the dealerships have each failed multiple audits due to payment packing and other



26.

27.    As a rule, Asbury does not contact consumers after the audits, even if they determine that consumers have been the victim of "Deceptive Practice[s]."

28.    Additional Asbury internal documents confirm the widespread problems identified in the audits. For example,

8

PUBLIC



29.    Similarly,

30.    Also

31.

**Respondents' Discriminatory Add-on Financing Practices**

32.    Respondents arrange financing through third-party financing entities for consumers to purchase motor vehicles and pay for these add-ons. In these credit transactions, Respondents mark up the price on add-ons for Black and Latino consumers and extract more in profit from them than from others, even though the cost to Respondents is the same. As detailed above, many consumers do not know that Respondents are charging them for add-ons, let alone that they are being charged more than consumers of a different race, color, or national origin.

33.    Respondents routinely charge different consumers for the same add-ons at prices that are hundreds of dollars apart. In particular, McDavid Fort Worth charges Latino consumers, on average, approximately $███ more for the same add-ons than non-Latino White consumers. McDavid Honda Frisco charges Black consumers, on average, $███ more for the same add-ons, and charges Latino consumers, on average, $███ more for the same add-ons, than non-Latino White consumers. And McDavid Honda Irving charges Black consumers, on average, $███ more for the same add-ons, and charges Latino consumers, on average, $███ more for the same add-ons, than non-Latino White consumers. These disparities are statistically significant even when accounting for other factors that could affect the cost of add-ons.

34.    Respondents treat Black and Latino consumers differently from non-Latino White consumers. Respondents target Black and Latino consumers with packed add-ons and higher-priced add-ons. For example, Respondents encourage employees to pack add-ons more often in contracts with Latino consumers and consumers who are non-native English speakers. No legitimate, nondiscriminatory reasons exist for the Respondents charging higher prices for the same or similar add-ons to Black and Latino consumers than to similarly situated non-Latino White consumers.

9

35.    Moreover, Respondents' policy and practice is to give their employees free rein to charge different prices for the same or similar add-ons, leading to statistically significant disparities. This practice is not justified by a business necessity that could not be met by a less discriminatory alternative.

## <u>VIOLATIONS OF THE FTC ACT</u>

36.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

37.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

38.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I
### Misrepresentations Regarding Charges

39.    In numerous instances, in connection with the offering for sale or financing, or sale and financing of vehicles, Respondents represent, directly or indirectly, expressly or by implication, that charges appearing on consumers' sales contracts are authorized by consumers.

40.    In fact, in numerous instances in which Respondents make the representations set forth in Paragraph 39, the charges appearing on consumers' sales contracts include charges not authorized by consumers.

41.    Therefore, Respondents' representations as set forth in Paragraph 39 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II
### Misrepresentations Regarding Add-On Charges

42.    In numerous instances, in connection with the offering for sale or financing, or sale and financing of vehicles, Respondents represent, directly or indirectly, expressly or by implication, that consumers are required to buy one or more add-ons.

43.    In fact, in numerous instances in which Respondents make the representations set forth in Paragraph 42, consumers are not required to buy the add-ons.

44.    Therefore, Respondents' representations as set forth in Paragraph 42 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III
## Unfair Practices Relating to Unauthorized Charges

45.     In numerous instances, Respondents charge consumers without obtaining their express, informed consent.

46.     Respondents' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

47.     Therefore, Respondents' acts or practices as set forth in Paragraph 45 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## <u>VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT AND REGULATION B</u>

48.     Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a), prohibit a creditor from discriminating against an applicant with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act, 15 U.S.C. Ch. 41.

49.     Corporate Respondents are creditors as defined in Section 702(e) of the ECOA, 15 U.S.C. § 1691a(e), and Section 202.2(l) of Regulation B, 12 C.F.R. § 202.2(l).

50.     Section 704(c) of the ECOA, 15 U.S.C. § 1691c(c), specifically empowers the Commission to enforce the ECOA. Respondents' violations of the ECOA are deemed to be violations of the FTC Act and are enforceable as such by the Commission under that Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the ECOA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act. This includes the power to enforce a Consumer Financial Protection Bureau regulation promulgated under the ECOA, such as Regulation B, in the same manner as if a violation of that regulation had been a violation of an FTC trade regulation rule.

## Count IV
## Discriminatory Financing Practices

51.     In connection with motor vehicle credit transactions, on the basis of race, color, or national origin, Respondents impose higher costs on Black and Latino applicants on average than on similarly situated non-Latino White applicants.

11

**PUBLIC**

52.    Respondents' acts, policies, and practices as set forth in Paragraph 51 constitute discrimination against applicants with respect to any aspect of a credit transaction on the basis of race, color, or national origin in violation of Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a).

PUBLIC

## NOTICE

You are notified that on the sixteenth day of April, 2025, at 10:00 a.m., at the Federal Trade Commission offices, 600 Pennsylvania Avenue, NW, Room 532-H, Washington, DC 20580, an Administrative Law Judge of the Federal Trade Commission, will hold a hearing on the charges set forth in this Complaint. At that time and place, you will have the right under the Federal Trade Commission Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in this Complaint.

You are notified that you are afforded the opportunity to file with the Federal Trade Commission ("Commission") an answer to this Complaint on or before the 14th day after service of the Complaint upon you. An answer in which the allegations of the Complaint are contested must contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the Complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the Complaint not thus answered will be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the Complaint, the answer should consist of a statement that you admit all of the material facts to be true. Such an answer will constitute a waiver of hearings as to the facts alleged in the Complaint and, together with the Complaint, will provide a record basis on which the Commission may issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings of fact and conclusions of law under FTC Rule § 3.46.

Failure to answer timely will be deemed to constitute a waiver of your right to appear and contest the allegations of the Complaint.  It will also authorize the Commission, without further notice to you, to find the facts to be as alleged in the Complaint and to enter a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding.

The Administrative Law Judge will hold an initial prehearing scheduling conference to be held not later than 10 days after the answer is filed by the last answering Respondent. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, NW, Room 532-H, Washington, DC 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the prehearing scheduling conference, but in any event no later than 5 days after the answer is filed by the last answering Respondent. Rule 3.31(b) obligates counsel for each party, within 5 days of receiving a Respondent's answer, to make certain initial disclosures without awaiting a formal discovery request.

Moreover, the Commission has reason to believe that, if the facts are found as alleged in the Complaint, it may be necessary and appropriate for the Commission to seek relief to redress injury to consumers. Such relief could be in the form of restitution for past, present, and future consumers and such other types of relief as are set forth in Section 19(b) of the Federal Trade

PUBLIC

Commission Act. The Commission will determine whether to apply to a court for such relief on the basis of the adjudicative proceedings in this matter and such other factors as are relevant to consider the necessity and appropriateness of such action.

### NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that Respondents have violated or are violating Section 5 of the FTC Act, 15 U.S.C. § 45, or the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691-1691f, and its implementing Regulation B, 12 C.F.R. § 202, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including but not limited to:

a. Prohibiting misrepresentations in connection with motor vehicles.
b. Requiring obtaining express, informed consent for all charges in connection with motor vehicles.
c. Prohibiting charges for any add-on that does not provide a benefit to consumers.
d. Prohibiting unlawful credit discrimination.
e. Requiring a fair lending program that safeguards against discrimination against credit applicants.
f. Requiring Respondents to obtain acknowledgments of the order.
g. Requiring Respondents to file periodic compliance reports with the Commission.
h. Requiring that Respondents create and retain certain records.
i. Requiring that Respondents' compliance with the order may be monitored for a term to be determined by the Commission.
j. Any other relief appropriate to correct or remedy the effects of Respondents' deceptive, unfair, or discriminatory practices or of any or all of the conduct alleged in the complaint.

**THEREFORE**, the Federal Trade Commission, this sixteenth day of August, 2024, has issued this Complaint against Respondents.

By the Commission.

SEAL:

April J. Tabor
Secretary

14

App.21

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

_____

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Asbury Automotive Group, Inc., | ) | |
| a corporation, | ) | |
| | ) | |
| Asbury Ft. Worth Ford, LLC, a limited liability | ) | |
| company, also d/b/a David McDavid Ford | ) | |
| Ft. Worth, | ) | |
| | ) | |
| McDavid Frisco – Hon, LLC, a limited liability | ) | DOCKET NO. 9436 |
| company, also d/b/a David McDavid Honda of | ) | |
| Frisco, | ) | |
| | ) | |
| McDavid Irving – Hon, LLC, a limited liability | ) | |
| company, also d/b/a David McDavid Honda of | ) | |
| Irving, and | ) | |
| | ) | |
| Ali Benli, individually and as an officer of | ) | |
| Asbury Ft. Worth Ford, LLC, | ) | |
| McDavid Frisco – Hon, LLC, and | ) | |
| McDavid Irving – Hon, LLC, | ) | |
| | ) | |
| Respondents. | ) | |

_____

## SCHEDULING ORDER

| October 11, 2024 | - | Complaint Counsel serves preliminary proposed fact witness list with a brief summary of the proposed testimony. |
|---|---|---|
| October 25, 2024 | - | Respondents serve preliminary proposed fact witness list with a brief summary of the proposed testimony. |
| December 13, 2024 | - | Parties file Joint Status Report #1. |
| December 30, 2024 | - | Complaint Counsel serves proposed expert witness list. |
| | | Complaint Counsel serves supplemental proposed fact witness list with a brief summary of the proposed testimony. |

| January 6, 2025 | - | Respondents serve proposed expert witness list. |
| | | Respondents serve supplemental proposed fact witness list with a brief summary of the proposed testimony. |
| January 17, 2025 | - | Deadline for parties to serve document requests, interrogatories, and subpoenas, except for discovery for purposes of authenticity and admissibility of exhibits. |
| February 11, 2025 | - | Deadline for parties to serve requests for admissions, except for requests for admissions for purposes of authenticity and admissibility of documents. |
| February 18, 2025 | - | Close of fact discovery, except for discovery permitted under Rule 3.24(a)(4), depositions of experts, and discovery for purposes of authenticity and admissibility of exhibits. |
| February 24, 2025 | - | Complaint Counsel serves expert witness reports. |
| March 5, 2025 | - | Complaint Counsel serves final proposed witness and exhibit lists, including depositions, copies of all proposed exhibits (except for demonstrative, illustrative, or summary exhibits and expert-related exhibits), the basis of admissibility for each proposed exhibit, and a brief summary of the testimony of each witness. Complaint Counsel's final proposed witness list shall include no more than twenty-five fact witnesses testifying live at the hearing. *See* Additional Provision 17. |
| | | Complaint Counsel provides the Administrative Law Judge (ALJ) with courtesy copies of final proposed witness and exhibit lists, the basis of admissibility for each proposed exhibit, and a brief summary of the testimony of each witness, including expert witnesses. |
| March 10, 2025 | - | Respondents serve expert witness reports. Respondents' expert reports shall include (without limitation) rebuttal, if any, to Complaint Counsel's expert witness report(s). |
| March 11, 2025 | - | Parties file Joint Status Report #2. |
| March 12, 2025 | - | Respondents serve final proposed witness and exhibit lists, including depositions, copies of all proposed exhibits (except for demonstrative, illustrative, or summary exhibits and expert-related exhibits), the basis of admissibility for each proposed exhibit, and a brief summary of the testimony of each witness. |

App.23

Respondents' final proposed witness list shall include no more than twenty-five fact witnesses testifying live at the hearing. *See* Additional Provision 17.

Respondents provide the ALJ with courtesy copies of final proposed witness and exhibit lists, the basis of admissibility for each proposed exhibit, and a brief summary of the testimony of each witness, including expert witnesses.

March 13, 2025    -    Parties intending to offer confidential materials of an opposing party or non-party as evidence at the hearing must provide notice to the opposing party or non-party, pursuant to 16 C.F.R. § 3.45(b).[1]

March 20, 2025    -    Complaint Counsel to identify rebuttal expert witness(es) and serve rebuttal expert witness report(s). Any such reports are to be limited to rebuttal of matters set forth in Respondents' expert witness reports. If material outside the scope of fair rebuttal is presented, Respondents will have the right to seek appropriate relief (such as striking Complaint Counsel's rebuttal expert witness report(s) or seeking leave to submit surrebuttal expert witness report(s)).

March 25, 2025    -    Deadline for parties to depose expert witnesses (including rebuttal expert witnesses) and exchange expert-related proposed exhibits.

March 25, 2025    -    Deadline to file motions for in camera treatment of proposed trial exhibits. *See* Additional Provision 15.

March 27, 2025    -    Deadline for parties to file motions in limine to preclude admission of evidence. *See* Additional Provision 16.

March 28, 2025    -    Parties exchange objections to final proposed witness lists and exhibit lists, serving courtesy copies on the ALJ. Parties are to review the Commission's Rules on the admissibility of evidence before filing objections to exhibits and only raise objections that are necessary and valid.

---

[1] The Standard Protective Order states that if a party or third party wishes in camera treatment for a document or transcript that a party intends to introduce into evidence, that party or third party shall file an appropriate motion with the ALJ within five days after it receives notice of a party's intent to introduce such material. Appendix A to Commission Rule 3.31. Commission Rule 3.45(b) states that parties who seek to use material obtained from a third party subject to confidentiality restrictions must demonstrate that the third party has been given at least ten days' notice of the proposed use of such material. To resolve this apparent conflict, this Scheduling Order requires that the parties provide at least ten days' notice to the opposing party or third parties to allow for the filing of motions for in camera treatment.

App.24

March 28, 2025      -      Complaint Counsel files pretrial brief supported by legal authority.

April 1, 2025      -      Deadline for parties to file responses to motions for in camera treatment of proposed exhibits.

April 3, 2025      -      Deadline for parties to file responses to motions in limine to preclude admission of evidence.

April 9, 2025      -      Parties exchange proposed stipulations as to law, facts, the admissibility of proposed exhibits, and the expertise of any expert witnesses.

April 11, 2025     -      Respondents file pretrial brief supported by legal authority.

April 15, 2025     -      Final prehearing conference begins at 10:00 a.m. Eastern Time.

The parties shall meet and confer prior to the final prehearing conference regarding trial logistics and proposed stipulations as to law, facts, admissibility of exhibits, and expertise of any expert witnesses. To the extent the parties have agreed to stipulate to any issues of law, facts, admissibility of exhibits, and/or expertise of any expert witnesses, the parties shall prepare a list of such stipulations and submit a copy of the stipulations to the ALJ one business day prior to the final prehearing conference. At the final prehearing conference, the parties' list of stipulations shall be marked as "JX1" and signed by each party, and the list shall be offered into evidence as a joint exhibit. No signature by the ALJ is required. Any subsequent stipulations may be offered as agreed to by the parties.

Also at the final prehearing conference, the parties may present any objections to the final proposed witness lists and proposed exhibits. All proposed exhibits will be admitted or excluded to the extent practicable. To the extent the parties agree to the admissibility of proposed exhibits, the parties shall prepare a list identifying each proposed exhibit to which admissibility is stipulated, which shall be offered into evidence as a joint exhibit marked as "JX2" and signed by each party. No signature by the ALJ is required.

April 16, 2025     -      Evidentiary Hearing begins at 10:00 a.m. Eastern Time.

## ADDITIONAL PROVISIONS

**Filings**

1.   For all papers that are required to be filed with the Office of the Secretary, the parties shall serve a courtesy copy on the Office of the Administrative Law Judges (OALJ) by email to: oalj@ftc.gov. The courtesy copy should be transmitted at or shortly after the time of any electronic filing with the Office of the Secretary. Courtesy copies must be transmitted to the OALJ by email directly; the FTC E-filing system shall not be used for this purpose. Certificates of service for any pleading shall not include the OALJ email address, or the email address of any OALJ personnel, but rather shall designate only 600 Pennsylvania Ave., NW, Rm. H-110, Washington, DC, 20580 as the place of service. **The subject line of all submissions to oalj@ftc.gov shall set forth the docket number, case name, and title of the submission**. The parties are not required to serve a courtesy copy on the OALJ in hard copy, except upon request. Discovery requests and discovery responses are to be exchanged between the parties and shall not be submitted to the OALJ.

2.   The parties shall serve each other by email and shall include "Docket 9436" in the subject line. All attached documents shall be in .pdf format, or as otherwise agreed by the parties. In the event that service by email is not possible, the parties may serve each other through any method authorized under the Commission's Rules of Practice. 16 C.F.R. § 4.4.

3.   Each pleading that cites to an unpublished opinion(s) or opinion(s) not available on LEXIS or WESTLAW shall include a copy of such opinion(s) as an exhibit.

4.   Each motion (other than a motion to dismiss, motion for summary decision, or a motion for in camera treatment) shall be accompanied by a separate signed statement representing that counsel for the moving party has conferred in good faith with opposing counsel in an effort to resolve the issues raised by the motion, describing those efforts. In addition, pursuant to Rule 3.22(g), for each motion to quash filed pursuant to Rule 3.34(c), each motion to compel or determine sufficiency pursuant to Rule 3.38(a), or each motion for sanctions pursuant to Rule 3.38(b), the required signed statement must also recite the date, time, and place of each conference between counsel and the names of all parties participating in each such conference. Motions that fail to include such separate statement may be denied on that ground.

5.   By signing and presenting a pleading, written motion, or other filing, an attorney or pro se litigant certifies that either: (1) no portion of the filing was drafted by generative artificial intelligence ("AI") (such as ChatGPT, Microsoft Copilot, Harvey.AI, or Google Gemini), or (2) any language in the filing that was drafted by generative AI was checked for accuracy by human attorneys or paralegals using printed legal reporters and/or online legal databases. Any filing that fails to comply with these mandatory certification requirements may be stricken on that ground.

App.26

6.   In relevant part, Rule 3.22(c) states:

> All written motions shall state the particular order, ruling, or action
> desired and the grounds therefor. Memoranda in support of, or in
> opposition to, any dispositive motion shall not exceed 10,000 words.
> Memoranda in support of, or in opposition to, any other motion shall not
> exceed 2,500 words. Any reply in support of a dispositive motion shall
> not exceed 5,000 words and any reply in support of any other motion
> authorized by the Administrative Law Judge or the Commission shall not
> exceed 1,250 words.

If a party chooses to submit a motion without a separate memorandum, the word count
limits of Rule 3.22(c) apply to the motion. If a party chooses to submit a motion with a separate
memorandum, absent prior approval of the ALJ, the motion shall be limited to 750 words and
the word count limits of Rule 3.22(c) apply to the memorandum in support of the motion. This
provision applies to all motions filed with the ALJ, including those filed under Rule 3.38.

7.   If papers filed with the Office of the Secretary contain in camera or confidential
material, the filing party shall mark any such material in the complete version of their
submission with **{bold font and braces}**. 16 C.F.R. § 3.45(e). Parties shall be aware of the
rules for filings containing such information, including Rule 4.2.

## **Discovery**

8.   Each party is limited to serving on each opposing party: fifty requests for
production of documents, including all discrete subparts; twenty-five interrogatories, including
all discrete subparts; and twenty requests for admissions, including all discrete subparts, except
that there shall be no limit on the number of requests for admission for authentication and
admissibility of exhibits. There is no limit to the number of sets of discovery requests the
parties may issue, so long as the total number of each type of discovery request, including all
subparts, does not exceed these limits.

9.   The parties will serve any objection to a document request within ten business
days of service of the request. The parties will meet and confer to attempt to resolve any
disputes and to discuss timing of production within three business days of the objection being
served. The party responding to a document request will make a good-faith effort to produce
responsive documents as expeditiously as possible, including by making productions on a
rolling basis.

10. Compliance with the scheduled close of discovery requires that the parties serve
subpoenas and discovery requests sufficiently in advance of the discovery cut-off date and that
all responses and objections will be due on or before that date, unless otherwise noted. Any
motion to compel a response to a discovery request or to seek certification of a request for court
enforcement of a non-party subpoena shall be filed within thirty days of service of the response
and/or objection to the discovery request or within twenty days after the close of discovery,
whichever first occurs; except that, where the parties have been engaged in negotiations over a

discovery dispute, including negotiations with any non-party with regard to a subpoena, the deadline for the motion to compel shall be within five business days of reaching an impasse.

11. One Rule 3.33(c) deposition notice of each Respondent shall be permitted. Depositions of all individuals designated as representatives for purposes of a 3.33(c) deposition notice shall count as one deposition for purposes of this paragraph, even if the noticed entity designates multiple individuals to provide testimony. The parties shall consult and coordinate the time and place of the deposition prior to confirming any deposition. The parties shall use reasonable efforts to reduce the burden on witnesses noticed for depositions and to accommodate witness schedules. The deposition of any person may be recorded by video, provided that the deposing party notifies the deponent and all parties of its intention to record the deposition by video at least five days in advance of the deposition. Except as otherwise provided in this paragraph, no deposition, whether recorded by video or otherwise, may exceed a single day, with a seven-hour limit on the deposition testimony record time, unless otherwise agreed to by the parties or ordered by the ALJ. The parties will agree upon and submit to the ALJ a remote deposition protocol.

12. The parties shall serve upon one another, at the time of issuance, copies of all subpoenas for documents and subpoenas for testimony. For subpoenas for testimony, the party seeking the deposition shall consult with the other parties before the time and place of the deposition is scheduled. Cross-notices must be served at least twenty-four hours before the deposition. Unless the parties otherwise agree, at the request of any party, the time and allocation for a non-party deposition that has been cross-noticed shall be divided evenly between each side. If both Complaint Counsel and Respondents notice any non-party fact deposition (including any Rule 3.33(c) deposition), the seven hours of record time will be divided equally between the sides with each side having three and a half hours of record time. Unused time in any side's allocation of deposition time of a non-party shall not transfer to the other side. To the extent a deposition involves a non-party fact witness and is not cross-noticed, the party who did not notice the deposition will have thirty minutes available to them and the party seeking the deposition will have six hours and thirty minutes.

13. Every documentary subpoena to a non-party shall include a cover letter requesting that: (1) the non-party Bates-stamp each document with a production number and any applicable confidentiality designation prior to producing it, and (2) the non-party provide to the other parties copies of all productions at the same time as they are produced to the requesting party. If a non-party fails to provide copies of productions to both sides, within three business days of receiving the documents, the requesting party shall produce all materials received pursuant to the non-party subpoena, as well as all materials received voluntarily in lieu of a subpoena, including, but not limited to, declarations or affidavits obtained from a non-party. If a party serves a non-party subpoena for the production of documents or electronically stored information and a subpoena commanding attendance at a deposition, the deposition date must be at least seven calendar days after the original return date for the document subpoena, unless a shorter time is required by unforeseen logistical issues in scheduling the deposition, or a non-party produces those documents at the time of the deposition, as agreed to by all parties involved.

14. A party that obtains a declaration, note of support, or affidavit from a party or non-party witness will promptly produce it to the other party(ies), and in any event not later than (1) three business days before the party or non-party is scheduled to be deposed and (2) seven calendar days before the end of fact discovery. Declarations, notes of support, or affidavits produced after this date shall not be admitted into evidence or used in the administrative proceeding except upon a showing of good cause. The parties reserve all rights and objections with respect to the use and/or admissibility of any declaration, note of support, or affidavit. No declaration, note of support, or affidavit will be admitted unless a fair opportunity was available to depose the declarant.

**Motions**

15. If a party intends to offer confidential materials of an opposing party or non-party into evidence at the hearing, in providing notice to such non-party, the party is required to inform each non-party of the strict standards for motions for in camera treatment for evidence to be introduced at trial. 16 C.F.R. § 3.45; *In re Otto Bock Healthcare North American*, 2018 WL 3491602, at *1 (July 2, 2018); *In re 1-800 Contacts, Inc.*, 2017 FTC LEXIS 55 (Apr. 4, 2017). Motions for in camera treatment must be supported by a declaration or affidavit by a person qualified to explain the confidential nature of the documents. *In re 1-800 Contacts, Inc.*, 2017 FTC LEXIS 55 (Apr.4, 2017); *In re North Texas Specialty Physicians*, 2004 FTC LEXIS 66 (Apr. 23, 2004). Each party or non-party that files a motion for in camera treatment shall provide one copy of the documents for which in camera treatment is sought to the ALJ.

16. Motions in limine are strongly discouraged. Motion in limine refers "to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *In re Daniel Chapter One*, 2009 FTC LEXIS 85, *18-20 (Apr. 20, 2009) (citing *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). Evidence should be excluded in advance of trial on a motion in limine only when the evidence is clearly inadmissible on all potential grounds. *Id*. (citing *Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993); *SEC v. U.S. Environmental, Inc.*, 2002 U.S. Dist. LEXIS 19701, at *5-6 (S.D.N.Y. Oct. 16, 2002)). Moreover, the risk of prejudice from giving undue weight to marginally relevant evidence is minimal in a bench trial such as this where the ALJ is capable of assigning appropriate weight to evidence.

**Witnesses**

17. The final proposed witness lists shall represent counsel's good faith designation of all potential witnesses whom the parties reasonably expect may be called upon in their case-in-chief. A general designation that a party reserves the right to call anyone on the opposing party's witness list is insufficient. A party shall promptly notify the opposing party of changes to witness lists to facilitate completion of discovery within the dates of this Scheduling Order. The final proposed witness lists may not include additional witnesses not listed in the preliminary or supplemental proposed witness lists, who have not been deposed, or for whom affidavits/declarations have not been submitted, unless by consent of all parties, or, if the parties do not consent, by an order of the ALJ upon a showing of good cause.

18. If any party wishes to offer a rebuttal witness other than a rebuttal expert witness, the party shall file a request in writing in the form of a motion to request a rebuttal witness. That motion shall be filed as soon as possible after the testimony sought to be rebutted is known and shall include: (a) the name of any witness being proposed (b) a detailed description of the rebuttal evidence being offered; (c) citations to the record, by page and line number, to the evidence that the party intends to rebut; and (d) shall demonstrate that the witness the party seeks to call has previously been designated on its witness list or adequately explain why the requested witness was not designated on its witness list.

19. Witnesses shall not testify to a matter unless sufficient evidence is introduced to support a finding that the witness has personal knowledge of the matter. F.R.E. 602.

20. Witnesses not properly designated as expert witnesses shall not provide opinions beyond what is allowed in F.R.E. 701.

21. The parties are required to comply with Rule 3.31A and with the following:

(a)  At the time an expert is first listed as a witness by a party, that party shall provide to the other parties:

(i) Materials fully describing or identifying the background and qualifications of the expert, all publications authored by the expert within the preceding ten years, and all prior cases in which the expert has testified or has been deposed within the preceding four years; and
(ii) Transcripts of such testimony in the possession, custody, or control of the producing party or the expert, except that transcript sections that are under seal in a separate proceeding need not be produced.

(b)  At the time an expert witness report is produced, the producing party shall provide to the other parties all documents and other written materials relied upon by the expert in formulating an opinion in this case, subject to the provisions of paragraph (g) below, except that documents and materials already produced in the case need only be listed by Bates number.

(c)  It shall be the responsibility of a party designating an expert witness to ensure that the expert witness is reasonably available for deposition in keeping with this Scheduling Order. Unless otherwise agreed to by the parties or ordered by the ALJ, expert witnesses shall be deposed only once and each expert deposition shall be limited to one day for seven hours of record deposition time.

(d)  Each expert witness report shall include a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the expert witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the expert; and the compensation to be paid for the study and testimony.

(e)  A party may not discover facts known or opinions held by an expert witness who has been retained or specially employed by another party in anticipation of this litigation or

9

preparation for hearing and who does not provide an expert report or will not act as a testifying expert.

(f)  At the time of service of the expert witness reports, a party shall provide opposing counsel:

(i) A list of all commercially-available computer programs used by the expert witness in the preparation of the report;
(ii) A copy of all data sets used by the expert witness, in native file format and processed data file format; and
(iii) All customized computer programs used by the expert witness in the preparation of the report or necessary to replicate the findings on which the expert witness's report is based.

(g)  Expert witnesses' disclosures and reports shall comply in all respects with Rule 3.31A, except that neither side must preserve or disclose:

(i) Any form of communication or work product shared between any of the parties' counsel and their expert witness(es), or between any of the expert witnesses themselves;
(ii) Any form of communication or work product shared between an expert witness and persons assisting the expert witness;
(iii) An expert witness's notes, unless they constitute the only record of a fact or an assumption relied upon by the expert witness in formulating an opinion in this case;
(iv) Drafts of expert witness reports, analyses, or other work product; or
(v) Data formulations, data runs, data analyses, or any database-related operations not relied upon by the expert witness in the opinions contained in the expert witness's report.

22. If the expert witness reports prepared for either party contain confidential information that has been granted in camera treatment, the party shall prepare two versions of its expert witness report(s) in accordance with Additional Provision 7 of this Scheduling Order and Rule 3.45(e).

23. An expert witness's testimony is limited to opinions contained in that expert witness's report provided to the opposing party. No opinion will be considered, even if included in an expert report, if the underlying and supporting documents and information have not been properly provided to the opposing party. Unless an expert witness is qualified as a fact witness, an expert witness shall provide opinion testimony; expert testimony is not considered for the purpose of establishing the underlying facts of the case.

**<u>Proceedings</u>**

24. In the event that the evidentiary hearing in this matter is conducted remotely by video conference, in advance of the hearing, the parties may take expert depositions for the purpose of perpetuating trial testimony (i.e., a trial deposition) and submit such trial testimony as an exhibit in lieu of presenting the expert's live testimony at the hearing. This trial deposition may be conducted in addition to any deposition of an expert witness for purposes of

discovery (discovery deposition). Although a party may submit trial depositions in lieu of live video testimony at trial for all expert witnesses in the case, a party may elect to conduct trial depositions for all or fewer than all experts.

25. The final exhibit lists shall represent counsel's good faith designation of all trial exhibits other than demonstrative, illustrative, or summary exhibits. Additional exhibits may be added after the submission of the final exhibit lists only by consent of all parties, or, if the parties do not consent, by an order of the ALJ upon a showing of good cause.

26. Properly admitted deposition testimony and properly admitted investigational hearing transcripts are part of the record and need not be read in open court. Videotape deposition excerpts that have been admitted in evidence may be presented in open court only upon prior approval by the ALJ.

27. The parties shall provide to one another, the ALJ, and the court reporter at least forty-eight hours in advance, not including weekends and holidays, a list of all witnesses to be called on each day of the hearing, subject to possible delays or unforeseen circumstances.

**Exhibits**

28. The parties shall provide one another with copies of any demonstrative, illustrative, or summary exhibits (other than those prepared for cross-examination) twenty-four hours before they are used with a witness.

29. Complaint Counsel's exhibits shall bear the designation "PX," Respondents' exhibits shall bear the designation "RX," and joint exhibits shall bear the designation "JX," or some other appropriate designation. Complaint Counsel's demonstrative exhibits shall bear the designation "PXD" and Respondents' demonstrative exhibits shall bear the designation "RXD," or some other appropriate designation. If demonstrative exhibits are used with a witness, the exhibit will be marked and referred to for identification only. Any demonstrative exhibits referred to by any witness may be included in the trial record, but they are not part of the evidentiary record and may not be cited to support any disputed fact. Both sides shall number the first page of each exhibit with a single series of consecutive numbers. When an exhibit consists of more than one page, each page of the exhibit must bear a consecutive control number or some other consecutive page number.

30. At the final prehearing conference, counsel will be required to introduce all exhibits they intend to introduce at trial. The parties shall confer and eliminate duplicative exhibits in advance of the final prehearing conference and, if necessary, during trial. To that end, the parties shall agree in advance of the final prehearing conference to the identification of joint exhibits. Counsel shall contact the court reporter regarding submission of exhibits.

**Page Limitations**

31. Pretrial briefs shall not exceed fifty pages per side, post-trial initial briefs shall not exceed seventy-five pages per side, post-trial reply briefs shall not exceed fifty pages per side,

and post-trial initial findings of fact and conclusions of law shall not exceed one hundred pages per side, unless otherwise agreed to by the parties or ordered by the ALJ.

ORDERED:                         *Dania L. Ayoubi*

Dania L. Ayoubi
Administrative Law Judge

Date: September 13, 2024

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission file number: 001-31262**

# ASBURY AUTOMOTIVE GROUP, INC.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **01-0609375** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **2905 Premiere Parkway, NW, Suite 300** | |
| **Duluth, Georgia** | **30097** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(770) 418-8200**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value per share | ABG | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Except as the context otherwise requires, "we," "our," "us," "Asbury," and "the Company" refer to Asbury Automotive Group, Inc. and its subsidiaries.

**Item 1. BUSINESS**

Asbury Automotive Group, Inc., a Delaware corporation organized in 2002, is a Fortune 500 company and one of the largest franchised automotive retailers in the United States. Our mission and vision is to put the guest experience first and follow our "North Star" to be the most guest-centric automotive retailer in the industry. We follow three key principles to guide us: (1) have a fun, supportive and inclusive culture where team members thrive personally while building meaningful bonds with one another; (2) be great brand ambassadors and exceptional stewards of capital for our partners who fuel our mission; and (3) be caring professionals who strive to delight our guests and foster love for the brand. Our strong organizational culture and purposeful mission allow us to continuously deliver best-in-class experiences to our guests. As of December 31, 2023, we owned and operated 208 new vehicle franchises, representing 31 brands of automobiles at 158 dealership locations, 37 collision centers, and Total Care Auto, Powered by Landcar ("TCA" or "TCA Business"), our finance and insurance ("F&I") product provider, within 16 states. Our store operations are conducted by our subsidiaries.

We offer an extensive range of automotive products and services fulfilling the entire vehicle ownership lifecycle including new and used vehicles, parts and service, which includes vehicle repair and maintenance services, replacement parts and collision repair services (collectively referred to as "parts and services" or "P&S"), and F&I products, including arranging vehicle financing through third parties and aftermarket products, such as extended service contracts, guaranteed asset protection ("GAP") debt cancellation and prepaid maintenance. We strive for a diversified mix of products, services, brands and geographic locations which allows us to reduce our reliance on any one manufacturer, minimize the impact from changes in customer preference and maintain profitability across fluctuations in new vehicle sales. Our diverse revenue base, along with our commitment to operational excellence across our dealership portfolio, provides a resilient business model and strong profit margins.

Our omni-channel platform is designed to engage with customers where and when they want to interact and to increase our market share through digital innovation. We are focused on providing a high level of customer service and have designed our dealerships' services to meet the increasingly sophisticated needs of customers throughout the vehicle ownership lifecycle. Our digital capabilities further enhance our physical dealership network and drive additional revenue. Our ability to provide a low friction experience across our omni-channel platform drives customer satisfaction and repeat business across our dealership portfolio.

**Acquisitions**

On December 11, 2023, the Company completed the acquisition of the business of the Jim Koons ("Koons") Automotive Companies, (collectively, the "Koons acquisition"), thereby acquiring 20 new vehicle dealerships, six collision centers and the real property related thereto for an aggregate purchase price of approximately $1.50 billion, which includes $256.1 million of new vehicle floor plan financing and $103.8 million of assets held for sale related to Koons Lexus of Wilmington. The acquisition was funded with borrowings under Asbury's existing credit facility and cash on hand. The Koons acquisition diversifies Asbury's geographic mix, with expansion in the greater Washington-Baltimore region of the United States.

There were no acquisitions during the year ended December 31, 2022.

On December 17, 2021, the Company completed the acquisition of the businesses of the Larry H. Miller ("LHM") Dealerships and TCA (collectively, the "LHM acquisition"), thereby acquiring 54 new vehicle dealerships, seven used cars stores, 11 collision centers, a used vehicle wholesale business, the real property related thereto, and the entities comprising the TCA business for a total purchase price of $3.48 billion. The purchase price was financed through a combination of cash, debt, including senior notes, real estate facilities, new and used vehicle floor plan facilities and the proceeds from the issuance of common stock. As a result of the transaction, the Company operates in two reportable segments, the Dealerships and TCA segments.

In addition to the LHM acquisition, during the year ended December 31, 2021, we acquired the assets of 11 franchises (10 dealership locations) in the Denver, Colorado market and three franchises (one dealership location) in the Indianapolis, Indiana market for a combined purchase price of $485.7 million. We funded these acquisitions with an aggregate of $455.1 million of cash and $9.6 million of floor plan borrowings for the purchase of the related new vehicle inventory. In the aggregate, these acquisitions included purchase price holdbacks of $21.0 million for potential indemnity claims made by us with respect to the acquired franchises.

**Divestitures**

During the year ended December 31, 2023, we sold one franchise (one dealership location) in Austin, Texas. The Company recorded a pre-tax gain totaling $13.5 million.

6

App.35

Table of Contents



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Office of the Secretary

August 1, 2022

Via FedEx
Asbury Automotive Group, Inc.
2905 Premier Parkway, Suite 300
Duluth, Georgia 30097

FTC Matter No. 2223135

Dear Sir or Madam:

The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of a non-public investigation. Our purpose is to determine whether Asbury Automotive Group has engaged in deceptive or unfair practices in connection with auto sales and leases, in violation of the FTC Act, 15 U.S.C. § 45, or has discriminated on a prohibited bases in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, resulting in higher vehicle sales prices, period payments, or add-on charges, and whether Commission action to obtain monetary relief would be in the public interest. Please read the attached documents carefully. Here are a few important points we would like to highlight:

1. **Contact FTC counsel, Colin Hector, <u>chector@ftc.gov</u> and 202 876 5657, as soon as possible to schedule a telephone call to be held within 14 days.** During that telephone call, FTC counsel can address any questions or concerns you have regarding this CID, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs. Please read the attached documents for more information about that meeting.

2. **You must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

3. **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.** We will not

App.37

disclose the information under the Freedom of Information Act, 5 U.S.C. § 552. We may disclose the information in response to a valid request from Congress, or to other civil or criminal law enforcement agencies for their official law enforcement purposes. The FTC or other agencies may use and disclose your response in any civil or criminal proceeding, or if required to do so by law. However, we will not publicly disclose your information without giving you prior notice.

4. **Please read the attached documents closely.** They contain important information about how you should provide your response.

Please contact FTC counsel as soon as possible to set up an initial meeting. We appreciate your cooperation.

Very truly yours,

April J. Tabor
Secretary



United States of America
Federal Trade Commission

## CIVIL INVESTIGATIVE DEMAND

| 1. TO | 1a. MATTER NUMBER |
|---|---|
| Asbury Automotive Group, Inc.<br>2905 Premiere Parkway, Suite 300<br>Duluth, GA 30097 | 2223135 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |
| | |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

August 31, 2022 by 5 pm ET

3. SUBJECT OF INVESTIGATION

See attached Schedule and attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Joseph Michael Kerrane<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W.<br>Mail Stop CC-10232<br>Washington DC, 20580<br>(202) 326-2162 | Colin Hector<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W.<br>Mail Stop CC-10232<br>Washington DC, 20580<br>(202) 876-5657 |

| DATE ISSUED 8/1/2022 | COMMISSIONER'S SIGNATURE |
|---|---|

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 11/17)

---

# Form of Certificate of Compliance*

---

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____    _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible. In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

**FEDERAL TRADE COMMISSION ("FTC")**
**CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE**
**FTC File No. 2223135**

**Meet and Confer:** You must contact **FTC counsel, Colin Hector (202-876-5657; chector@ftc.gov)**, as soon as possible to schedule a telephonic meeting to be held within fourteen (14) days after You receive this CID. At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of electronically stored information. You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all documentary materials used in preparing responses to this CID. The FTC may require the submission of additional Documents later during this investigation. **Accordingly, You must suspend any routine procedures for Document destruction and take other measures to prevent the destruction of Documents in Your possession, custody, or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third-party or You believe those Documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:** The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production**: Contact **J. Michael Kerrane (202-326-2162; jkerrane@ftc.gov)** by email or telephone at least five days before the return date for instructions on how to produce information responsive to this CID.

**Certification of Compliance**: You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by signing the "Certification of Compliance" attached to this CID.

**Certification of Records of Regularly Conducted Activity**: Attached is a Certification of Records of Regularly Conducted Activity. Please execute and return this Certification with Your response. Completing this certification may reduce the need to subpoena You to testify at future proceedings to establish the admissibility of Documents produced in response to this CID.

-1-

**Definitions and Instructions**:  Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## I.    SUBJECT OF INVESTIGATION

Whether the "Company" as defined herein has engaged in deceptive or unfair practices in connection with auto sales and leases, in violation of the FTC Act, 15 USC §45, or has discriminated on a prohibited basis in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, resulting in higher vehicle sales prices, periodic payments, or add-on charges, and whether Commission action to obtain monetary relief would be in the public interest.  See also attached resolution(s).

## II.    SPECIFICATIONS

**Applicable Time Period:**  Unless otherwise directed, the applicable time period for the requests set forth below is from **August 1, 2019 until the date of full and complete compliance with this CID**.

### A. INTERROGATORY RESPONSES

1.  State the following information for the **Company**:

    a.  Its full legal name and all other names under which it has done business;
    b.  The mailing address, street address, and telephone number of its headquarters;
    c.  The date and state(s) in which it is incorporated or formed;
    d.  The names and titles of all its officers, directors, principal stockholders, and owners;
    e.  The names and percentages of ownership of all persons holding five percent or more ownership in it;
    f.  The names, addresses, officers, directors, owners, and states of incorporation of any parent, subsidiary, affiliate company, or division and the relationship of each to the **Company**; and
    g.  The names (including legal names and any business names) and addresses of all dealerships operated by the **Company** in the United States.

2.  For each **McDavid Group** dealership, state:

    a.  Its full legal name and all other names under which it has done business;
    b.  The mailing address, street address, and telephone number;
    c.  The date(s) and state(s) in which it is incorporated or formed;
    d.  The names and titles of all its officers, directors, principal stockholders, and owners; and
    e.  The names and percentages of ownership of all persons holding five percent or more ownership in it.

-2-

App.42

3. For each **McDavid Group** dealership, **identify** each manager, supervisor, or other employee who worked at the dealership at any time during the relevant time period with any responsibility relating to the sale of motor vehicles, **Add-ons**, financing, customer service, complaint handling or resolution, or compliance, stating for each such individual:

      i. Date hired;
      ii. Date employment ended, if any;
      iii. Which dealership(s) the person was employed by;
      iv. Contact information; and
      v. Title(s) and description of position(s) held.

4. **Identify** the **Company's** fair lending officer at all times during the applicable time period.

5. Detail the compensation structure for sales personnel at each **McDavid Group** dealership, including:

    a. Salary;
    b. Commissions, direct compensation or indirect compensation from any source, earned for sale of vehicles, **Add-ons** or related goods and services. Broken out by:
      i. Amount earned for individual car sale;
      ii. Amount earned for loans applied for, approved, or negotiated;
      iii. Amount earned related to interest rate;
      iv. Amount earned for sale of add-ons and extras; and
      v. Amount earned for consumer reviews or ratings.
    c. Bonuses.

6. Describe the nature of the relationship between the **Company** and each **McDavid Group** dealership, including:

    a. The existence and nature of a regional or corporate management that has oversight or control over compensation, sales, financing, or **Add-Ons** at any **McDavid Group** dealership;
    b. The names and titles of all individuals that are part of the regional or corporate management, and their role with respect to the **McDavid Group** dealerships;
    c. The name and nature of any policies, procedures, audits, monitoring programs, or training programs that apply to the **McDavid Group** dealerships and concern sales, financing, or **Add-Ons**.

7. **Identify** payment processors used for each **McDavid Group** dealership's payroll.

-3-

App.43

8. For each **McDavid Group** dealership, state the following on an aggregate, annual basis and by new and used motor vehicles sold or leased:

    a. Number of vehicles sold;
    b. Total cost of vehicles sold;
    c. Gross revenue from vehicle sales;
    d. Number of vehicles for which the dealership offered to provide or arrange financing;
    e. Total cost of vehicles for which the dealership offered to provide or arrange financing;
    f. Revenue from vehicles for which the dealership offered to provide or arrange financing;
    g. Number of vehicle leases;
    h. Total cost of vehicles leased;
    i. Revenue from vehicle leases.

9. For each **McDavid Group** dealership, **identify** each financial institution used to obtain financing for consumers to purchase vehicles from the dealership. For each financial institution, state, on an annual basis, the number and percentage of the dealership's vehicle sales for which such financial institution provided financing.

10. State whether, and to what extent, the **Company** bears any risk in any vehicle sale financed by a third-party financial institution after the consumer takes possession.

11. State whether the **Company** offers vehicle financing to consumers, including on an initial basis, regardless of whether the loans are later sold.

12. Describe any compliance program or policy related to fair lending used by the **Company**.

13. Describe any policies or procedures related to the presentation of financing offers to consumers, including whether the **Company** presents multiple financing offers.

14. Describe any monitoring program used by the **Company** relating to financing markups.

15. Describe any onboarding or ongoing fair lending training provided to employees.

16. For each **McDavid Group** dealership, list all types of **Add-ons** sold, or offered for sale, and state for each **Add-on**:

    a. The **Add-on** name;
    b. The **Add-on** provider
    c. Its function, purpose, or coverage;
    d. Its duration of coverage in months, if applicable;
    e. Its cost per unit, or if the cost varies, range of costs per unit, to the **Company**;
    f. If the cost per unit to the **Company** varies, an explanation, schedule, or table describing the factors determining the exact cost per unit.

g. Its price per unit, or if the price varies, range of prices per unit to the consumer;

h. If the price per unit to the consumer varies, an explanation, schedule, or table describing the factors determining the exact price per unit.

i. Any additional costs or expenses to the consumer to utilize the **Add-on**;

j. Whether it is mandatory;

k. Whether it is mandatory to obtain financing;

l. Whether it may be purchased individually or must be purchased in a bundle with other **Add-ons**;

m. Whether it is cancellable with a full or partial refund within a set period of time; and

n. Whether it is cancellable with a full or partial refund at any time before it is fully paid.

17. For each **Add-on** listed in Interrogatory 16, state for each **McDavid Group** dealership:

a. The number of **Add-ons** sold, on a monthly basis;

b. The compensation (or range of compensation) offered to **You** or **Your** employees for each type of **Add-on** sold by the provider;

c. The aggregate amount paid by the dealership' customers for **Add-ons** from the provider, on an annual basis; and

d. The compensation **Your** employees received in connection with the sale of **Add-ons** from the provider, on an annual basis;

e. The compensation the **Company** received in connection with the sale of **Add-ons** from the provider, on an annual basis.

18. For each **Add-on** listed in Interrogatory 16, for the past three years, state:

a. The overall penetration rate of the **Add-On** and the **Add-On** category (e.g. GAP, extended warranty) for the **Company**'s sale of new vehicles;

b. The overall penetration rate of the **Add-On** and the **Add-On** category for the **Company**'s sale of used vehicles;

c. The penetration rate of the **Add-On** and the **Add-On** category for each **McDavid Group** dealership's sale of new vehicles;

d. The penetration rate of the **Add-On** and the **Add-On** category for each **McDavid Group** dealership's sale of used vehicles;

19. For **McDavid Group** dealership transactions from May 2021 to May 2022, state for each vehicle sale or lease in which an **Add-on** was sold, the following:

a. The customer's name and contact information;

b. The vehicle VIN;

c. Whether the transaction was a sale or lease;

d. For sales, whether there was dealer-arranged financing;

e. Which **Add-on(s)** were sold;

f. The amount charged to the consumer for each **Add-on** sold;

-5-

App.45

g.  For sales of GAP, the loan-to-value ratio of the sale, the amount financed, the interest rate, the sales price, and the year, make, and model of the vehicle;

h.  Whether there was a request for a full or partial refund, cancellation, or chargeback of **Add-ons**, and if so, date of each dull or partial refund request, and whether the request came within one month of the purchase or lease; and

i.  Whether the **Company** provided a refund or submitted paperwork or otherwise facilitated the provision of a refund.

This information may be provided as part of the response to the Data Request (Specification C), in lieu of a response to this Interrogatory.

20.  For each **McDavid Group** dealership, list and describe the **Company's** databases and systems, both internal and external, that contain contact and transaction information regarding current and former customers.

21.  List by date each instance in which **You** charged a consumer for **Add-ons**, but did not obtain such **Add-ons** for the consumer, and **identify** each such consumer.

22.  List any federal, state or local law enforcement, or governmental actions, citations, demands, inquires, investigations, proceedings, or subpoenas, and any arbitrations mediations, or lawsuits, or private lawsuits, relating to the sale of a motor vehicle, **Add-on**, or financing, including (a) the law enforcement or governmental entity, if applicable; (b) the nature of the action; (c) the name, number, jurisdiction, and any other identifying information about the action, if applicable; (d) the parties involved; and (e) the status of the action, including the date and resolution of the action, if applicable.

23.  **Identify** all officers, agents, or representatives of the **Company** who have prepared, participated in, or supervised the preparation of its response to this CID.

## B.  DOCUMENTARY MATERIALS

Please provide the following **Documents**:

1.  **Documents** sufficient to show the **Company's** organizational structure, including the relationship between and among the **Company** and each **McDavid Group** dealership.

2.  **Documents** sufficient to show the compensation structure for the **Company's** employees, agents or other persons working for or on behalf of a **McDavid Group** dealership relating to the sale of a motor vehicle, **Add-on**, or financing, including bonuses, incentives, or raises.

3.  Copies of advertising materials used by or on behalf of the **McDavid Group** dealerships relating to **Add-ons,** including placards, table tents, and pamphlets.

-6-

App.46

4. All policies, procedures, employee manuals or training material referring or relating to **Add-ons,** advertising, marketing, sales, financing (including fair lending), rate sheets, leasing, repossession, consumer inquiries or complaints, and compliance.

5. For each **McDavid Group** dealership, all deal jackets, retail installment sale contracts, financing applications, and **Documents** relating to **Add-ons** for vehicle sales or leases with **Add-on** sales from July 1, 2019 to July 1, 2022.

Please confer with the FTC counsel before responding if the number of responsive transactions would exceed 500.

6. All **Documents** referring or relating to any request to obtain a refund, cancellation, payment reversal, or chargeback of any **Add-on**, with respect to a **McDavid Group** dealership**.**

7. All communications and agreements with **Add-on** providers that relate to the **McDavid Group**, including materials that refer to company-wide or regional matters that would include any **McDavid Group** dealership.

8. All communications with financing companies that relate to the **McDavid Group**, including materials that refer to company-wide or regional matters that would include any **McDavid Group** dealership.

9. All **Documents** relating to consumer inquiries regarding any **McDavid Group** dealership, including:

   a. All consumer complaints, including any written, oral, or electronic complaint, accusation, allegation, challenge, charge, claim, criticism, demand, dispute, grievance, lawsuit, or objection by any person relating to the sale of any motor vehicle, **Add-on,** or financing;
   b. The **Company's** policy for tracking consumer inquiries;
   c. Any responses to consumer complaints and any **Documents** relating to the settlement or resolution of complaints;
   d. All internal and external communications referring or relating to any complaint, including any telephone call recordings, voicemails, e-mails, instant messages, or notes, records, or transcriptions memorializing or reflecting any such communication;
   e. All **Documents** referring or relating to any consumer identified in any complaint relating to **Add-ons** or financing, including deal jackets; retail installment sale contracts, financing applications; and
   f. All **Documents** related to any action taken by or on behalf of the **Company** in response to any complaint, including decisions, determinations, findings, recommendations, reports, responses, or policy changes.

-7-

App.47

10. All **Documents** relating to any disciplinary actions related to financing or sales practices of a **McDavid Group** dealership. The term "disciplinary actions" includes formal or informal discipline, counseling, warnings, demotions, suspensions, or terminations.

11. All communications, including emails, text messages, instant messages, call recordings, notes of phone calls, and meeting minutes, regarding the sale of vehicles for more than the advertised price, the sale of **Add-ons**, or compliance with the FTC Act, 15 U.S.C. § 45, or the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. 1691 *et seq.* and Regulation B, 12 C.F.R. pt. 202, and which relate to the **McDavid Group**, including materials that refer to company-wide or regional matters that would include any **McDavid Group** dealership..

12. All **Documents** relating or referring to any audits, inquiries, investigations, or reviews (including those conducted by or on behalf of the **Company**) that relate to the **McDavid Group**'s sales or financing practices, including any findings, recommendations, reports, and communications.

13. **Documents** sufficient to show the **Company's** document retention or destruction policies during the relevant time period.

### C. DATA REQUEST

1. For each consumer's auto financing transaction at a **McDavid Group** dealership, please produce in a machine-readable format (e.g. CSV, TXT, XLS, XLSX, XML, SAS, DTA, MDB, ACCDB) the following data:

    a.    Dealer name
    b.    Dealer address, including separately providing street address, city, state, and zip code
    c.    Cash Y/N
    d.    Lender
    e.    Subvented loan Y/N
    f.    Deal number
    g.    Deal date
    h.    Stock number
    i.    Lease Y/N
    j.    Funded loan Y/N
    k.    Borrower's last name
    l.    Borrower's first name
    m.    Borrower's street address
    n.    Borrower's city
    o.    Borrower's state
    p.    Borrower's zip code
    q.    Borrower's date of birth
    r.    Borrower's home phone number, including area code
    s.    Borrower's mobile phone number, including area code
    t.    Borrower's email address

u.    New or used or certified vehicle
v.    Vehicle identification number (VIN)
w.    Make of vehicle
x.    Model of vehicle
y.    Model year
z.    Trim of vehicle
aa.    Odometer reading at time of sale
bb.    Initial price; advertised price; and quoted or penciled price of vehicle
cc.    Cost to dealer of vehicle
dd.    Vehicle book value
ee.    Additional compensation paid by lender to dealer
ff.    Reconditioning fees
gg.    Dealer prep fees
hh.    Certification fees
ii.    Pre-delivery inspection fees
jj.    Shop fees
kk.    Origination fees
ll.    Sale price of vehicle
mm.    Term in months
nn.    Contract interest rate
oo.    Annual percentage rate
pp.    Lowest interest rate consumer was approved for
qq.    Buy rate
rr.    Dealer reserve or Dealer Participation
ss.    Dealer flat fee
tt.    Net trade-in allowance credited or negative equity added to amount
       financed
uu.    Cash down amount
vv.    Rebate amount
ww.    Total down amount
xx.    Document fees
yy.    Title fees
zz.    Lien fees
aaa.    Registration fees
bbb.    State inspection fees
ccc.    Any other fees
ddd.    Taxes
eee.    The price to the consumer, add-on product name, add-on tier level, and
        coverage duration in months of each of the following add-ons (if
        purchased), each in separate fields for each **Add-on**:
        i.    Credit life
        ii.    GAP
        iii.    Disability insurance
        iv.    Maintenance contract
        v.    Vehicle service contract
        vi.    Extended warranty

-9-

App.49

   vii. Tire and wheel protection
   viii. Any other add-ons purchased
  fff. The revenue, cost to the Company, and each full or partial refund request, date of each full and partial refund request, and refund, each in separate fields for each **Add-on**:
   i. Credit life
   ii. GAP
   iii. Disability insurance
   iv. Maintenance contract
   v. Vehicle service contract
   vi. Extended warranty
   vii. Tire and wheel protection
   viii. Any other add-ons purchased
 ggg. MSRP
 hhh. Amount and timing of any balloon payments
 iii. Amount financed
 jjj. Monthly payment amount
 kkk. Borrower's credit score
 lll. Borrower's booked credit tier
 mmm. Borrower's monthly income
 nnn. Borrower's job title or position
 ooo. Coborrower's last name
 ppp. Coborrower's first name
 qqq. Coborrower's address
 rrr. Coborrower's city
 sss. Coborrower's state
 ttt. Coborrower's zip code
 uuu. Coborrower's date of birth
 vvv. Coborrower's credit score
 www. Coborrower's monthly income
 xxx. Coborrower's job title or position
 yyy. Coborrower's home phone number, including area code
 zzz. Coborrower's mobile phone number, including area code
 aaaa. Coborrower's email address
 bbbb. Loan to value ratio
 cccc. Debt to income ratio
 dddd. Payment to income ratio
 eeee. Any additional data used to determine a consumer's monthly payment

Please confer with the FTC counsel before responding to Data Request 1, to determine a secure method for transfer consistent with Instruction I-II.

**RFPA AND SARS NOTICE: This CID does not seek any financial records for which prior customer notice is required under the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401 *et seq.* If the Company believes it is a financial institution or an agent of a financial institution under RFPA, 12 U.S.C. §§ 3401(1) & 3403(a), You should not produce any information contained in the financial records of any individual or partnership of five or**

-10-

**fewer individuals, and You should contact FTC counsel prior to responding to this CID to discuss what information contained in financial records is subject to production under RFPA. This CID does not seek any Suspicious Activity Reports (SARs). Do not produce any SARs. If You have any questions, please contact FTC counsel before providing responsive information.**

## III.    DEFINITIONS

The following definitions apply to this CID:

D-1.    "**Add-on**" or "**Add-ons**" means any product(s) or service(s) not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer and for which the Motor Vehicle Dealer, directly or indirectly, charges a consumer in connection with a vehicle sale, lease, or financing transaction.

D-2.    "**Company**," "**You**," or "**Your**" means Asbury Automotive Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, including the **McDavid Group** dealerships, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the Company.

D-3.    "**Document**" means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A).

D-4.    "**Identify**" or "**the Identity of**" requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of Your contact persons at the business or organization.

D-5.    "**McDavid Group**" means the Company's dealerships doing business under the David McDavid name, including David McDavid Acura of Austin, David McDavid Acura of Plano, David McDavid Ford of Fort Worth, David McDavid Honda of Frisco, David McDavid Honda of Irving, and David McDavid Lincoln of Frisco.

## IV.    INSTRUCTIONS

I-1.    **Petitions to Limit or Quash**: You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2). **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.** 16 C.F.R. § 2.7(k); *see also* § 2.11(b). **If You file a petition to limit or**

**quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.** 15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2.    **Withholding Requested Material / Privilege Claims**:  For specifications requesting production of Documents or answers to written interrogatories, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c).  The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information.  If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material.  Otherwise, produce all responsive information and material without redaction.  16 C.F.R. § 2.11(c).  The failure to provide information sufficient to support a claim of protected status may result in denial of the claim.  16 C.F.R. § 2.11(a)(1).

I-3.    **Modification of Specifications**:  The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID.  16 C.F.R. § 2.7(l).

I-4.    **Scope of Search**:  This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

I-5.    **Identification of Responsive Documents**:  For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification. Documents that may be responsive to more than one specification of this CID need not be produced more than once.  If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

I-6.    **Maintain Document Order**:  For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored.  If Documents are removed from their original folders, binders, covers, containers, or electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

I-7.    **Numbering of Documents**:  For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

I-8.    **Production of Copies**:  For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state

-12-

as of the time You received this CID. Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.    **Production in Color**:  For specifications requesting production of Documents, You must produce copies of Advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.    **Electronically Stored Information**:  For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC. You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-11.    **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to written interrogatories, if any responsive materials contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

Sensitive PII includes an individual's Social Security number; an individual's biometric data; and an individual's name, address, or phone number in combination with one or more of the following: date of birth, driver's license or state identification number (or foreign country equivalent), military identification number, passport number, financial account number, credit card number, or debit card number. Biometric data includes biometric identifiers, such as fingerprints or retina scans, but does not include photographs (with the exception of photographs and corresponding analyses used or maintained in connection with facial recognition software) or voice recordings and signatures (with the exception of those stored in a database and used to verify a person's identity). SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-12.    **Interrogatory Responses**:  For specifications requesting answers to written interrogatories:  (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct by signing Your answers under the following statement:  "I verify under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." The verification must be submitted contemporaneously with Your interrogatory responses.

**CERTIFICATION OF COMPLIANCE**
**Pursuant to 28 U.S.C. § 1746**

I, _____, certify the following with respect to the Federal Trade

Commission's ("FTC") Civil Investigative Demand directed to Asbury Automotive Group (the

"Company") (FTC File No. 2223135) (the "CID"):

1.    The Company has identified all documents, information, and/or tangible things

("responsive information") in the Company's possession, custody, or control responsive to the

CID and either:

       (a)  provided such responsive information to the FTC; or

       (b) for any responsive information not provided, given the FTC written objections

           setting forth the basis for withholding the responsive information.

2.    I verify that the responses to the CID are complete and true and correct to my

knowledge.


I certify under penalty of perjury that the foregoing is true and correct.


Date: _____       _____

                                Signature

                                _____

                                Printed Name

                                _____

                                Title

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.      I, _____, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.      I have authority to certify the authenticity of the records produced by Asbury Automotive Group (the "Company") and attached hereto.

3.      The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

   a)      Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

   b)      Were kept in the course of the regularly conducted activity of the Company; and

   c)      Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.


Date: _____          _____
                                                      Signature

App.55

**Federal Trade Commission - Bureau of Consumer Protection**
**Production Requirements**
Revised July 2020

In producing information to the FTC, comply with the following requirements, unless the FTC agrees otherwise. If you have questions about these requirements, please contact FTC counsel before production.

## Production Format

1. **General Format**: Provide load-ready electronic productions with:

   a. A delimited data load file (.DAT) containing a line for every document, unique id number for every document (DocID), metadata fields, and native file links where applicable; and

   b. A document level text file, named for the DocID, containing the text of each produced document.

   Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, provide an Opticon image load file (.OPT) containing a line for every image file.

2. **Electronically Stored Information (ESI)**: Documents stored in electronic format in the ordinary course of business must be produced in the following format:

   a. For ESI other than the categories below, submit in native format with all metadata and either document level extracted text or Optical Character Recognition (OCR). Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, they should be converted to Group IV, 300 DPI, single-page TIFF (or color JPEG images when necessary to interpret the contents or render them intelligible.)

   b. For Microsoft Excel, Access, or PowerPoint files, submit in native format with extracted text and metadata. Data compilations in Excel spreadsheets or delimited text formats must contain all underlying data, formulas, and algorithms without redaction.

   c. For other spreadsheet, database, presentation, or multimedia formats; instant messages; or proprietary applications, discuss the production format with FTC counsel.

3. **Hard Copy Documents**: Documents stored in hard copy in the ordinary course of business must be scanned and submitted as either one multi-page pdf per document or as 300 DPI single page TIFFs (or color JPEGs when necessary to interpret the contents or render them intelligible), with corresponding document-level OCR text and logical document determination in an accompanying load file.

4. **Document Identification**: Provide a unique DocID for each hard copy or electronic document, consisting of a prefix and a consistent number of numerals using leading zeros. Do not use a space to separate the prefix from numbers.

-A1-

5. **Attachments**: Preserve the parent/child relationship by producing attachments as separate documents, numbering them consecutively to the parent email, and including a reference to all attachments.

6. **Metadata Production**: For each document submitted electronically, include the standard metadata fields listed below in a standard delimited data load file. The first line of the data load file shall include the field names. <u>Submit date and time data in separate fields</u>. Use these standard Concordance delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | ¶ | 20 |
| Quote Character | Þ | 254 |
| Multi Entry delimiter | ® | 174 |
| \<Return\> Value in data | ~ | 126 |

7. **De-duplication**: Do not use de-duplication or email threading software without FTC approval.

8. **Password-Protected Files**: Remove passwords prior to production. If password removal is not possible, provide the original and production filenames and the passwords, under separate cover.

<u>**Producing Data to the FTC**</u>

1. Prior to production, scan all data and media for viruses and confirm they are virus-free.

2. For productions smaller than 50 GB, submit data electronically using the FTC's secure file transfer protocol. Contact FTC counsel for instructions. **The FTC cannot accept files via Dropbox, Google Drive, OneDrive, or other third-party file transfer sites**.

3. If you submit data using physical media:

   a. Use only CDs, DVDs, flash drives, or hard drives. Format the media for use with Windows 7;

   b. Use data encryption to protect any Sensitive Personally Identifiable Information or Sensitive Health Information (as defined in the instructions), and provide passwords in advance of delivery, under separate cover; and

   c. Use a courier service (e.g., Federal Express, UPS) because heightened security measures delay postal delivery.

4. Provide a transmittal letter with each production that includes:

   a. Production volume name (e.g., Volume 1) and date of production;

   b. Numeric DocID range of all documents in the production, and any gaps in the DocID range; and

   c. List of custodians and the DocID range for each custodian.

-A2-

**Standard Metadata Fields**

| DAT FILE FIELDS | DEFINITIONS | POPULATE FIELD FOR: |
|---|---|---|
| DocID | Unique ID number for each document | All Documents |
| FamilyID | Unique ID for all documents in a family including parent and all child documents | All Documents |
| ParentID | Document ID of the parent document. This field will only be populated on child items | All Documents |
| File Path | Path to produced native file | All Documents |
| TextPath | Path to document level text or OCR file | All Documents |
| Custodian | Name of the record owner/holder | All Documents |
| AllCustodians | Names of all custodians that had copy of this record (populate if data was deduplicated or email threading was used) | All Documents |
| Source | Source of documents: CID, Subpoena, Third Party Data, etc. | All Documents |
| Filename | Original file name | All Documents |
| File Size | Size of documents | All Documents |
| File Extensions | Extension of file type | All Documents |
| MD5 Hash | Unique identifier for electronic data used in de-duplication | All Documents |
| PRODUCTION_VOLUME | Production Volume | All Documents |
| HASREDACTIONS | Redacted document | All Documents |
| Exception Reason | Reason for exception encountered during processing (e.g., empty file, source file, password-protected file, virus) | All Documents |
| PRODBEG | Beginning production bates number | Documents with Produced Images |
| PRODEND | Ending production bates number | Documents with Produced Images |
| PRODBEG_ATTACH | Beginning production family bates number | Documents with Produced Images |
| PRODEND_ATTACH | Ending production family bates number | Documents with Produced Images |
| Page Count | The number of pages the document contains | Documents with Produced Images |
| From | Names retrieved from the FROM field in a message | Emails |
| To | Names retrieved from the TO field in a message; the recipient(s) | Emails |
| CC | Names retrieved from the CC field in a message; the copied recipient(s) | Emails |
| BCC | Names retrieved from the BCC field in a message; the blind copied recipient(s) | Emails |
| EmailSubject | Email subject line | Emails |
| Date Sent | The date an email message was sent | Emails |
| Time Sent | The time an email message was sent | Emails |
| Date Received | The date an email message was received | Emails |
| Time Received | The time an email message was received | Emails |
| Author | File Author | Loose Native Files and Email Attachments |
| Title | File Title | Loose Native Files and Email Attachments |
| Subject | File Subject | Loose Native Files and Email Attachments |
| Date Created | Date a document was created by the file system | Loose Native Files and Email Attachments |
| Time Created | Time a document was created by the file system | Loose Native Files and Email Attachments |
| Date Modified | Last date a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Time Modified | Last time a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Date Printed | Last date a document was printed and recorded by the file system | Loose Native Files and Email Attachments |
| Time Printed | Last time a document was printed and recorded by the file system | Loose Native Files and Email Attachments |

App.58

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:     James C. Miller III, Chairman
                   Michael Pertschuk
                   Patricia P. Bailey
                   George W. Douglas
                   Terry Calvani

RESOLUTION DIRECTING USE OF COMPULSORY
PROCESS IN NONPUBLIC INVESTIGATION

File No. 832 3127

Nature and Scope of Investigation:  To determine whether
unnamed persons, partnerships, corporations or others engaged in
the advertising, marketing, offering for sale, sale or financing
of motor vehicles, have been engaging or may be engaging in
violations of the Truth in Lending Act, 15 U.S.C. §1601 et seq.,
as amended, or Regulation Z, 12 C.F.R. Part 226, as amended, or
in unfair or deceptive acts or practices or unfair methods of
competition in violation of Section 5 of the Federal Trade
Commission Act, 15 U.S.C. §45, as amended.

The investigation is also to determine whether Commission
action to obtain redress of injury to consumers or others would
be in the public interest.

The Federal Trade Commission hereby resolves and directs that
any and all compulsory processes available to it be used in
connection with this investigation.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of Federal Trade Commission Act,
15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; FTC Procedures
and Rules of Practices, 16 C.F.R. § 1.1., et seq., and
supplements thereto; and Title 1 of the Consumer Credit Protec-
tion Act, Section 108(c), 15 U.S.C. § 1607; 12 C.F.R. §226.1(e),
and supplements thereto.

By direction of the Commission.

Emily H. Rock
Secretary

Dated: December 20, 1983

**UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION**

COMMISSIONERS:              Janet D. Steiger, Chairman
                           Mary L. Azcuenaga
                           Deborah K. Owen
                           Roscoe B. Starek, III
                           Dennis A. Yao

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS
IN NONPUBLIC INVESTIGATION**

Unnamed Violators of the Equal Credit Opportunity Act
File Number P944809

<u>Nature and Scope of Investigation:</u>

To determine whether certain unnamed persons, partnerships, corporations, associations or other entities have been or may be engaged in acts or practices in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. and Regulation B, 12 C.F.R. § 202 et seq., and to determine whether these persons, partnerships, corporations, associations or other entities have been or are engaged in unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended. Such acts or practices may include, but are not limited to, discriminating in the extension of credit on the basis of an applicant's gender, race, marital status, national origin, color, age, religion, receipt of public assistance income, or because an applicant in good faith exercised any right under the Consumer Credit Protection Act. This investigation is also to determine whether Commission action to obtain redress of injury to consumers or others would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

<u>Authority to Conduct Investigation:</u>

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50 and 57b-1, as amended; FTC Procedures and Rules of Practice 16 C.F.R. § 1.1 <u>et</u> <u>seq.</u> and supplements thereto; Title VI of the Consumer Credit Protection

Act, Section 621, 15 U.S.C. § 1681 (s); and Regulation B, 12 C.F.R. § 202 et seq.

By direction of the Commission.

*C. Landis Plummer*
C. Landis Plummer
Acting Secretary

DATED:  August 1, 1994

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the quarterly period ended June 30, 2024

### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from          to
### Commission file number: 001-31262

# ASBURY AUTOMOTIVE GROUP, INC.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **01-0609375**<br>(I.R.S. Employer Identification No.) |
| **2905 Premiere Parkway NW, Suite 300**<br>**Duluth, Georgia**<br>(Address of principal executive offices) | **30097**<br>(Zip Code) |

### (770) 418-8200
### (Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.01 par value per share | ABG | New York Stock Exchange |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

**ASBURY AUTOMOTIVE GROUP, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. DESCRIPTION OF BUSINESS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Asbury Automotive Group, Inc., a Delaware corporation organized in 2002, is one of the largest automotive retailers in the United States. Our store operations are conducted by our subsidiaries.

As of June 30, 2024, we owned and operated 204 new vehicle franchises (155 dealership locations), representing 31 brands of automobiles, and 37 collision centers in 15 states. For the six months ended June 30, 2024, our new vehicle revenue brand mix consisted of 29% luxury, 41% imports and 29% domestic brands. Our stores offer an extensive range of automotive products and services, including new and used vehicles; parts and service, which includes repair and maintenance services, replacement parts and collision repair services (collectively referred to as "parts and services" or "P&S"); and finance and insurance ("F&I") products, including arranging vehicle financing through third parties and aftermarket products, such as extended service contracts, guaranteed asset protection ("GAP") debt cancellation and prepaid maintenance. The finance and insurance products are provided by independent third parties and Total Care Auto, Powered by Landcar ("TCA"). The Company reflects its operations in two reportable segments: Dealerships and TCA.

*Basis of Presentation*

The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"), and reflect the consolidated accounts of Asbury Automotive Group, Inc. (the "Company") and our wholly owned subsidiaries. All intercompany transactions have been eliminated in consolidation. If necessary, reclassifications of amounts previously reported have been made to the accompanying condensed consolidated financial statements in order to conform to current presentation.

In the opinion of management, all adjustments, consisting only of normal, recurring adjustments, considered necessary for a fair statement of the condensed consolidated financial statements as of June 30, 2024, and for the three and six months ended June 30, 2024 and 2023, have been included, unless otherwise indicated. Amounts presented in the condensed consolidated financial statements have been calculated using non-rounded amounts for all periods presented and therefore certain amounts may not compute.

The results of operations for the three and six months ended June 30, 2024 are not necessarily indicative of the results that may be expected for any other interim period, or any full year period. Our condensed consolidated financial statements should be read together with our audited consolidated financial statements contained in our Annual Report on Form 10-K for the year ended December 31, 2023.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities as of the date of the financial statements, and the reported amounts of revenues and expenses during the periods presented. Actual results could differ materially from these estimates. Estimates and assumptions are reviewed quarterly and the effects of any revisions are reflected in the condensed consolidated financial statements in the period they are determined to be necessary. Estimates made in the accompanying condensed consolidated financial statements include, but are not limited to, those relating to inventory valuation reserves, reserves for chargebacks against revenue recognized from the sale of F&I products, reserves for self-insurance programs, and certain assumptions related to goodwill and dealership franchise rights intangible assets.

*Share Repurchases*

Share repurchases may be made from time-to-time in open market transactions or through privately negotiated transactions under the authorization approved by the Board of Directors. Periodically, the Company may retire repurchased shares of common stock previously held by the Company as treasury stock. In accordance with our accounting policy, we allocate any excess share repurchase price over par value between additional paid-in capital, which is limited to amounts initially recorded for the same issue, and retained earnings.

During the three months ended June 30, 2024 and 2023, the Company repurchased 192,599 and 959,803 shares and retired 192,599 and 959,803 shares, of our common stock under our share repurchase program, respectively. During the six months ended June 30, 2024 and 2023, the Company repurchased 432,389 and 1,070,126 shares and retired 432,389 and 1,124,330 shares, of our common stock under our share repurchase program, respectively. The cash paid for these share repurchases was $93.2 million and $210.7 million for the six months ended June 30, 2024 and 2023, respectively.

counsel sent to us a proposed consent order and draft complaint, alleging that the Company and three of our dealerships had violated Section 5 of the Federal Trade Commission Act ("FTC Act") and certain provisions of the Equal Credit Opportunity Act ("ECOA") in connection with the sale of add-on products (e.g., vehicle service contracts, maintenance plans, etc.), and advising that it would recommend the filing of an enforcement action if the Company did not settle the FTC's claims. The Company disputes the FTC's allegations that it violated the FTC Act and the ECOA, and is currently involved in discussions with the FTC staff regarding the matter. There can be no assurance that negotiations between us and the FTC for a favorable settlement will be successful, or that we will succeed in any litigation as a result of the investigation. At this time, we are unable to reasonably predict the possible outcome of this matter, or provide a reasonably possible range of loss, if any, as a result of the investigation. If the FTC files a suit against us based on these allegations, whether meritorious or not, it may adversely affect our ability to attract customers, result in the loss of existing customers, harm our reputation and cause us to incur defense costs and other expenses.

Our dealerships are party to dealer and framework agreements with applicable vehicle manufacturers. In accordance with these agreements, each dealership has certain rights and is subject to restrictions typical in the industry. The ability of these manufacturers to influence the operations of the dealerships or the loss of any of these agreements could have a materially negative impact on our operating results.

In some instances, manufacturers may have the right, and may direct us, to implement costly capital improvements to dealerships as a condition to entering into, renewing, or extending franchise agreements with them. Manufacturers also typically require that their franchises meet specific standards of appearance. These factors, either alone or in combination, could cause us to use our financial resources on capital projects for which we might not have planned or otherwise determined to undertake.

From time-to-time, we and our dealerships are or may become involved in various claims relating to, and arising out of, our business and our operations. These claims may involve, but not be limited to, financial and other audits by vehicle manufacturers or lenders and certain federal, state, and local government authorities, which have historically related primarily to (i) incentive and warranty payments received from vehicle manufacturers, or allegations of violations of manufacturer agreements or policies, (ii) compliance with lender rules and covenants, and (iii) payments made to government authorities relating to federal, state, and local taxes, as well as compliance with other government regulations. Claims may also arise through litigation, government proceedings, and other dispute resolution processes. Such claims, including class actions, could relate to, but may not be limited to, the practice of charging administrative fees and other fees and commissions, employment-related matters, truth-in-lending and other dealer assisted financing obligations, contractual disputes, actions brought by governmental authorities, and other matters.

We evaluate pending and threatened claims and establish loss contingency reserves based upon outcomes we currently believe to be probable and reasonably estimable. Based on our review of the various types of claims currently known to us, there is no indication of material reasonably possible losses in excess of amounts accrued in the aggregate. We currently do not anticipate that any known claim will materially adversely affect our financial condition, liquidity, or results of operations. However, the outcome of any matter cannot be predicted with certainty, and an unfavorable resolution of one or more matters presently known or arising in the future could have a material adverse effect on our financial condition, liquidity, or results of operations.

A significant portion of our business involves the sale of vehicles, parts, or vehicles composed of parts that are manufactured outside the United States. As a result, our operations are subject to customary risks of importing merchandise, including fluctuations in the relative values of currencies, import duties, exchange controls, trade restrictions, work stoppages, and general political and socio-economic conditions in foreign countries. The United States or the countries from which our products are imported may, from time-to-time, impose new quotas, duties, tariffs, or other restrictions, or adjust presently prevailing quotas, duties, or tariffs, which may affect our operations, and our ability to purchase imported vehicles and/or parts at reasonable prices.

Substantially all of our facilities are subject to federal, state and local provisions regarding the discharge of materials into the environment. Compliance with these provisions has not had, nor do we expect such compliance to have, any material effect upon our capital expenditures, net earnings, financial condition, liquidity or competitive position. We believe that our current practices and procedures for the control and disposition of such materials comply with applicable federal, state, and local requirements. No assurances can be provided, however, that future laws or regulations, or changes in existing laws or regulations, would not require us to expend significant resources in order to comply therewith.

We had $13.3 million of letters of credit outstanding as of June 30, 2024, which are required by certain of our insurance providers. In addition, as of June 30, 2024, we maintained a $21.3 million surety bond line in the ordinary course of our business. Our letters of credit and surety bond line are considered to be off balance sheet arrangements.



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, DC 20580

March 11, 2024

**Sent Via Email**
Rob Johnson
Foley & Lardner LLP
600 Congress Ave., Suite 3000
Austin, TX  78701

Re:    FOIA-2024-00742

Dear Rob Johnson:

This is in response to your Freedom of Information Act ("FOIA") request dated March 8, 2024, seeking access to complaints received directly or indirectly from consumers during the past 5 years about the following companies:

1.    Asbury Automotive Group, Inc.,
2.    Asbury Ft. Worth Ford, LLC d/b/a David McDavid Ford Ft. Worth,
3.    McDavid Frisco-Honda, LLC d/b/a David McDavid Honda of Frisco, and
4.    McDavid Irving-Honda, LLC d/b/a David McDavid Honda of Irving.

The Commission's fee regulations specify that fees less than $25 will be waived. *See* 16 C.F.R. § 4.8(b)(4). Because the fees associated with the processing of your request did not exceed $25, we have processed your request free of charge.

In accordance with the FOIA and agency policy, we used appropriate methods to carry out a reasonable, good faith search for responsive records beginning on March 11, 2024. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *see also e.g. Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007). We have located **2** responsive complaints that consumers have made to the Federal Trade Commission ("FTC"). You should know that the enclosed complaints have not necessarily been verified by the FTC. Therefore, you should make your own judgment about relying on the information provided. I am denying access to consumers' names and addresses, and any other identifying information found in the complaints. This information is exempt from release under FOIA Exemption 6, 5 U.S.C. § 552(b)(6), because individuals' right to privacy outweighs the general public's interest in seeing personal identifying information. *See The Lakin Law Firm v. FTC*, 352 F.3d 1122 (7th Cir. 2003).

If you have any questions about the way we handled your request or about the FOIA regulations or procedures, please contact Anthony Ellis at rellis@ftc.gov. Please note that a detailed description of each record located is not required unless the requester has exhausted all administrative remedies and pursued litigation in the federal district court. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *see also, e.g., Jud. Watch, Inc. v. Clinton*, 880 F. Supp. 1, 11 (D.D.C. 1995). At the administrative stage of the FOIA process, the agency's response to a FOIA

FOIA-2024-00742
Foley & Lardner LLP
March 11, 2024
Page 2

request need only provide "the reasons" for its determination, which include, "most obviously, the specific exemptions that may apply." 5 U.S.C. § 552(a)(6)(A)(i); *see also Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 186 (D.C. Cir. 2013).

If you are not satisfied with this response to your request, you may appeal by writing to Freedom of Information Act Appeal, Office of the General Counsel, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580, or via email at FOIAAppeal@ftc.gov, within 90 days of the date of this letter. Please enclose a copy of your original request and a copy of this response.

You also may seek dispute resolution services from the FTC FOIA Public Liaison Richard Gold via telephone at 202-326-3355 or via e-mail at rgold@ftc.gov; or from the Office of Government Information Services via email at ogis@nara.gov, via fax at 202-741-5769, or via mail at National Archives and Records Administration, 8601 Adelphi Road, Office of Government Information Services , College Park, MD 20740. Please note that the FOIA Public Liaison's role relates to comments, questions, or concerns that a FOIA Requester may have with or about the FOIA Response. The FOIA Public Liaison's role does not relate to taking action in matters of private controversy nor can they resolve individual complaints.

Sincerely,

*/s/ Burke W. Kappler*[RAE]
Burke W. Kappler
Acting Assistant General Counsel

Attachment(s)

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 1 of 32 * PUBLIC *

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     **Lina M. Khan, Chair**
**Rebecca Kelly Slaughter**
**Alvaro M. Bedoya**
**Melissa Holyoak**
**Andrew Ferguson**

| |
|---|
| **In the Matter of** |
| |
| **ASBURY AUTOMOTIVE GROUP, INC.,** <br> **a corporation,** |
| |
| **ASBURY FT. WORTH FORD, LLC, a limited liability** <br> **company, also d/b/a DAVID MCDAVID FORD** <br> **FT. WORTH,** |
| |
| **MCDAVID FRISCO – HON, LLC, a limited liability** <br> **company, also d/b/a DAVID MCDAVID HONDA OF** <br> **FRISCO,** |
| |
| **MCDAVID IRVING – HON, LLC, a limited liability** <br> **company, also d/b/a as DAVID MCDAVID HONDA OF** <br> **IRVING, and** |
| |
| **ALI BENLI, individually and as an officer of** <br> **ASBURY FT. WORTH FORD, LLC,** <br> **MCDAVID FRISCO – HON, LLC, and** <br> **MCDAVID IRVING – HON, LLC.** |

**DOCKET NO. D-9436**

## RESPONDENTS' ANSWER AND AFFIRMATIVE DEFENSES

Respondents—Asbury Automotive Group, Inc., Asbury Ft. Worth Ford, LLC, also d/b/a David McDavid Ford Ft. Worth, McDavid Frisco – Hon, LLC, also d/b/a David McDavid Honda of Frisco, McDavid Irving – Hon, LLC, also d/b/a David McDavid Honda of Irving (collectively, "the 3 McDavid Dealerships"), and Ali Benli—respectfully state as follows for their Answer and Affirmative Defenses to the Complaint filed by the Federal Trade Commission (the "FTC" or the "Commission").

Due to the general and unspecified nature of many of the allegations contained in the Complaint, Respondents can respond only to the information contained therein and when that information is overly general, Respondents cannot admit what is not plead specifically. To the extent that some of the Complaint merely quotes from statutory sources or portions thereof,

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 2 of 32 * PUBLIC *

PUBLIC

Respondents simply defer to the language of the actual text in its entirety and do not admit or deny such references as they do not constitute factual assertions.

Except as specifically admitted below, Respondents deny the Commission's allegations. In addition, Respondents do not respond to the headings and sub-headings included in the Complaint—and reiterated below for ease of reference—as factual allegations because they are not well-pleaded allegations of fact. To the extent a response is required, any allegations in the headings and sub-headings are denied.

## ADMISSIONS AND DENIALS BY PARAGRAPH

Respondents admit that the FTC is bringing an action but deny the existence of any violations of law or that the FTC is entitled to any relief.

### Summary of Case

#### Complaint – Paragraph No. 1:

> 1.    Respondents sell cars and trucks at multiple dealerships in and around Dallas, Texas. In selling these vehicles, Respondents often charge consumers for additional items ("add-ons"), such as service contracts, maintenance contracts, or chemical coatings, on top of the price of the vehicle. But in many instances, Respondents add these charges without consumers' consent or misrepresent that the charges are required. And Respondents charge Black and Latino consumers more than non-Latino White consumers for add-ons, discriminatorily imposing higher costs on Black and Latino consumers. These add-on charges can amount to several thousand dollars, substantially increasing the cost of a vehicle—and Respondents' profits.

1.    Respondents admit that cars and trucks are sold at the 3 McDavid Dealerships, other McDavid dealerships, and other dealerships owned or operated by Asbury Automotive Group, Inc. Respondents admit that when customers elect to purchase additional items—such as service contracts, maintenance contracts, or chemical coatings—Respondents may charge consumers for such additional items on top of the price of the vehicle. Respondents deny that "in many instances, Respondents add these charges without consumers' consent or misrepresent that the charges are required." Respondents deny that they "charge Black and Latino consumers more than non-Latino White consumers for add-ons, discriminatorily imposing higher costs on Black and Latino consumers." Answering further, Respondents deny that their pricing and charges are based on the race or ethnicity of consumers, and deny that the FTC has any legitimate factual basis for determining the race or ethnicity of consumers who patronize their dealerships—much less for making the scurrilous and false accusation that Respondents charge certain consumers more based on their race or ethnicity. Answering further, Respondents admit that additional items, such as service contracts, maintenance contracts, or chemical coatings, can cost several thousand dollars. The Complaint does not include specific information as to what constitutes a "substantial increase." Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegation that the cost of additional items "substantially increase[es] the cost of a vehicle—and Respondents' profits" and on that basis deny the allegation. To the extent not

2

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 3 of 32 * PUBLIC *

specifically addressed, Respondents deny the remainder of this paragraph. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details, including details regarding the alleged "survey" on which the Complaint is based, before filing the Complaint. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

## Respondents

### Complaint – Paragraph No. 2:

> 2. Respondent Asbury Automotive Group, Inc. ("Asbury"), is a Delaware corporation with its principal place of business at 2905 Premiere Parkway, Suite 300, Duluth, GA 30097. The individuals working at Asbury's dealership locations are all Asbury employees, paid through a separately created wholly owned subsidiary.

2. Respondents admit the factual assertions in the first sentence. Respondents admit that, with the exception of outside third-party vendors that perform work at dealership locations, workers at the 3 McDavid Dealership locations are Asbury employees and not independent contractors.

### Complaint – Paragraph No. 3:

> 3. Respondent Asbury Ft. Worth Ford, LLC, also d/b/a David McDavid Ford Ft. Worth ("McDavid Ford Ft. Worth"), is a Delaware limited liability company with its principal place of business at 300 West Loop 820 South, Ft. Worth, Texas 76108. McDavid Ford Ft. Worth is a wholly owned subsidiary of Asbury, and the individuals working at McDavid Ford Ft. Worth are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of McDavid Ford Ft. Worth, or has overseen such business functions, including human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Ford Ft. Worth, employed the personnel who worked at McDavid Ford Ft. Worth, and had control over the acts and practices of McDavid Ford Ft. Worth that are at issue in this Complaint.

3. Respondents admit the factual assertions in the first sentence. Respondents admit the factual assertions in the second sentence with the exception that outside third-party vendors that perform work at dealership locations are not employees. The remainder of the paragraph is admitted except to the extent that it is denied that the alleged "acts and practices" are accurately described in the Complaint.

### Complaint – Paragraph No. 4:

> 4. Respondent McDavid Frisco – Hon, LLC, also d/b/a David McDavid Honda of Frisco ("McDavid Honda Frisco"), is a Delaware limited liability company with its principal place of business at 1601 North Dallas Parkway (7200 State Highway 121), Frisco, Texas 75034. McDavid Honda Frisco is a

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 4 of 32 * PUBLIC *

*wholly owned subsidiary of Asbury, and the individuals working at McDavid Honda Frisco are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of McDavid Honda Frisco, or has overseen such business functions, including human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Honda Frisco, employed the personnel who worked at McDavid Honda Frisco, and controlled the acts and practices of McDavid Honda Frisco that are at issue in this Complaint.*

4.    Respondents admit the factual assertions in the first sentence. Respondents admit the factual assertions in the second sentence with the exception that outside third-party vendors that perform work at dealership locations are not employees. The remainder of the paragraph is admitted except to the extent that it is denied that the alleged "acts and practices" are accurately described in the Complaint.

**Complaint – Paragraph No. 5:**

*5.    Respondent McDavid Irving – Hon, LLC, also d/b/a David McDavid Honda of Irving ("McDavid Honda Irving"), is a Delaware limited liability company with its principal place of business at 3700 West Airport Freeway, Irving, Texas 75062. McDavid Honda Irving is a wholly owned subsidiary of Asbury, and individuals working at McDavid Honda Irving are all Asbury employees. At all relevant times, Asbury has performed various functions on behalf of McDavid Honda Irving, or has overseen such business functions, including payroll, human resources, finance, compliance auditing, and information technology and security. Asbury established relevant policies of McDavid Honda Irving, employed the personnel who worked at McDavid Honda Irving, and controlled the acts and practices of McDavid Honda Irving that are at issue in this Complaint.*

5.    Respondents admit the factual assertions in the first sentence. Respondents admit the factual assertions in the second sentence with the exception that outside third-party vendors that perform work at dealership locations are not employees. The remainder of the paragraph is admitted except to the extent that it is denied that the alleged "acts and practices" are accurately described in the Complaint.

**Complaint – Paragraph No. 6:**

*6.    Respondent Ali Benli ("Benli") is the General Manager of McDavid Ford Ft. Worth and an employee of Asbury, and was the General Manager of McDavid Honda Irving and the General Manager of McDavid Honda Frisco. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving, including the acts and practices set forth in this Complaint. As general manager, Respondent Benli has had control and responsibility over day-to-day operations of McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving, including the implementation of financing and sales*

4

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 5 of 32 * PUBLIC *

PUBLIC

*policies and the sale of add-on products and services. Respondent Benli has had knowledge of Respondents' unlawful practices, including* ███████████

6.      Respondents admit that Ali Benli ("Benli") is the General Manager of David McDavid Ford Ft. Worth and an employee of Asbury Automotive Group, Inc. Respondents admit that Benli was the General Manager of David McDavid Honda of Irving from December 16, 2020, to July 13, 2022. Respondents admit that Benli was the General Manager of David McDavid Honda of Frisco from May 15, 2019, to December 16, 2020. Respondents admit that, while employed as the General Manager at each dealership, Benli had responsibility for hiring, training, and supervising all department managers at the dealership at which he was then employed. In supervising department managers, Benli directed and monitored all supervisory personnel at the dealership at which he was then employed. Answering further, Respondents note that as General Manager, Benli was responsible for planning dealership operations for the coming years, which he would submit to Asbury Automotive Group, Inc. for approval for each dealership at which he was then employed. Respondents admit that, while employed as the General Manager of each dealership, Benli also oversaw the implementation of financing and sales policies, and policies related to the sale of additional items, such as service contracts, maintenance contracts, or chemical coatings. These financing, sales, and other policies related to the sale of additional items allow customers to negotiate for the purchase of vehicles and additional items. Answering further, Respondents note that, while employed as the General Manager of each dealership, Benli ████████████████████████████████████████████████████ related to the particular dealership at which Benli was the General Manager at the time. As the FTC has not provided any details regarding when and where particular acts alleged in this Complaint occurred, Respondents are unable to admit or deny that Benli was the General Manager at a particular dealership at the time the alleged acts took place. Respondents deny that there were any "unlawful practices." Respondents admit that as the General Manager of David McDavid Ford Ft. Worth, Benli has ██████████████████████████████ Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 7:**

*7.      Respondents Asbury, McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving (collectively, "Corporate Respondents") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Corporate Respondents have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, directors, business functions, employees, advertising, policies, and practices. Because Corporate Respondents have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.*

7.      Respondents deny the allegations in this paragraph other than that Respondents admit that Asbury Automotive Group, Inc., David McDavid Ford Ft. Worth, David McDavid

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 6 of 32 * PUBLIC *

PUBLIC

Honda of Frisco, and David McDavid Honda of Irving (collectively, "Corporate Respondents") are a related network of companies.

**Complaint – Paragraph No. 8:**

> 8.    At all times relevant to this Complaint, acting alone or in concert with others, Respondents have advertised, marketed, distributed, or offered vehicles to consumers for sale, and have regularly arranged for the extension of credit.

8.    With the exception of the Complaint's lack of specific information as to what constitutes "all times relevant to the Complaint" or "regularly," Respondents admit the allegations of this paragraph.

**Complaint – Paragraph No. 9:**

> 9.    The acts and practices of Respondents alleged in this Complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

9.    This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Respondents state that Section 4 of the Federal Trade Commission Act speaks for itself and deny any and all allegations inconsistent therewith.

### Respondents' Business Activities

**Complaint – Paragraph No. 10:**

> 10.    Asbury owns and operates a network of motor vehicle dealerships. It is the parent company and owner of the three dealership respondents—McDavid Ford Ft. Worth, McDavid Honda Frisco, and McDavid Honda Irving—and it employs the individuals who work at these dealerships. In many instances, Respondents have charged consumers for add-ons they did not agree to, misled consumers into believing add-ons were required, and charged Black and Latino consumers more than non-Latino White consumers for the same products, including add-ons.

10.    Respondents admit that Asbury Automotive Group, Inc. is the ultimate parent entity of a network of motor vehicle dealerships. Respondents deny that Asbury Automotive Group, Inc. directly owns any motor vehicle dealerships, including David McDavid Ford Ft. Worth, David McDavid Honda of Frisco, and David McDavid Honda of Irving. Respondents deny that Asbury Automotive Group, Inc. employs the individuals who work at the 3 McDavid Dealerships. Respondents admit that Asbury Automotive Group, Inc. directly employs only David Hult, Chief Executive Office of Asbury Automotive Group, Inc. Answering further, Respondents note that Asbury Automotive Group, LLC employs the individuals who work at the 3 McDavid Dealerships, with the exception that outside third-party vendors that perform work at dealership locations are not employees. Respondents also note that Asbury Management Services LLC provides payroll

6

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 7 of 32 * PUBLIC *

for the 3 McDavid Dealerships.  Respondents deny the third sentence in every respect.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

### Respondents' Unauthorized and Deceptive Add-On Charges

#### Complaint – Paragraph No. 11:

*11.     Respondents charge consumers for an array of add-ons that are tacked on to the purchase of a vehicle, such as extended warranties, maintenance plans, chemical coatings, and dent protection.  Under the policies set by Asbury, employees receive additional compensation for add-on charges, including bonuses that managers earn when a certain percentage of the dealer's sales include an add-on.  Add-ons commonly cost consumers hundreds or thousands of dollars per transaction.*

11.     Respondents deny the allegations in this paragraph other than that Respondents admit that when customers elect to purchase additional items, such as extended warranties, maintenance plans, chemical coatings, and dent protection, Respondents may charge consumers for such additional items and that some additional items can cost "hundreds or thousands of dollars."  Respondents admit that employees are compensated in accordance with their individual pay plans, not policy.  Compensation may include several different components, including, for some employees, compensation based on the sales price of the vehicle, Customer Satisfaction Index ("CSI") scores, customer agreement to purchase products, and other items.  Respondents further note that they have policies that discourage the sale of products for the sole reason of increasing individual employees' compensation.

*Unauthorized Charges*

#### Complaint – Paragraph No. 12:

*12.     In numerous instances, Respondents have added unwanted charges to vehicle sales contracts.  One tactic Respondents use is getting a consumer to agree to a monthly payment that exceeds what they need to pay under the contract to purchase a vehicle, and then "packing" the sales contract with add-on charges to make up the difference.  For example, a salesperson might represent that a consumer qualifies for financing with a monthly payment of $400, when the monthly payment for the vehicle under the contract is actually $350.  The salesperson then includes, or "packs," the contract with add-ons to make up some or all of the difference between the two monthly payments, so that it appears the consumer is receiving a similar or smaller monthly payment.*

12.     Respondents note that, despite repeated requests for same, the FTC refused to provide these or other details before filing the Complaint.  Respondents deny all allegations in this paragraph, including the FTC's description of "packing."  Respondents admit that they have a strict policy that prohibits any "payment packing."  Under Respondents' internal audit standards, "payment packing" occurs when, during the *vehicle* negotiations, a sales employee presents the customer with monthly payments that are higher than the likely payments.  If the dealership presents payments higher than they should be, based on that likely credit score, or fails to update

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 8 of 32 * PUBLIC *

PUBLIC

a payment quote once the likely credit score is known, Internal Audit finds that "payment packing" may have occurred. According to the Respondents' internal audit standards, although "payment packing" may be done unintentionally, such as in response to a specific guest request for a quote at a specific rate, trade-in value, or with additional products that deviate from policy, when done intentionally the motive of payment packing can be for the sales team to get the guest accustomed to a higher payment. The hope is that the guest is then pleasantly surprised in the Finance Office with the good news that the dealership was able to get the base payment lowered. When happy with the savings, the guest may be more agreeable to purchasing add-on products, which the guest would still *voluntarily* purchase, by which time the guests will also have been presented with a written disclosure showing the true (lower) vehicle payment. Respondents admit that Respondents' policy requires total transparency in the vehicle price negotiations. If customers are considering optional products, company policy requires that the customer receive both a quote that shows the price of the vehicle with no optional products and the price of the vehicle with the optional products. Customers must then approve the price of the vehicle and the price of the vehicle with any optional products selected. Respondents further admit that they strictly prohibit and monitor for this sort of gamesmanship of inflating the vehicle payment in the showroom to set the finance office up for easier sales of additional products.

**Complaint – Paragraph No. 13:**

>        13.      *Many consumers have reported that Respondents, using this type of payment packing or other methods, charged them for add-ons the consumers never agreed to buy. For example, one consumer reported that McDavid Ford Ft. Worth charged him over $2,800 for products he never agreed to, including $1,200 for guaranteed asset protection ("GAP") agreement; $1,024 for ResistAll, a supposed microscopic chemical coating that claims to prevent damage to the vehicle's interior and exterior; and $584 for a key replacement service. Likewise, a David McDavid Honda Frisco consumer discovered that Respondents had charged her on multiple occasions for add-ons that she did not know about and never would have agreed to purchase, including $3,000 for a service contract and over $4,700 for a life insurance policy, a disability insurance policy, a maintenance plan, and a service contract.*

        13.      The Complaint does not include specific information as to what constitutes "many consumers" or to which customers, vehicles, or transactions the alleged reports relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 14:**

>        14.      *Consumers have reported that Respondents sometimes did not mention the add-on items at all. For instance,*

8

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 9 of 32 * PUBLIC *

PUBLIC



14.    The Complaint does not include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Respondents deny that they "sometimes d[o] not mention the add-on items at all."  To the contrary, Respondents state that charges for additional products are identified for consumers at multiple times and in multiple documents throughout the purchasing process, including in the vehicle contracts.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 15:**

> 15.    *Other consumers reported that they specifically declined add-on items only to discover that Respondents charged them anyway.  For example,*



15.    The Complaint does not include specific information as to which customers, vehicles, or transactions the allegations relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 16:**

> 16.    *Consumers have reported that Respondents made it difficult for them to understand the terms of the transaction.  One consumer described how a financing representative had the paperwork for the sale on his computer, but the screen was pointed in the direction of the representative so the consumer could not see it.  She reported that the representative briefly described the document, and then asked her to sign on an electronic signature pad without viewing the document itself.  And, not knowing that she had been charged for both a maintenance plan and service contract, she and her daughter paid for maintenance and repairs out of pocket.  Similarly, a McDavid Honda Irving consumer signed his sales contract*

App.75

*on a portable electronic device and was only shown the spots where he needed to sign and not the entire contract. Three weeks later, he discovered that the finance manager had added a $1,750 maintenance package and $609 key replacement package without permission.*

16.    The Complaint does not include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 17:**

17.    *Many consumers may not discover that Respondents have charged them without consent until after the vehicle transaction is complete, if ever. For example, after buying a car, a McDavid Ford Ft. Worth consumer discovered that the dealer had extended what he thought was a 72-month financing agreement to 84 months without his consent so that the lower monthly payment under the longer term masked the increase from the hidden charges for unwanted add-ons. Another consumer likewise discovered that his loan had been changed from a 72-month to an 84-month term without his consent, masking not only hidden charges for unwanted add-ons, but also a vehicle price increase of more than a thousand dollars.*

17.    The Complaint does not include specific information as to what constitutes "many consumers" or to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 18:**



18.    *Asbury has received directly many complaints from consumers reporting that they were charged for add-on products without consent. For example,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Other complaints Asbury has received include:*

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 11 of 32 * PUBLIC *

PUBLIC



18.    The Complaint does not include specific information as to what constitutes "many complaints" or to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them, except that Respondents state that, from time to time, they may receive complaints regarding various issues.  Respondents admit that they investigate and resolve such complaints that they receive. ████████████████████████████████████████████████████████████████ ████████████████████████  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 19:**



19.    *Mr. Benli has received direct notice of consumer complaints.  In particular, he tracked public complaints and pressured consumers to take down negative reviews.* ████████████████████████████████████████ *Among the* complaints Mr. Benli received, in addition to those noted above:

• *Consumer complaining he* ████████████████████████ ████████████████████

• ████████████████████████████████████████████ ████████████

App.77

PUBLIC



19.    The Complaint does not include specific information as to what constitutes "direct notice" or to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them, except that, Respondents state that, from time to time, they may receive complaints regarding various issues.  Respondents admit that they investigate and resolve such complaints that they receive. ███████████████████████ ████████████████████████████████████████████ Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Respondents deny that Benli has "tracked" public complaints about the Respondents and "pressured" consumers to take them down.  Respondents state that, at times, Benli may receive complaints regarding the sales or service departments at the dealerships at which he is employed, for example, via email or Google reviews.  When Benli receives a complaint, he contacts the guest and works with the guest to remedy the stated concerns as Respondents' goal is to retain guests for the long term.  Answering further, Respondents note that, at times, following successful remedy of guest concerns, Benli may politely request that guests consider updating their online reviews regarding Respondents to the extent the guests feel an updated review is warranted.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

*Charges Misrepresented as Required*

**Complaint – Paragraph No. 20:**

20.    *In numerous other instances, Respondents falsely represent that consumers are required to purchase an optional add-on.  These representations are false.  Neither the finance companies nor the vehicle manufacturers require that the add-ons be sold.*

20.    The Complaint does not include specific information as to what constitutes "numerous other instances" or to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Respondents admit that finance companies and vehicle manufacturers

do not require the sale of additional products and deny that they make contrary representations to consumers. Answering further, Respondents note that all documents in the vehicle sales process which identify charges for additional products clearly state that the sale of such additional products is not required by the finance companies or vehicle manufacturers. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 21:**

21. *Many consumers have been charged thousands of dollars for add-ons that Respondents falsely claimed were required. For example, a David McDavid Ford Ft. Worth representative told one consumer that to finance the purchase of a truck, he had to purchase a bundle of add-ons—including a maintenance plan, chemical protection and warranty, windshield, extended vehicle warranty, and key replacement service—that ended up being more than $9,500. Asbury has received many complaints from consumers that they were falsely told that add-ons were required. For example:*



21. The Complaint does not include specific information as to what constitutes "many consumers," "many complaints," and/or what statements the FTC contends constitute "complaints"—much less alleged complaints that Asbury Automotive Group, Inc. supposedly received. Nor does the Complaint include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them, except that, Respondents admit that, from time to time, they may receive complaints regarding various issues. Respondents admit that they investigate and resolve received

13

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 14 of 32 * PUBLIC *

PUBLIC

complaints. ██████████████████████████████████████████████████ Respondents
██████████████████████████████████████ note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 22:**

> 22.    *Many consumers do not catch the dealers' misrepresentations before the paperwork is signed and the transaction is finalized. But even if consumers were to discover false representations or unauthorized charges mid-transaction, it is often unrealistic for consumers to walk away at that point. Buying a vehicle is a lengthy process involving complex, dense paperwork; it can take several hours or days to finalize, on top of the hours it can take to drive to and from a dealership. Consumers may need to take time off work or arrange childcare, and the immediate need for the vehicle for work, school, or other vital household reasons makes it infeasible to start the process anew at a different dealership.*

22.    This paragraph appears to consist of speculation rather than factual allegations about Respondents, but to the extent they are considered factual allegations, Respondents deny them.

*Respondents' Add-on Misconduct Is Widespread*

**Complaint – Paragraph No. 23:**

> 23.    *Respondents have added unwanted add-ons to vehicle sales without consumers' knowledge or consent, or misrepresented that an add-on was required, in numerous instances. According to a survey of consumers who Respondents charged for at least one add-on:*
>
> a)    *At least 58% of consumers who purchased a vehicle at McDavid Ford Ft. Worth were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.*
>
> b)    *At least 75% of consumers who purchased a vehicle at McDavid Honda Frisco were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.*
>
> c)    *At least 73% of consumers who purchased a vehicle at McDavid Honda Irving were charged for at least one add-on that they did not agree to buy or that was misrepresented as required.*

23.    The Complaint does not include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate. Nor does the Complaint include specific information as to the alleged "survey" report, results, and underlying data upon which the alleged "survey" relies. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.

Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details regarding the alleged "survey" before filing the Complaint. The FTC's allegations are inconsistent and are thus denied. On the face of the allegations in this paragraph, the FTC alleges that it conducted a survey of "consumers who Respondents charged for at least one add-on" and then alleges the results as percentages "of consumers who purchased a vehicle," which is not the same population as supposedly surveyed. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 24:**

> 24. *Asbury periodically audits its dealerships for misconduct. Asbury's audit process relies on what the dealerships document in writing; Asbury does not contact consumers during the audit process to ask what employees at the dealership told them or what consumers understood about add-ons.*

24. The Complaint does not include specific information as to what constitutes "misconduct." Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents admit that the Corporate Respondents employ audits on an ongoing real-time and after-the-fact basis to ensure compliance with company policies and legal requirements. On an ongoing real-time basis, an accounting center deal clerk, who is not a dealership employee, audits every single deal jacket before finalizing the sale against a "Compliance Checklist" to confirm all paperwork and signatures required, including signatures related to the purchase of additional items, are present in the deal jacket and correctly executed. On an after-the-fact basis, Asbury employs multiple compliance auditors who conduct frequent compliance audits of sampled deals. The samples target "higher risk" deals (*i.e.*, subprime guests, purchases where the loan amount is high, or purchases with higher-than-average profits on product sales). As with the deal clerks, the compliance auditors confirm the required paperwork is correctly executed. These auditors also conduct forensic review of the entire purchase process. The Corporate Respondents also outsource several audits a year to an external compliance consultant retained by the legal department for benchmarking/training of its own internal audit team. Corporate Respondents acknowledge that customers are not contacted during the audit process in which deal jackets are reviewed to confirm that all required paperwork and signatures—including signatures related to the purchase of additional items—are present in the deal jacket and correctly executed because the accuracy and completeness of a deal jacket is apparent on its face. Respondents state that employees of the 3 McDavid Dealerships regularly discuss with customers any concerns they may have regarding their individual transactions. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 25:**

> 25. *Despite their limited nature, audits at each Respondent dealership have uncovered substantial evidence that consumers are charged for add-ons without consent: the dealerships have each failed multiple audits due to payment packing and other* ████████



25.    The Complaint does not include specific information as to what constitutes "substantial evidence," that incomplete documentation is evidence that add-ons were "without consent," or to which audits the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, thus deny them. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Respondents deny that the Complaint accurately reflects the findings of the ▆▆▆ audits ▆▆▆▆▆▆▆ In the audits of deals that closed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ as only one example, auditors found that ▆▆▆ deals ▆▆▆▆▆▆▆ examined had *the potential* to have "inconsistent payment" *or* "suspected payment packing," not that those deals actually involved payment packing. ▆▆▆▆▆▆▆▆▆▆ Deals may be identified in this category of audit findings because they were inconsistent with the dealership's heightened internal policy related to payment quotes without necessarily constituting the deceptive practice of payment packing. For example, a deal may be identified as being included in this category of audit findings if a payment quote was handwritten instead of being given through the Respondents' electronic compliance tool. By falsely suggesting that ▆▆▆▆▆▆▆▆▆▆▆▆ transactions ▆▆▆▆▆▆▆▆▆ involved payment packing, the FTC unscrupulously and inappropriately relies on sample bias to assert the allegations in this paragraph. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 26:**

*26.* ▆▆▆▆▆▆▆▆▆▆▆▆

26.    The Complaint does not include specific information as to what constitutes ▆▆▆▆▆▆▆ or to which ▆▆▆▆ the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint. Respondents deny that the Complaint accurately reflects ▆▆▆▆▆▆▆▆▆

16

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 17 of 32 * PUBLIC *

PUBLIC



By falsely suggesting that the FTC unscrupulously and inappropriately relies on to assert the allegations in this paragraph.

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 18 of 32 * PUBLIC *

PUBLIC



Respondents also deny that the allegation, accurately reflects Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 27:**

> 27.    As a rule, Asbury does not contact consumers after the audits, even if they determine that consumers have been the victim of "Deceptive Practice[s]."

27.    Respondents deny the premise of and allegations in this paragraph.  No internal audit has "determined that consumers have been the victim of 'Deceptive Practice[s].'" Respondents further deny that they, "[a]s a rule, . . . do[ ] not contact consumers after the audits." Respondents admit that at times they do contact customers following audits of their deals.

18

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 19 of 32 * PUBLIC *

PUBLIC

**Complaint – Paragraph No. 28:**

> 28.    *Additional Asbury internal documents confirm the widespread problems identified in the audits.  For example,*



28.    The Complaint does not include specific information as to what internal documents the allegations of this paragraph refer or what constitutes "widespread problems."  Nor does the Complaint include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 29:**

> 29. *Similarly,*



29.    The Complaint does not include specific information as to what constitutes a ▮▮▮▮▮▮▮▮▮ as the term is used in this paragraph, nor to which ▮▮▮▮▮▮▮▮▮ the allegations of this paragraph refer.  The Complaint also fails to include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents deny that they would ever ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Respondents admit that if they learn of allegations related to their business, they investigate, confirm or deny the allegations, and respond to such allegations.

**Complaint – Paragraph No. 30:**

> 30.    *Also*



30.    The Complaint does not include specific information as to what ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the allegations of this paragraph refer.  Nor does the Complaint include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  While the Complaint does not specifically identify the source of its factual assertions, Respondents admit

App.85

PUBLIC

that they impose price caps for the sale of certain additional items. The sale of additional products at costs that exceed price caps is a violation of company policy but not a violation of law.

**Complaint – Paragraph No. 31:**



*31.*

31.    The Complaint does not include specific information as to what internal documents the allegations of this paragraph refer. Nor does the Complaint include specific information as to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.

**Respondents' Discriminatory Add-on Financing Practices**

**Complaint – Paragraph No. 32:**

*32.    Respondents arrange financing through third-party financing entities for consumers to purchase motor vehicles and pay for these add-ons. In these credit transactions, Respondents mark up the price on add-ons for Black and Latino consumers and extract more in profit from them than from others, even though the cost to Respondents is the same. As detailed above, many consumers do not know that Respondents are charging them for add-ons, let alone that they are being charged more than consumers of a different race, color, or national origin.*

32.    Respondents admit that they arrange financing through third-party financing entities for consumers who seek such financing to purchase motor vehicles and pay for additional items. Respondents deny the other allegations in this paragraph. The Complaint does not include specific information as to what constitutes "many consumers" or to which customers, vehicles, or transactions the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them. Respondents note that, despite repeated request for same, the FTC refused to provide these and other details before filing the Complaint. While having been denied any information regarding the basis for the allegations, Respondents deny them based on their own review of Asbury sales data which does not show the alleged racial disparity, and notes that the FTC never requested and did not have access to the detailed information necessary to account for other factors that could affect the cost of financing or additional items. Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

App.86

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 21 of 32 * PUBLIC *

PUBLIC

**Complaint – Paragraph No. 33:**

> 33.    Respondents routinely charge different consumers for the same add-ons at prices that are hundreds of dollars apart.  In particular, McDavid Fort Worth charges Latino consumers, on average, approximately $▇▇ more for the same add-ons than non-Latino White consumers.  McDavid Honda Frisco charges Black consumers, on average, $▇▇ more for the same add-ons, and charges Latino consumers, on average, $▇▇ more for the same add-ons, than non-Latino White consumers.  And McDavid Honda Irving charges Black consumers, on average, $▇▇ more for the same add-ons, and charges Latino consumers, on average, $▇▇ more for the same add-ons, than non-Latino White consumers.  These disparities are statistically significant even when accounting for other factors that could affect the cost of add-ons.

33.    The Complaint does not include specific information as to the basis for the allegations of this paragraph.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated request for same, the FTC refused to provide these and other details before filing the Complaint.  While having been denied any information regarding the basis for the alleged calculations, Respondents deny that they track the race and/or ethnicity of consumers in the ordinary course of business.  Answering further, Asbury notes that the FTC never requested and did not have access to the detailed information necessary to "account[] for other factors that could affect the cost of add-ons" as alleged in the Complaint.  Respondents admit that customers may be charged differently for additional products for a variety of reasons, including for example, due to the make, model, and model year of the vehicle purchased, and/or the types of coverages purchased.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 34:**

> 34.    Respondents treat Black and Latino consumers differently from non-Latino White consumers.  Respondents target Black and Latino consumers with packed add-ons and higher-priced add-ons.  For example, Respondents encourage employees to pack add-ons more often in contracts with Latino consumers and consumers who are non-native English speakers.  No legitimate, nondiscriminatory reasons exist for the Respondents charging higher prices for the same or similar add-ons to Black and Latino consumers than to similarly situated non-Latino White consumers.

34.    Respondents deny the allegations in this paragraph.

**Complaint – Paragraph No. 35:**

> 35.    Moreover, Respondents' policy and practice is to give their employees free rein to charge different prices for the same or similar add-ons, leading to statistically significant disparities.  This practice is not justified by a business necessity that could not be met by a less discriminatory alternative.

21

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 22 of 32 * PUBLIC *

PUBLIC

35.    Respondents deny the allegations in this paragraph.

## <u>VIOLATIONS OF THE FTC ACT</u>

**<u>Complaint – Paragraph No. 36:</u>**

> *36.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."*

36.    The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute referenced, 15 U.S.C. § 45(a), speaks for itself and deny any and all allegations inconsistent therewith.

**<u>Complaint – Paragraph No. 37:</u>**

> *37.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.*

37.    The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute referenced, 15 U.S.C. § 45(a), speaks for itself and deny any and all allegations inconsistent therewith.

**<u>Complaint – Paragraph No. 38:</u>**

> *38.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).*

38.    The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute referenced, 15 U.S.C. § 45(n), speaks for itself and deny any and all allegations inconsistent therewith.

**Count I**
**Misrepresentations Regarding Charges**

**<u>Complaint – Paragraph No. 39:</u>**

> *39.    In numerous instances, in connection with the offering for sale or financing, or sale and financing of vehicles, Respondents represent, directly or indirectly, expressly or by implication, that charges appearing on consumers' sales contracts are authorized by consumers.*

39.    The Complaint does not include specific information as to what constitutes "numerous instances" or to which vehicles or customers the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 23 of 32 * PUBLIC *

PUBLIC

Complaint.  Respondents admit that when customers purchase additional items with vehicles, each of the documents that identify the additional items purchased requires a customer acknowledgement or signature assenting to the purchase of such additional items.  Indeed, immediately below the signature line on the final acceptance forms for purchase, the forms state:

> "You should be aware the products above are optional and contain additional benefits, limitations, and exclusions from coverage.  PLEASE REVIEW THE CONTRACT.  By signing above you certify that all valuable options have been clearly explained and fully understand that there is no requirement to purchase any of these coverages in order to obtain financing.  I further represent that Dealership personnel have disclosed their Privacy Policy as mandated under the Gramm Leach Bliley Act."

Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 40:**

> 40.     In fact, in numerous instances in which Respondents make the representations set forth in Paragraph 39, the charges appearing on consumers' sales contracts include charges not authorized by consumers.

40.     The Complaint does not include specific information as to what constitutes "numerous instances" or as to the vehicles or customers to which the allegations of this paragraph relate.  Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these or other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 41:**

> 41.     Therefore, Respondents' representations as set forth in Paragraph 39 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

41.     The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute cited speaks for itself and deny that they have violated the cited statute.

**Count II**
**Misrepresentation Regarding Add-On Charges**

**Complaint – Paragraph No. 42:**

> 42.     In numerous instances, in connection with the offering for sale or financing, or sale and financing of vehicles, Respondents represent, directly or

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 24 of 32 * PUBLIC *

PUBLIC

*indirectly, expressly or by implication, that consumers are required to buy one or more add-ons.*

42.    The Complaint does not include specific information as to what constitutes "numerous instances" or to which vehicles or customers the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 43:**

*43.    In fact, in numerous instances in which Respondents make the representations set forth in Paragraph 42, consumers are not required to buy the add-ons.*

43.    The Complaint does not include specific information as to what constitutes "numerous instances" or to which vehicles or customers the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 44:**

*44.    Therefore, Respondents' representations as set forth in Paragraph 42 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).*

44.    The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute cited speaks for itself and deny that they have violated the cited statute.

### Count III
### Unfair Practices Relating to Unauthorized Charges

**Complaint – Paragraph No. 45:**

*45.    In numerous instances, Respondents charge consumers without obtaining their express, informed consent.*

45.    The Complaint does not include specific information as to what constitutes "numerous instances" or to which vehicles or customers the allegations of this paragraph relate. Therefore, Respondents lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny them.  Respondents note that, despite repeated requests for same, the FTC refused to provide these and other details before filing the

24

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 25 of 32 * PUBLIC *

PUBLIC

Complaint.  Except as expressly admitted herein, Respondents deny the allegations of this paragraph.

**Complaint – Paragraph No. 46:**

> 46.     *Respondents' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.*

46.     Respondents deny the allegations in this paragraph.

**Complaint – Paragraph No. 47:**

> 47.     *Therefore, Respondents' acts or practices as set forth in Paragraph 45 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).*

47.     The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute cited speaks for itself and deny that they have violated the cited statute.

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT AND REGULATION B

**Complaint – Paragraph No. 48:**

> 48.     *Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a), prohibit a creditor from discriminating against an applicant with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act, 15 U.S.C. Ch. 41.*

48.     The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute and regulation cited speak for themselves and deny any and all allegations inconsistent therewith.

**Complaint – Paragraph No. 49:**

> 49.     *Corporate Respondents are creditors as defined in Section 702(e) of the ECOA, 15 U.S.C. § 1691a(e), and Section 202.2(l) of Regulation B, 12 C.F.R. § 202.2(l).*

49.     The allegation contains a legal conclusion to which no response is required.  To the extent a response is required, Respondents state that the statute and regulation cited speak for themselves and deny any and all allegations inconsistent therewith.

App.91

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 26 of 32 * PUBLIC *

PUBLIC

**Complaint – Paragraph No. 50:**

       *50.    Section 704(c) of the ECOA, 15 U.S.C. § 1691c(c), specifically empowers the Commission to enforce the ECOA. Respondents' violations of the ECOA are deemed to be violations of the FTC Act and are enforceable as such by the Commission under that Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the ECOA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act. This includes the power to enforce a Consumer Financial Protection Bureau regulation promulgated under the ECOA, such as Regulation B, in the same manner as if a violation of that regulation had been a violation of an FTC trade regulation rule.*

       50.    The allegation contains a legal conclusion to which no response is required. To the extent a response is required, Respondents state that the statutes cited speaks for themselves and deny that they have violated the cited statutes.

**Count IV**
**Discriminatory Financing Practices**

**Complaint – Paragraph No. 51:**

       *51.    In connection with motor vehicle credit transactions, on the basis of race, color, or national origin, Respondents impose higher costs on Black and Latino applicants on average than on similarly situated non-Latino White applicants.*

       51.    Respondents deny the allegations in this paragraph.

**Complaint – Paragraph No. 52:**

       *52.    Respondents' acts, policies, and practices as set forth in Paragraph 51 constitute discrimination against applicants with respect to any aspect of a credit transaction on the basis of race, color, or national origin in violation of Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a).*

       52.    The allegation contains a legal conclusion to which no response is required. To the extent a response is required, Respondents state that the statute and regulation cited speak for themselves and deny that they have violated the cited statute and/or regulation.

**AFFIRMATIVE AND OTHER DEFENSES**

       Respondents assert the following affirmative and other defenses without waiver of any others that may be available to it. Each is asserted in the alternative and none is an admission by Respondents. Respondents specifically reserve the right to raise any additional defenses and affirmative defenses at any time during the pendency of these proceedings, including any and all that may come to light through discovery or otherwise. In alleging these affirmative and other

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 27 of 32 * PUBLIC *

PUBLIC

defenses, Respondents do not assume any burden of proof, persuasion, or production not otherwise assigned them under applicable law.

1.    **Laches**.    The FTC served its Civil Investigative Demand on Respondents approximately two years ago, on August 1, 2022.  Having waited such a long time before taking any action, excluding any period for which the Tolling Agreement applied, the FTC is barred by laches from asserting any claim for preliminary or permanent injunctive relief.  Any request for preliminary or permanent injunctive relief based upon allegations that are several years old and for which there is no evidence that they are ongoing or continuing courses of conduct should also be barred by laches.

2.    **Failure to State a Claim Against the Respondents**.  The Complaint fails to state a claim for which relief can be granted.  The Complaint makes no specific, identifiable allegations attributed to Respondents.  Further, the Complaint fails to assert any ongoing violations of law such that would entitle the FTC to relief.

3.    **Failure to State a Claim Against Respondent Benli**.  The Complaint fails to state a claim against Respondent Benli for which relief can be granted.  The Complaint makes no specific allegations attributed to Respondent Benli in his individual capacity related to his participation in unlawful acts or his enactment or enforcement of any policies or procedures that promote unlawful acts. All allegations which refer to Respondent Benli refer to his possible receipt of complaints, without addressing his response to such complaints.  There is no theory by which the FTC can argue that Respondent Benli is vicariously or jointly and severally liable as an individual for any and all acts of the Asbury Automotive Group, Inc., David McDavid Ford Ft. Worth, David McDavid Honda of Irving, or David McDavid Honda of Frisco.

4.    **No Monetary Relief Available**.  Section 13(b) of the FTC Act provides the FTC with the ability to file suit in District Court for injunctive relief to halt ongoing violations.  According to *AMG Capital Management, LLC v. FTC*, 141 S.Ct. 1341 (2021) and *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019, cert. granted), the FTC is not authorized to seek monetary relief in this matter, to the extent the Notice of Contemplated Relief, including at paragraph j, could be construed to include claims for monetary relief because Section 13(b) authorizes only prospective, not retrospective relief.  The Complaint fails to state a claim for which monetary relief may be granted under Section 701(a)(1) of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a).

5.    **Respondents Acted in Good Faith**.  At all relevant times, Respondents acted in good faith and in accordance with all applicable statutory and common law obligations.

6.    **Violations of Respondents' Due Process & Other Constitutional Rights**.

   a.  The Seventh Amendment to the U.S. Constitution requires that the right to a jury trial for suits arising in common law exceeding $20 in value be preserved.  This proceeding entails the administrative adjudication of issues for which the Seventh Amendment affords Respondents' the right to trial by jury and is governed by a statutory scheme that provides for the potential future imposition of civil penalties.  Under the statutes and regulations governing this proceeding, however,

27

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 28 of 32 * PUBLIC *

PUBLIC

Respondents have no right to a jury trial.  Therefore, this proceeding violates Respondents' right to a trial by jury under the Seventh Amendment.

b.  Article III of the U.S. Constitution requires that the judicial power of the United States be vested in Article III courts.  As a result, cases involving private rights may not be removed from the jurisdiction of those courts.  Such private rights that cannot be removed from the jurisdiction of the Article III courts include property rights.  The FTC seeks to usurp the exclusive jurisdiction of the Article III courts by actively impinging on respondents' private rights to property.   The FTC's adjudication of private rights, including in this proceeding, violates Article III of the U.S. Constitution and the Seventh Amendment.

c.  The Commission's procedures arbitrarily subject Respondents to administrative proceedings rather than to proceedings before an Article III judge in violation of Respondents' right to Equal Protection under the Fifth Amendment to the U.S. Constitution.

d.  Congress unconstitutionally delegated legislative power to the FTC by failing to give the FTC an "intelligible principle" by which to exercise the delegated power.  Congress may grant legislative power to an agency only if it provides an "intelligible principle" by which the agency can exercise that power.  Congress cannot otherwise properly delegate to the FTC the decision whether it should use administrative action, rather than a civil action in a court, to redress alleged misconduct.  Congress' unconstitutional delegation of legislative power to the FTC violates Article I of the U.S. Constitution.

e.  The statutory procedures for appointment and removal of the FTC's administrative law judges violate the appointments clause set forth in Article II, Section 2, Clause 2 of the U.S. Constitution and the separation of powers.

f.  Article II, Section 3 of the U.S. Constitution provides that the President must "take Care that the Laws be faithfully executed," and grants the President appointment and removal powers over executive officers.  The Commissioners are executive officers because they exercise executive authority delegated to them by the President of the United States, including by exercising prosecutorial discretion and the ability to initiate enforcement proceedings.  The Commissioners are not freely removable by the President.  *See* 15 U.S.C. § 41.  They may only be removed from their positions for "inefficiency, neglect of duty, or malfeasance in office."  *Id.*  Because they exercise executive authority but are not freely removable by the President, the Commissioners' insulation under Section 41 of the FTC Act violates Article II, Section 3 of the U.S. Constitution and the separation of powers.

g.  Under the FTC Act, the FTC, as prosecutor, initiates an administrative proceeding in its discretion, and, as judge, finally adjudicates the matter, including through factual findings and legal determinations.  Such a structural dual role of prosecutor and adjudicator violates Respondents' right to due process under the Fifth

28

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 29 of 32 * PUBLIC *

PUBLIC

Amendment to the U.S. Constitution because it brings into serious question whether the respondent will receive a fair and unbiased hearing before a neutral arbiter.

h.   The FTC's structural dual role under the FTC Act also violates the separation of powers.

i.   The FTC's procedures also violate Respondents' rights to procedural due process under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

j.   Granting the relief the FTC seeks in these proceedings would constitute a taking of Respondents' property in violation of the Fifth Amendment to the U.S. Constitution.

### ADDITIONAL DEFENSES

Respondents have not knowingly or intentionally waived any applicable affirmative or other defense and reserve the right to rely upon such defenses as may become available or apparent. Respondents further reserve the right to amend this Answer and/or affirmative defenses accordingly, and/or withdraw affirmative defenses Respondents determine are not applicable.

### RESPONDENTS' PRAYER FOR RELIEF

Respondents respectfully request that the case be dismissed because here, the FTC, its processes, and the FTC Act:

a.   Fail to comply with the Seventh Amendment to the U.S. Constitution by failing to provide for trial by jury;

b.   Adjudicate private rights outside of an Article III tribunal, in violation of Article III of the U.S. Constitution and the Seventh Amendment;

c.   Violate equal protection for Respondents under the Fifth Amendment to the U.S. Constitution by arbitrarily subjecting Respondents to administrative proceedings rather than to proceedings before an Article III judge;

d.   Violate Article I of the U.S. Constitution by improperly delegating legislative power;

e.   Violate Article II of the U.S. Constitution and the separation of powers due to the appointments and removal processes for the Commissioners and the administrative law judge;

f.   Violate separation of powers and Respondents' right to due process under the Fifth Amendment to the U.S. Constitution because of the FTC's structural dual role under the FTC Act;

g.   Violate Respondents' rights to procedural due process under the Due Process Clause of the Fifth Amendment to the U.S. Constitution because of the FTC's procedures;

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 30 of 32 * PUBLIC *

PUBLIC

h. Violate the Respondents' right to procedural due process under the Fifth Amendment to the U.S. Constitution; and

i. Intend to Take Respondents' property in violation of the Fifth Amendment to the U.S. Constitution through the relief sought by the FTC in this proceeding.

Respondents further request that judgment be entered in their favor and against the Federal Trade Commission, remove Benli as a Respondent, and that Respondents be granted such other and further relief as is just and proper.

THEREFORE, the Respondents this 3rd day of September, 2024, have issued this Answer in response to the Federal Trade Commission's Complaint.

FOLEY & LARDNER LLP

*/s/Edward D. Burbach*
Edward D. ("Ed") Burbach
Email: eburbach@foley.com
Tel: 512.542.7070
Robert F. Johnson III
Email: rjohnson@foley.com
Tel: 512.542.7127
John Sepehri
Email: jsepehri@foley.com
Tel: 512.542.7016
600 Congress Avenue
Suite 2900
Austin, Texas 78701

Michael J. Lockerby
Email: mlockerby@foley.com
Tel: 202.945.6079
Megan Chester
Email: mxchester@foley.com
Tel: 202.295.4085
3000 K Street N.W.
Suite 600
Washington, DC 20007

COUNSEL FOR RESPONDENTS

App.96

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 31 of 32 * PUBLIC *

PUBLIC

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION
### OFFICE OF ADMINISTRATIVE LAW JUDGES

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2024, I caused the forgoing **RESPONDENTS'**

**ANSWER AND AFFIRMATIVE DEFENSES** to be filed electronically using the FTC's E-

Filing system, which will send notification of such filing to:

| | |
|---|---|
| April Tabor | OFFICE OF ADMINISTRATIVE LAW JUDGES |
| Office of the Secretary | Federal Trade Commission |
| Federal Trade Commission | 600 Pennsylvania Avenue, NW, Rm. H-110 |
| 600 Pennsylvania Avenue, NW | Washington, DC 20580 |
| Rm. H-113 | |
| Washington, DC 20580 | |
| ElectronicFilings@ftc.gov | |

The Honorable Dania L. Ayoubi
Administrative Law Judge
Federal Trade Commission
600 Pennsylvania Ave., NW, Rm. H-110
Washington, DC 20580

I further certify that on September 3, 2024, I caused a courtesy copy of the forgoing to be

served via email to:

ElectronicFilings@ftc.gov

OALJ@ftc.gov

I further certify that on September 3, 2024, I caused the forgoing to be served via email

to:

| | |
|---|---|
| Jamie D. Brooks (Attorney) | Daniel Dwyer (Attorney) |
| Federal Trade Commission | Federal Trade Commission |
| 600 Pennsylvania Avenue, NW | 600 Pennsylvania Avenue, NW |
| Mail Drop CC-10232 | Mail Drop CC-10232 |
| Washington, DC 20580 | Washington, DC 20580 |
| Tel. (202) 621-3913 | Tel. (202) 326-2957 |
| jbrooks4@ftc.gov | ddwyer@ftc.gov |

4858-6795-4398.2

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 09/03/2024 OSCAR NO. 611552 -PAGE Page 32 of 32 * PUBLIC *

PUBLIC

James Doty (Attorney)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-10232
Washington, DC 20580
Tel. (202) 650-8037
jdoty@ftc.gov

Sarah Abutaleb (Attorney)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-10232
Washington, DC 20580
Tel. (202) 326-2583
sabutaleb@ftc.gov

Dated: September 3, 2024

Respectfully Submitted,

/s/ *Megan Chester*
Megan Chester

FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007
Email: mxchester@foley.com
Tel: 202.295.4085

COUNSEL FOR RESPONDENTS

4858-6795-4398.2

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 08/21/2024 OSCAR NO. 611477 -PAGE Page 1 of 4 * PUBLIC *

PUBLIC

# UNITED STATES OF AMERICA
# FEDERAL TRADE COMMISSION
## OFFICE OF ADMINISTRATIVE LAW JUDGES

| | |
|---|---|
| In the Matter of )<br><br>Asbury Automotive Group, Inc.,<br>a corporation, )<br><br>Asbury Ft. Worth Ford, LLC, a limited liability<br>company, also d/b/a David McDavid Ford<br>Ft. Worth, )<br><br>McDavid Frisco – Hon, LLC, a limited liability<br>company, also d/b/a David McDavid Honda of<br>Frisco, )<br><br>McDavid Irving – Hon, LLC, a limited liability<br>company, also d/b/a David McDavid Honda of<br>Irving, and )<br><br>Ali Benli, individually and as an officer of<br>Asbury Ft. Worth Ford, LLC,<br>McDavid Frisco – Hon, LLC, and<br>McDavid Irving – Hon, LLC, )<br><br>Respondents. | DOCKET NO. 9436 |

## PROTECTIVE ORDER GOVERNING CONFIDENTIAL MATERIAL

Commission Rule 3.31(d) states: "In order to protect the parties and third parties against improper use and disclosure of confidential information, the Administrative Law Judge shall issue a protective order as set forth in the appendix to this section." Pursuant to Commission Rule 3.31(d), the protective order set forth in the appendix to that section is attached verbatim as Attachment A and is hereby issued.

ORDERED:  *Dania L. Ayoubi*

Dania L. Ayoubi
Administrative Law Judge

Date: August 21, 2024

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 08/21/2024 OSCAR NO. 611477 -PAGE Page 2 of 4 * PUBLIC *

**PUBLIC**

## ATTACHMENT A

For the purpose of protecting the interests of the parties and third parties in the above-captioned matter against improper use and disclosure of confidential information submitted or produced in connection with this matter:

**IT IS HEREBY ORDERED THAT** this Protective Order Governing Confidential Material ("Protective Order") shall govern the handling of all Discovery Material, as hereafter defined.

1. As used in this Order, "confidential material" shall refer to any document or portion thereof that contains privileged, competitively sensitive information, or sensitive personal information. "Sensitive personal information" shall refer to, but shall not be limited to, an individual's Social Security number, taxpayer identification number, financial account number, credit card or debit card number, driver's license number, state-issued identification number, passport number, date of birth (other than year), and any sensitive health information identifiable by individual, such as an individual's medical records. "Document" shall refer to any discoverable writing, recording, transcript of oral testimony, or electronically stored information in the possession of a party or a third party. "Commission" shall refer to the Federal Trade Commission ("FTC"), or any of its employees, agents, attorneys, and all other persons acting on its behalf, excluding persons retained as consultants or experts for purposes of this proceeding.

2. Any document or portion thereof submitted by a respondent or a third party during a Federal Trade Commission investigation or during the course of this proceeding that is entitled to confidentiality under the Federal Trade Commission Act, or any regulation, interpretation, or precedent concerning documents in the possession of the Commission, as well as any information taken from any portion of such document, shall be treated as confidential material for purposes of this Order. The identity of a third party submitting such confidential material shall also be treated as confidential material for the purposes of this Order where the submitter has requested such confidential treatment.

3. The parties and any third parties, in complying with informal discovery requests, disclosure requirements, or discovery demands in this proceeding may designate any responsive document or portion thereof as confidential material, including documents obtained by them from third parties pursuant to discovery or as otherwise obtained.

4. The parties, in conducting discovery from third parties, shall provide to each third party a copy of this Order so as to inform each such third party of his, her, or its rights herein.

5. A designation of confidentiality shall constitute a representation in good faith and after careful determination that the material is not reasonably believed to be already in the public domain and that counsel believes the material so designated constitutes confidential material as defined in Paragraph 1 of this Order.

6. Material may be designated as confidential by placing on or affixing to the document containing such material (in such manner as will not interfere with the legibility thereof), or if an entire folder or box of documents is confidential by placing or affixing to that folder or box, the designation "CONFIDENTIAL – FTC Docket No. 9436" or any other appropriate notice that

2

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 08/21/2024 OSCAR NO. 611477 -PAGE Page 3 of 4 * PUBLIC *

identifies this proceeding, together with an indication of the portion or portions of the document considered to be confidential material. Confidential information contained in electronic documents may also be designated as confidential by placing the designation "CONFIDENTIAL – FTC Docket No. 9436" or any other appropriate notice that identifies this proceeding, on the face of the CD or DVD or other medium on which the document is produced. Masked or otherwise redacted copies of documents may be produced where the portions deleted contain privileged matter, provided that the copy produced shall indicate at the appropriate point that portions have been deleted and the reasons therefor.

7. Confidential material shall be disclosed only to: (a) the Administrative Law Judge presiding over this proceeding, personnel assisting the Administrative Law Judge, the Commission and its employees, and personnel retained by the Commission as experts or consultants for this proceeding; (b) judges and other court personnel of any court having jurisdiction over any appellate proceedings involving this matter; (c) outside counsel of record for any respondent, their associated attorneys and other employees of their law firm(s), provided they are not employees of a respondent; (d) anyone retained to assist outside counsel in the preparation or hearing of this proceeding including consultants, provided they are not affiliated in any way with a respondent and have signed an agreement to abide by the terms of the protective order; and (e) any witness or deponent who may have authored or received the information in question.

8. Disclosure of confidential material to any person described in Paragraph 7 of this Order shall be only for the purposes of the preparation and hearing of this proceeding, or any appeal therefrom, and for no other purpose whatsoever, provided, however, that the Commission may, subject to taking appropriate steps to preserve the confidentiality of such material, use or disclose confidential material as provided by its Rules of Practice; sections 6(f) and 21 of the Federal Trade Commission Act; or any other legal obligation imposed upon the Commission.

9. In the event that any confidential material is contained in any pleading, motion, exhibit or other paper filed or to be filed with the Secretary of the Commission, the Secretary shall be so informed by the Party filing such papers, and such papers shall be filed *in camera*. To the extent that such material was originally submitted by a third party, the party including the materials in its papers shall immediately notify the submitter of such inclusion. Confidential material contained in the papers shall continue to have *in camera* treatment until further order of the Administrative Law Judge, provided, however, that such papers may be furnished to persons or entities who may receive confidential material pursuant to Paragraphs 7 or 8. Upon or after filing any paper containing confidential material, the filing party shall file on the public record a duplicate copy of the paper that does not reveal confidential material. Further, if the protection for any such material expires, a party may file on the public record a duplicate copy which also contains the formerly protected material.

10. If counsel plans to introduce into evidence at the hearing any document or transcript containing confidential material produced by another party or by a third party, they shall provide advance notice to the other party or third party for purposes of allowing that party to seek an order that the document or transcript be granted *in camera* treatment. If that party wishes *in camera* treatment for the document or transcript, the party shall file an appropriate motion with the Administrative Law Judge within 5 days after it receives such notice. Except where such an order is granted, all documents and transcripts shall be part of the public record. Where *in*

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 08/21/2024 OSCAR NO. 611477 -PAGE Page 4 of 4 * PUBLIC *

**PUBLIC**

*camera* treatment is granted, a duplicate copy of such document or transcript with the confidential material deleted therefrom may be placed on the public record.

11. If any party receives a discovery request in any investigation or in any other proceeding or matter that may require the disclosure of confidential material submitted by another party or third party, the recipient of the discovery request shall promptly notify the submitter of receipt of such request. Unless a shorter time is mandated by an order of a court, such notification shall be in writing and be received by the submitter at least 10 business days before production, and shall include a copy of this Protective Order and a cover letter that will apprise the submitter of its rights hereunder. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Order to challenge or appeal any order requiring production of confidential material, to subject itself to any penalties for non-compliance with any such order, or to seek any relief from the Administrative Law Judge or the Commission. The recipient shall not oppose the submitter's efforts to challenge the disclosure of confidential material. In addition, nothing herein shall limit the applicability of Rule 4.11(e) of the Commission's Rules of Practice, 16 CFR 4.11(e), to discovery requests in another proceeding that are directed to the Commission.

12. At the time that any consultant or other person retained to assist counsel in the preparation of this action concludes participation in the action, such person shall return to counsel all copies of documents or portions thereof designated confidential that are in the possession of such person, together with all notes, memoranda or other papers containing confidential information. At the conclusion of this proceeding, including the exhaustion of judicial review, the parties shall return documents obtained in this action to their submitters, provided, however, that the Commission's obligation to return documents shall be governed by the provisions of Rule 4.12 of the Rules of Practice, 16 CFR 4.12.

13. The provisions of this Protective Order, insofar as they restrict the communication and use of confidential discovery material, shall, without written permission of the submitter or further order of the Commission, continue to be binding after the conclusion of this proceeding.

App.102

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Asbury Automotive Group, Inc., | ) | |
| a corporation, | ) | |
| | ) | |
| Asbury Ft. Worth Ford, LLC, a limited liability | ) | |
| company, also d/b/a David McDavid Ford | ) | |
| Ft. Worth, | ) | |
| | ) | |
| McDavid Frisco – Hon, LLC, a limited liability | ) | DOCKET NO. 9436 |
| company, also d/b/a David McDavid Honda of | ) | |
| Frisco, | ) | |
| | ) | |
| McDavid Irving – Hon, LLC, a limited liability | ) | |
| company, also d/b/a David McDavid Honda of | ) | |
| Irving, and | ) | |
| | ) | |
| Ali Benli, individually and as an officer of | ) | |
| Asbury Ft. Worth Ford, LLC, | ) | |
| McDavid Frisco – Hon, LLC, and | ) | |
| McDavid Irving – Hon, LLC, | ) | |
| | ) | |
| Respondents. | ) | |

**COMPLAINT COUNSEL'S RESPONSES AND OBJECTIONS
TO ASBURY AUTOMOTIVE GROUP, INC.'S FIRST SET OF
REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

**<u>GENERAL RESPONSES</u>**

1.        By responding or agreeing to produce documents in response to these

Requests, Complaint Counsel does not concede that such documents exist or are within

the scope of discovery, relevant, material, or admissible in evidence.  In particular,

Complaint Counsel does not waive or intend to waive, but rather reserves and intends

6.          Complaint Counsel's Responses are based on a search of the documents and information in the possession, custody, or control of the Division of Financial Practices ("Division"), the division of the Commission's Bureau of Consumer Protection that investigated this matter and is handling the prosecution of this action. 16 C.F.R. 3.31(c)(2).

6.          Privileges held by the Commission (not Complaint Counsel) can only be waived by the Commission.

## **GENERAL OBJECTIONS**

1.          Complaint Counsel objects to these Requests, and each instruction and definition therein, to the extent that they seek documents that are not discoverable pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4, or otherwise exempt from disclosure by law, including, but not limited to, identification of documents or information protected from disclosure by the attorney-client privilege, the work product doctrine, the government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, or any other applicable privilege of law. Complaint Counsel does not intend to waive any of the privileges asserted in this objection by any inadvertent reference to, or production of, protected documents or information that may occur, and reserves the right to seek the return of any such material inadvertently produced to Respondents.

2.          Complaint Counsel objects to these Requests, and each instruction and definition therein, to the extent they are vague, ambiguous, overly broad, unduly burdensome, or duplicative of other Requests.

expressly reserves its right to supplement, revise, modify, or otherwise change or amend its response based on any new facts obtained through further investigation or discovery.

6.      **Copies of any Materials related to the "survey" referenced in Paragraph 23 of the Administrative Complaint, including but not limited to:**

**a. Any report of survey results,**

**b. The survey instrument(s) used,**

**c. Any description of the survey methodology,**

**d. A list of all persons invited to participate,**

**e. A list of all persons who responded,**

**f. Copies of all responses received,**

**g. Unedited copies of any computer code used to sort, organize, or analyze the survey responses,**

**h. Contracts (or any other written agreement) with any person or organization outside the FTC to assist in preparing, conducting, or analyzing the survey.**

Complaint Counsel objects to the Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, and/or any other applicable privilege of law.  Complaint Counsel further objects to the Request to the extent it seeks documents or information that are outside of the scope of materials to be searched or produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4.  Complaint Counsel further objects to the Request on the ground that it contravenes 16 C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert

discovery. Accordingly, Complaint Counsel will not produce documents responsive to this Request.

7.    **Any data evidencing the actual race and/or ethnicity of any of the "consumers" referenced in Paragraphs 32-34 of the Administrative Complaint**.

Complaint Counsel objects to the Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, and/or any other applicable privilege of law. Complaint Counsel further objects to the Request to the extent it seeks documents or information that are outside of the scope of materials to be searched or produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4. Complaint Counsel further objects to the Request to the extent that it contravenes 16 C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert discovery.

Complaint Counsel further objects to this Request to the extent it calls for documents already in Respondents' possession, custody, or control, including documents that Respondents produced to Complaint Counsel during the pre-suit investigation. It would be more convenient, less burdensome, and less expensive for Respondents to refer to the documents previously produced to Complaint Counsel than for Complaint Counsel to re-produce such documents to Respondents.

Apart from documents withheld based on the foregoing objections and documents produced in response to other Requests, Complaint Counsel responds that it is not currently aware of additional documents responsive to the Request.

Complaint Counsel's responses are based on the investigation it has conducted to date,

9

and Complaint Counsel notes that discovery is ongoing.  Accordingly, Complaint Counsel

expressly reserves its right to supplement, revise, modify, or otherwise change or amend its

response based on any new facts obtained through further investigation or discovery.

**8.**     **Any data or modeling used to estimate and/or analyze the race and/or ethnicity of any of the "consumers" referenced in Paragraphs 32-34 of the Administrative Complaint.**

Complaint Counsel objects to the Request to the extent it seeks documents or

information protected from discovery by the attorney-client privilege, the work product

doctrine, the government deliberative process privilege, the law enforcement evidentiary or

investigative file privilege, the common interest rule, the informant privilege, and/or any other

applicable privilege of law.  Complaint Counsel further objects to the Request to the extent it

seeks documents or information that are outside of the scope of materials to be searched or

produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3,

and 4.  Complaint Counsel further objects to the Request on the ground that it contravenes 16

C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert

discovery.  Accordingly, Complaint Counsel will not produce documents responsive to this

Request.

**9.**     **Unedited copies of any queries or computer code written by or for You that was used to estimate and/or analyze the race and/or ethnicity of any of the "consumers" referenced in Paragraphs 32-34 of the Administrative Complaint.**

Complaint Counsel objects to the Request to the extent it seeks documents or information

protected from discovery by the attorney-client privilege, the work product doctrine, the

10

government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, and/or any other applicable privilege of law.  Complaint Counsel further objects to the Request to the extent it seeks documents or information that are outside of the scope of materials to be searched or produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4.  Complaint Counsel further objects to the Request on the ground that it contravenes 16 C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert discovery.  Accordingly, Complaint Counsel will not produce documents responsive to this Request.

10.    **Unedited copies of any queries or computer code written by or for You that was used to sort, organize, and/or analyze the pricing data to support the allegations of discriminatory pricing referenced in Paragraphs 32-34 of the Administrative Complaint**.

Complaint Counsel objects to the Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, and/or any other applicable privilege of law.  Complaint Counsel further objects to the Request to the extent it seeks documents or information that are outside of the scope of materials to be searched or produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4.  Complaint Counsel further objects to the Request on the ground that it contravenes 16 C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert discovery.  Accordingly, Complaint Counsel will not produce documents responsive to this Request.

11.    **Any information, including unedited copies of queries or computer code written by or for**

11

**You and resulting data, that reflects how "other factors that could affect the cost of add-ons" were accounted for, as described in Paragraph 33 of the Administrative Complaint.**

Complaint Counsel objects to the Request on the ground that the phrases "Any information . . . that reflects" and "were accounted for" is vague and ambiguous. Complaint Counsel construes the Request as seeking consultant, expert, or internal analyses that accounts for factors affecting the cost of add-ons. Construing the Request in that fashion, Complaint Counsel objects to the Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the government deliberative process privilege, the law enforcement evidentiary or investigative file privilege, the common interest rule, the informant privilege, and/or any other applicable privilege of law. Complaint Counsel further objects to the Request to the extent it seeks documents or information that are outside of the scope of materials to be searched or produced by Complaint Counsel pursuant to the FTC's Rules of Practice, 16 C.F.R. Parts 2, 3, and 4. Complaint Counsel further objects to the Request on the ground that it contravenes 16 C.F.R. § 3.31A(e) and Additional Provision 21 of the Scheduling Order governing expert discovery. Accordingly, Complaint Counsel will not produce documents in response to this Request.

**12.    Copies of any Materials that "represent, directly or indirectly, expressly or by implication, that charges appearing on consumers' sales contracts are authorized by consumers" that You contend were not, in fact, authorized by the consumer(s), as alleged in Paragraphs 39-41 of the Administrative Complaint.**

Complaint Counsel objects to the request on the ground that the phrase "Materials that 'represent'" is vague and ambiguous and misstates the allegations in the Complaint. Complaint Counsel further objects to this Request to the extent it calls for documents already in

12

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**
OFFICE OF ADMINISTRATIVE LAW JUDGES

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| Asbury Automotive Group, Inc., | ) |
| a corporation, | ) |
|  | ) |
| Asbury Ft. Worth Ford, LLC, a limited liability | ) |
| Company, also d/b/a David McDavid Ford | ) |
| Ft. Worth, | ) |
|  | ) |
| McDavid Frisco – Hon, LLC, a limited liability | ) |
| Company, also d/b/a David McDavid Honda of | )          Docket No. 9436 |
| Frisco, | ) |
|  | ) |
| McDavid Irving – Hon, LLC, a limited liability | ) |
| Company, also d/b/a David McDavid Honda of | ) |
| Irving, and | ) |
|  | ) |
| Ali Benli, individually and as an officer of | ) |
| Asbury Ft. Worth Ford, LLC, | ) |
| McDavid Frisco – Hon, LLC, and | ) |
| McDavid Irving – Hon, LLC, | ) |
|  | ) |
| Respondents. | ) |

**COMPLAINT COUNSEL'S PRELIMINARY PROPOSED FACT WITNESS LIST**

Pursuant to the Court's Scheduling Order, dated September 13, 2024, Complaint Counsel hereby provides its Preliminary Proposed Fact Witness List to Respondents Asbury Automotive Group, Inc., Asbury Ft. Worth Ford LLC, also d/b/a David McDavid Ford Ft. Worth, McDavid Frisco – Hon, LLC, also d/b/a David McDavid Honda of Frisco, McDavid Irving – Hon, LLC, also d/b/a David McDavid Honda of Irving, and Ali Benli ("Respondents"). This list identifies the fact witnesses who may testify for Complaint Counsel at the hearing in this action by

deposition and/or investigational hearing transcript, declaration, or orally by live witness.[1] It does not identify expert or rebuttal witnesses, whom Complaint Counsel will identify at a later date in compliance with the Scheduling Order.

The information disclosed herein, including the employment status and job titles for Respondents' employees, is based upon information reasonably available to Complaint Counsel at present. Discovery is ongoing and likely will have an impact on Complaint Counsel's final proposed witness list. Subject to the limitations in the Scheduling Order entered in this action, Complaint Counsel reserves the right:

A.  To present testimony by deposition and/or investigational hearing transcript, declaration, or orally by live witness, from any other person that Respondent identifies as a potential witness in this action;

B.  To present testimony by deposition and/or investigational hearing transcript, declaration, or orally by live witness, from any witnesses to rebut the testimony of witnesses proffered by Respondents;

C.  Not to present testimony by deposition and/or investigational hearing transcript, declaration, or orally by live witness, from any of the witnesses listed below;

D.  To supplement this Preliminary Witness List if additional information becomes available through discovery or otherwise, and pursuant to the Scheduling Order;

E.  To present testimony by deposition transcript, declaration, or orally by live witness, from the custodian of records from which documents or records have been or will be obtained

---

[1] This list contemplates later refinement, in accordance with the Scheduling Order.

in this action, including, but not limited to, the non-parties listed below, to the extent

necessary for the admission of documents or deposition or investigational hearing

testimony into evidence in the event that a stipulation cannot be reached concerning the

admissibility of such documents or testimony; and

F.  For any individual listed below as being associated with a corporation or other non-party

entity, to substitute a witness designated by the associated non-party entity in response to

any subpoena that has been or may be issued by Complaint Counsel or Respondents to

that non-party entity in this action.

Subject to these reservations of rights, Complaint Counsel's preliminary list of

witnesses is as follows:

**I.    Current and Former Employees of Respondents**

**1.  Ali B. Benli, General Manager, David McDavid Ford Ft. Worth and former General Manager of David McDavid Honda Irving and David McDavid Honda Frisco**

We expect Ali Benli will testify about (i) his role and responsibilities,

(ii) Respondents' policies and practices related to the sale of add-ons, fair lending, and

compliance, (iii) consumer complaints he received or reviewed, (iv) deals and audits he

reviewed, and (v) Respondents' response to consumer complaints, audit findings, and incidents

of deceptive and unfair practices in connection with the sale of add-ons.

**2.  Steve Mansell, Former General Manager of David McDavid Ford Ft. Worth**

We expect Steve Mansell will testify about (i) his role and responsibilities,

(ii) Respondents' policies and practices related to the sale of add-ons, fair lending, and

Page 3 of 13

compliance, (iii) consumer complaints he received or reviewed, (iv) deals and audits he reviewed, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

### 3. Sonia Heredia, Former General Manager of David McDavid Honda of Frisco

We expect Sonia Heredia will testify about (i) Respondents' policies and practices related to the sale of add-ons, fair lending, and compliance (ii) consumer complaints she received or reviewed, (iii) deals and audits she reviewed, and (iv) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

### 4. Apollo Chang, General Manager of David McDavid Honda of Irving

We expect Apollo Chang will testify about (i) Respondents' policies and practices related to the sale of add-ons, fair lending, and compliance, (ii) consumer complaints he received or reviewed, (iii) deals and audits he reviewed, and (iv) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

### 5. David Hult, President & Chief Executive Officer, Asbury Automotive Group

We expect David Hult will testify about (i) the corporate structure and business functions of Asbury Automotive Group, Inc. and its subsidiaries, including David McDavid Ford Ft. Worth, David McDavid Honda of Frisco, David McDavid Honda of Irving ("McDavid Group Dealerships"), (ii) policies and practices related to add-on sales, fair lending, and compliance, (iii) consumer complaints, audits, investigations, and findings of misconduct related to the sale of

add-ons, and Respondents' responses thereto, and (iv) the role and responsibilities of Ali Benli and other witnesses.

**6. Daniel Clara, Senior Vice President, Operations, Asbury Automotive Group, Inc.**

We expect Daniel Clara will testify about (i) the corporate structure of Asbury Automotive Group, Inc. and its subsidiaries, including Asbury Automotive Group, LLC, Asbury Management Services, LLC, Asbury Risk Services, LLC, and the McDavid Group Dealerships, (ii) Respondents' policies and practices related to the sale of add-ons and fair lending, and (iii) audits, investigations, consumer complaints, and findings of misconduct related to the McDavid Group Dealerships.

**7. Kelly Baker, Vice President, Chief Audit & Risk Executive, Asbury Automotive Group**

We expect Kelly Baker will testify about (i) Respondents' policies and practices related to compliance, including the process for conducting audits, (ii) policies and practices related to add-on sales, (iii) policies and practices related to fair lending, (iv) audits, investigations, and findings of misconduct related to the McDavid Group Dealerships and Respondents' responses thereto.

**8. Scott Grogan, Director of Compliance and Internal Audit, Asbury Automotive Group**

We expect Scott Grogan will testify about (i) Respondents' policies and practices related to compliance, including the process for conducting audits, and (ii) audits and investigations of the McDavid Group Dealerships and Respondents' responses thereto.

9. **Barbara Jessup, Chief Audit and Risk Executive**

We expect Barbara Jessup will testify about (i) Respondents' policies and practices related to compliance, including the process for conducting audits, and (ii) audits, investigations, and findings of misconduct at the McDavid Group Dealerships and Respondents' responses thereto.

10. **Ivan Cerna-Villalobos, Internal Auditor, Asbury Automotive Group**

We expect Ivan Cerna-Villalobos will testify about (i) Respondents' policies and practices related to add-on sales, fair lending, and compliance, including the process for conducting audits, and (ii) audits, investigations, and findings of misconduct at of the McDavid Group Dealerships and Respondents' responses thereto.

11. **Paris Ramirez, National F&I Director, David McDavid Operations**

We expect Paris Ramirez will testify about (i) Respondents' policies and practices related to the sale of add-ons, fair lending, and compliance; (ii) Respondents' lending partners, and (iii) audits, investigations, consumer complaints, and findings of misconduct related to the McDavid Group Dealerships.

12. **Tiger Lester, Regional F&I Director, Asbury Automotive Group**

We expect Tiger Lester will testify about (i) Respondents' policies and practices related to the sale of add-ons, fair lending, and compliance, and (ii) audits, investigations, consumer complaints, and findings of misconduct related to the McDavid Group Dealerships.

13. **Chadrick S. McClellon, F&I Director, David McDavid Ford Ft. Worth**

We expect that Chadrick McClellon will testify concerning (i) Respondents' policies and

practices related to the sale of add-ons, (ii) his own experience managing the sale of add-ons, (iii) the documents and platforms used by F&I managers, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

## 14. One or more current or former F&I Managers of David McDavid Ford Ft. Worth; individual(s) to be identified

We expect that a current or former F&I manager of David McDavid Ford Ft. Worth will testify concerning (i) Respondents' policies and practices related to the sale of add-ons, (ii) his or her own experience selling add-ons, (iii) the documents and platforms used by F&I mangers, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

## 15. One or more current or former F&I Managers or Directors of David McDavid Honda of Frisco; individual(s) to be identified

We expect that a current or former F&I Manager or Director of David McDavid Honda of Frisco will testify concerning (i) Respondents' policies and practices related to the sale of add-ons, (ii) his or her own experience selling or overseeing the sale of add-ons, (iii) the documents and platforms used by F&I mangers, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

**16. One or more current or former F&I Managers or Directors of David McDavid Honda of Irving; individual(s) to be identified**

We expect that a current or former F&I Manager or Director of David McDavid Honda of Irving will testify concerning (i) Respondents' policies and practices related to the sale of add-ons, (ii) his or her own experience selling or overseeing the sale of add-ons, (iii) the documents and platforms used by F&I mangers, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

**17. Gerald N. Rollinson, Sales Manager, David McDavid Ford Ft. Worth**

We expect that Gerald Rollinson will testify concerning (i) his experience managing sales advisors, (ii) Respondents' policies and practices related to the sale, leasing, and financing of motor vehicles and add-ons, including policies and practices related to quoting prices and payments, (iii) the documents and platforms used by sales advisors, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

**18. Brian M. Bertschy, Sales Manager, David McDavid Ford Ft. Worth**

We expect that Brian Bertschy will testify concerning (i) his experience managing sales advisors, (ii) Respondents' policies and practices related to the sale, leasing, and financing of motor vehicles and add-ons, including policies and practices related to quoting prices and payments, (iii) the documents and platforms used by sales advisors, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of

Page 8 of 13

deceptive and unfair practices in connection with the sale of add-ons.

**19. One or more current or former Sales Managers or Advisors of David McDavid Honda of Irving; individual(s) to be identified**

We expect that a current or former Sales Manager or Advisor of David McDavid Honda of Irving will testify concerning (i) his or her experience selling or managing the sale of motor vehicles and add-ons, (ii) Respondents' policies and practices related to the sale, leasing, and financing of motor vehicles and add-ons, including policies and practices related to quoting prices and payments, (iii) the documents and platforms used by sales advisors, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

**20. One or more current or former Sales Managers of David McDavid Honda of Frisco; individual(s) to be identified**

We expect that a current or former Sales Manager or Advisor of David McDavid Honda of Frisco will testify concerning (i) his or her experience selling or managing the sale of motor vehicles and add-ons, (ii) Respondents' policies and practices related to the sale, leasing, and financing of motor vehicles and add-ons, including policies and practices related to quoting prices and payments, (iii) the documents and platforms used by sales advisors, (iv) consumer complaints, and (v) Respondents' response to consumer complaints, audit findings, and incidents of deceptive and unfair practices in connection with the sale of add-ons.

## II.    Related Entities

**21. Asbury Automotive Group, LLC Representative; individual to be identified.**

We anticipate that a representative from Asbury Automotive Group, LLC may testify regarding (i) the corporate structure and business functions of Asbury Automotive Group, Inc. and its subsidiaries, and (ii) the authenticity of any documents produced by Respondents and the manner in which any such document was stored and maintained in Respondents' files.

**22. Asbury Management Services, LLC Representative; individual to be identified.**

We anticipate that a representative from Asbury Management Services, LLC may testify regarding (i) the corporate structure and business functions of Asbury Automotive Group, Inc. and its subsidiaries, (ii) the hiring, termination, payment, and employment status of employees at the McDavid Group Dealerships, and (iii) the authenticity of any documents produced by Respondents and the manner in which any such document was stored and maintained in Respondents' files.

## III.    Business Partners and Third Parties

**23. Cal-Tex Protective Coatings, Inc. Representative; individual to be identified.**

We anticipate that a representative from Cal-Tex Protective Coatings, Inc. may testify about the sale of add-on products, including ResistAll, at the McDavid Group Dealerships.

**24. American Honda Finance Corporation Representative; individual to be identified.**

We anticipate that a representative from American Honda Finance Corporation may testify about the sale of add-on products at the McDavid Group Dealerships.

**25. Jim Moran & Associates, Inc. Representative; individual to be identified.**

We anticipate that a representative from Jim Moran & Associates, Inc. may testify about the sale of add-on products at the McDavid Group Dealerships.

**IV.    Consumers**

**26. Consumers who purchased vehicles at David McDavid Ford Ft. Worth; individuals to be identified.**

We expect one or more consumers will testify about their experience purchasing a motor vehicle and being charged for add-ons at David McDavid Ford Ft. Worth. Complaint Counsel note that fact discovery is ongoing and counsel is still identifying additional harmed consumers as well as awaiting Respondents' production of documents concerning the consumers Complaint Counsel have already identified to Respondents. This discovery will inform Complaint Counsel's decision of which consumers to call as witnesses.

**27. Consumers who purchased vehicles at David McDavid Honda of Frisco; individuals to be identified.**

We expect one or more consumers will testify about their experience purchasing a motor vehicle and being charged for add-ons at David McDavid Honda of Frisco.

**28. Consumers who purchased vehicles at David McDavid Honda of Irving; individuals to be identified.**

We expect one or more consumers will testify about their experience purchasing a motor vehicle and being charged for add-ons at David McDavid Honda of Irving.

Dated: October 11, 2024

/s/ *Jamie D. Brooks*

Jamie D. Brooks
James Doty
Daniel Dwyer
Sarah Abutaleb
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 621-3913 (Brooks)
Fax: (202) 326-3768
jbrooks4@ftc.gov
jdoty@ftc.gov
ddwyer@ftc.gov
sabutaleb@ftc.gov

*Counsel Supporting the Complaint*

Page 12 of 13

App.121

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by email on October 11, 2024.

/s/ *Jamie D. Brooks*

Jamie D. Brooks
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 621-3913
Fax: (202) 326-3768

*Counsel Supporting the Complaint*