**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| ASBURY AUTOMOTIVE GROUP, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 4:24-cv-00950-O |
| THE FEDERAL TRADE COMMISSION, *et al.*, | |
| *Defendants*. | |

**Defendants' Notice of Supplemental Authorities**

In accordance with Local Civil Rule 56.7 and this Court's July 28, 2025, Order (ECF No. 47), Defendants respectfully file this Notice of Supplemental Authorities in connection with Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) and Defendants' Motion to Dismiss (ECF No. 24). Defendants hereby notify the Court of two recent decisions: *Traffic Jam Events, L.L.C. v. FTC*, No. 21-60947, 2025 WL 1904566 (5th Cir. July 10, 2025) (unpublished) and *Walmart v. Chief Administrative Law Judge*, No. 24-11733, 2025 WL 1949488 (11th Cir. July 16, 2025). These decisions provide additional support for Defendants' contentions that Plaintiffs' preliminary injunction motion should be denied and that this action should be dismissed.

On October 4, 2024, Plaintiffs filed a Complaint for injunctive and declaratory relief, claiming that a pending FTC administrative proceeding involving Plaintiffs is unconstitutional. ECF No. 1 ("Compl."). Count III of the Complaint alleges that the FTC's dual role as prosecutor and adjudicator violates Plaintiffs' due process rights under the Fifth Amendment to the U.S. Constitution. *Id.* ¶¶ 69-72. Counts IV and V allege that removal protections for FTC Administrative Law Judges ("ALJs") and FTC Commissioners violate Article II of the U.S. Constitution. *Id.* ¶¶ 73-79. Plaintiffs moved for a preliminary injunction based on these contentions and others.

On November 12, 2024, Defendants opposed Plaintiffs' motion for a preliminary injunction and moved to dismiss this action. *See* ECF Nos. 23-24. Defendants contended, among other things, that Count III fails because the FTC's "combination of prosecutorial and adjudicative functions does not violate due process." ECF No. 25 ("MTD Br.") at 9-10. Counts IV and V likewise fail because Plaintiffs failed to make the "requisite showing of harm" in connection with their removal challenges. *Id.* at 29. Additionally, Counts IV and V fail because the removal protections could simply be severed if the Court concluded they were unconstitutional. *Id.* at 30.

In Section III.A of *Traffic Jam Events*, the Fifth Circuit similarly rejected a petitioner's constitutional challenges to removal protections implicating FTC's ALJs and Commissioners, finding that the petitioner had "failed to argue how the allegedly unconstitutional removal provisions have caused it harm." 2025 WL 1904566, at *3-4. In Section III.B, the Fifth Circuit also recognized that "binding precedent provides that there is no due process violation inherent in the FTC's dual role as investigator and adjudicator." *Id.* at *4. Moreover, in Section VII of *Walmart*, the Eleventh Circuit held that even if ALJ removal protections under the Administrative Procedure Act "were unconstitutional," they would be "easily severable" from the rest of the Administrative Procedure Act. 2025 WL 1949488, at *28.

Consistent with these authorities, Defendants request that the Court deny Plaintiffs' Motion for Preliminary Injunction, grant Defendants' Motion to Dismiss, and dismiss this action.

July 29, 2025

OF COUNSEL:

MATTHEW M. HOFFMAN
Attorney
Office of the General Counsel
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580

JAMIE D. BROOKS
JAMES DOTY
Attorneys
Division of Financial Practices
Bureau of Consumer Protection
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

SARMAD M. KHOJASTEH
Senior Counsel

LISA K. HSIAO
Acting Director, Consumer Protection Branch

JAMES W. HARLOW
Acting Assistant Director

*/s/ Zachary L. Cowan*
ISAAC C. BELFER (D.C. Bar No. 1014909)
ZACHARY L. COWAN (N.C. Bar No. 53432)
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-7134 (Belfer)
(202) 353-7728 (Cowan)
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov
Zachary.L.Cowan@usdoj.gov

3

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

July 29, 2025                                        */s/ Zachary L. Cowan*
                                                     ZACHARY L. COWAN

Traffic Jam Events, L. L. C. v. Federal Trade Commission, Not Reported in Fed. Rptr...

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 5 of 39    PageID 633

2025 WL 1904566

Only the Westlaw citation is currently available.

United States Court of Appeals, Fifth Circuit.

TRAFFIC JAM EVENTS, L.L.C., a limited liability
company; David J. Jeansonne, II, individually and as
an officer of Traffic Jam Events, L.L.C., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 21-60947
|
FILED July 10, 2025

Appeal from the Federal Trade Commission, Agency No.
9395

**Attorneys and Law Firms**

Luis Etienne Balart (argued), Jones Walker, L.L.P., New
Orleans, LA, for Petitioners.

Imad Dean Abyad (argued), Alden F. Abbott, Donald S.
Clark, Heather Hippsley, Joel Robert Marcus, Joseph J.
Simons, Federal Trade Commission Office of the General
Counsel, Washington, DC, for Respondent.

Before Stewart, Dennis, and Richman, Circuit Judges.

**Opinion**

Priscilla Richman, Circuit Judge: *

 **\*1** In an administrative proceeding, the Federal
Trade Commission (FTC) determined that Traffic Jam
Events, L.L.C. (Traffic Jam) had distributed deceptive
advertisements. The FTC released an order that, among other
requirements, banned Traffic Jam and its president, David
Jeansonne II, from participating in businesses involving
advertising, marketing, promoting, distributing, selling, or
leasing motor vehicles. Traffic Jam petitioned for review in
this court, alleging that (1) the structure of the FTC and the
proceedings against Traffic Jam were unconstitutional, (2)
the FTC did not have jurisdiction over Traffic Jam and the
advertisements did not violate the FTC Act,[1] (3) Traffic Jam
was not subject to the Truth in Lending Act, (4) the FTC's
remedy was unconstitutional, and (5) Jeansonne should not
be held individually liable. We deny Traffic Jam's petition for
review.

**I**

Traffic Jam is an advertising company that creates mailers on
behalf of automotive dealerships. David Jeansonne II was its
president and involved in all aspects of the business. Prior to
the current proceedings, Traffic Jam had faced at least three
charges by states relating to consumer protection laws and its
advertisements, which it settled.

The first set of advertisements at issue relates to mailers that,
the FTC alleges, falsely represented that the recipient had
won a valuable prize. For example, one such advertisement
indicated that the recipient had won $2,500 in cash. If the
recipient called or went to the listed website to claim their
prize, they were told to visit the dealership to obtain it.
However, the reverse side of the mailer stated in small print
that the winning code was not the one listed on the mailer but
rather a prize code posted on a board at the dealership, making
the winning code listed on the mailer meaningless. Some of
these mailers also advertised certain financing offers next to
images of cars. However, additional information, such as the
repayment period and annual percentage rate, was shown in
small print or on other pages. In some cases, the fine print
indicated the annual percentage rate was higher than the rate
advertised in large print.

The second set of advertisements at issue is a set of mailers
that the FTC alleges were designed to lure people to car sales
events with a false promise of COVID stimulus funds. These
mailers appeared to be official government mail. The State of
Florida also sued Traffic Jam regarding the COVID mailers.
The FTC states that Florida's charge was resolved through
a consent order barring Traffic Jam from doing business in
Florida.

Evidence shows that numerous consumers complained that
they had been deceived by these advertisements. The FTC
sued in federal district court for injunctive and other equitable
relief, which the FTC argues was warranted because "Traffic
Jam's COVID mailers posed an urgent threat to public health."
Traffic Jam argued in the district court that the case should
instead have been brought as an administrative proceeding
and that it had ceased sending the mailers. The district court
denied the FTC's motion for equitable relief because the FTC
had not shown that the deceptive advertising was ongoing.
The FTC then dismissed the district court proceeding and
brought the administrative action at issue here.

Traffic Jam Events, L. L. C. v. Federal Trade Commission, Not Reported in Fed. Rptr....

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 6 of 39    PageID 634

**\*2**  The administrative complaint charged violations of the FTC Act for the COVID mailers and prize mailers as well as violations of the Truth in Lending Act (TILA) and Regulation Z for disseminating credit advertisements that failed to make the proper disclosures with sufficient clarity. An Administrative Law Judge (ALJ) oversaw discovery. The agency moved for a summary decision, analogous to summary judgment. Traffic Jam did not file a counterstatement of facts, which is designed to indicate the material facts the opposing party believes create genuine issues for trial.[2] However, it did oppose the motion for summary decision.

In a summary decision, the FTC unanimously determined that Traffic Jam had committed the charged violations and that Jeansonne was individually liable. It then entered a cease-and-desist order which bars Traffic Jam and Jeansonne individually from (1) "participat[ing] in any business which involves, in whole or in part, advertising, marketing, promoting, distributing, offering for sale or lease, or selling or leasing motor vehicles"; (2) making misrepresentations about government financial assistance or any "prize, sweepstakes, lottery, or giveaway"; and (3) making statements about credit offers "without disclosing Clearly and Conspicuously" the terms required by the TILA and Regulation Z. It also required compliance monitoring, reporting, and recordkeeping.

Traffic Jam petitioned for review of the FTC's order, raising Appointments Clause, due process, and Seventh Amendment claims relating to the structure of the FTC and the administrative proceedings against Traffic Jam. We review the FTC's decision de novo.[3]

## II

We first address whether Traffic Jam's constitutional claims are properly before this court.

Traffic Jam failed to raise its Appointments Clause and Seventh Amendment claims in the administrative proceeding. Similarly, although Traffic Jam used the words "due process" in its answer and defense filing during the administrative proceeding, it provided virtually no detail as to what it alleged regarding "due process." These claims were not exhausted before the agency. However, Supreme Court precedent provides that some non-exhausted claims may still be considered by courts.

In *Carr v. Saul*,[4] the Supreme Court held that Social Security claimants who lost before an ALJ could raise an Appointments Clause claim during postadjudication judicial review *even if* the claimants did not exhaust that claim before the agency.[5] In examining whether a court should judicially impose an issue-exhaustion requirement where none exists in the agency's authorizing statutes or its regulations, the Supreme Court considered (1) whether the agency proceedings were adversarial or inquisitorial, in particular "whether claimants bear the responsibility to develop issues for adjudicators' consideration";[6] (2) "that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise"; and (3) that "this Court has consistently recognized a futility exception to exhaustion requirements."[7] In *Carr*, the claims were "purely constitutional" and the ALJs were not "capable of remedying any defects in their own appointments."[8] The Court concluded: "Taken together, the inquisitorial features of [Social Security Administration (SSA)] ALJ proceedings, the constitutional character of petitioners' claims, and the unavailability of any remedy make clear that 'adversarial development' of the Appointments Clause issue 'simply [did] not exist' (and could not exist) in petitioners' ALJ proceedings."[9]

**\*3**  With regard to Traffic Jam's Appointments Clause claims, like the SSA in *Carr*, the FTC "has no rule requiring waiver of issues not presented to it."[10] However, while SSA proceedings are more "inquisitorial rather than adversarial,"[11] the FTC proceedings were likely more adversarial than the SSA proceedings at issue in *Carr*. Even so, the claims raise structural constitutional issues, and the agency could not have remedied such claims had Traffic Jam raised them in the administrative proceeding. Traffic Jam's Appointments Clause claims are not forfeited.[12]

Regarding Traffic Jam's Seventh Amendment claim, Traffic Jam first raised that claim in its reply brief.[13] Although this court has stated that it may consider forfeited issues that are purely legal and otherwise would result in a miscarriage of justice,[14] no miscarriage of justice would result from not addressing the claims here because Traffic Jam argued in the district court that the proceeding should have been brought in an agency adjudication.

Traffic Jam forfeited its Seventh Amendment claim.

Traffic Jam Events, L. L. C. v. Federal Trade Commission, Not Reported in Fed. Rptr....

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 7 of 39    PageID 635

### III

### A

We first address whether the removal provisions for both ALJs and the FTC Commissioner violate the Appointments Clause. Traffic Jam argues that the "dual-layer of protection from Presidential removal" that FTC ALJs enjoy is "almost identical" to the protections struck down by the Supreme Court in *Free Enterprise Fund v. Public Co. Accounting Oversight Board* [15] and that the Supreme Court has held that SEC ALJs, who perform similar functions to FTC ALJs, are executive branch officers. [16]

After the conclusion of briefing, this court decided *Community Financial Services Ass'n of America, Ltd. v. Consumer Financial Protection Bureau* (*Community Financial I*), [17] which concluded that "to obtain a remedy, the challenging party must demonstrate not only that the removal restriction violates the Constitution but also that 'the unconstitutional removal provision inflicted harm' " [18] and that "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office." [19] This court determined "three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor." [20] The Supreme Court reversed our court on other grounds in *Community Financial Services.* [21] On remand to this court, we noted that "the [Supreme] Court did not address the other issues we decided in the case," and we reinstated the judgment "based on Plaintiffs' alternative arguments," citing specific parts of our court's prior decision. [22] The harm analysis, applying the three prerequisites, was among the alternative arguments referenced. Those three prerequisites remain the controlling law in our circuit.

**\*4** Traffic Jam has failed to argue how the allegedly unconstitutional removal provisions have caused it harm. It therefore cannot prevail on this claim. [23]

### B

We assume without deciding that Traffic Jam did not forfeit its due process claim, so we address the merits of that claim. Traffic Jam argues that the FTC has both investigative and adjudicative functions, a "dual-role" which violates due process when combined with the FTC's "win streak" and "procedural ability to inflict expense" because Traffic Jam was not given the opportunity to rebut the FTC's assertions before a neutral decisionmaker. It further argues that judicial power is reserved for Article III courts and that some matters, such as "inquiry into the circumstances of the pre-complaint investigation and reasons why a complaint is issued," are barred under FTC precedent but would have been informative to Traffic Jam's constitutional claims. Finally, it argues that the FTC's "vindictive behavior" is clear in that it first brought a federal lawsuit against Traffic Jam, "lost," and then brought the same complaint with additional charges in the agency proceeding.

Binding precedent provides that there is no due process violation inherent in the FTC's dual role as investigator and adjudicator [24] and that the choice "between consenting to an order or incurring the burdens and expenses of a defense is inherent in the adversary process and is basically 'part of the social burden of living under government.' " [25]

The only case-specific bias Traffic Jam claims is that the FTC first brought its case in district court. However, Traffic Jam argued in the district court that the case should be dismissed because the FTC should have instead pursued an administrative proceeding. Traffic Jam accordingly advocated for a non-jury, administrative proceeding. [26]

Traffic Jam nevertheless asserts that the FTC's "win" record deprived it of due process but has not explained how the FTC's win record inherently indicates wrongdoing. Additionally, Traffic Jam's assertion rings particularly hollow when it advocated in district court that the FTC was the appropriate forum. We find no due process violation.

### C

We do not address Traffic Jam's Seventh Amendment claim because it was first raised in Traffic Jam's reply brief.

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr...

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 8 of 39    PageID 636

## IV

Next, we address whether the FTC had jurisdiction over Traffic Jam's acts and whether Traffic Jam's misrepresentations violated the FTC Act. "We review the FTC's legal analysis and conclusions de novo, 'although even in considering such issues the courts are to give some deference to the [FTC]'s informed judgment that a particular commercial practice is to be condemned as "[deceptive]." ' ' ' [27]

## A

**\*5** We first address jurisdiction. Section 45(a)(2) empowers the FTC to prevent persons and corporations from "using *unfair methods* of competition in or affecting commerce and *unfair or deceptive acts* or practices in or affecting commerce." [28]

The FTC reasoned that it had jurisdiction under the FTC Act because it has jurisdiction over people and corporations "using unfair or deceptive acts or practices 'in or affecting commerce,' " as stated in § 45(a). It explained that Traffic Jam sends email blasts to car dealers across the country to promote its services, disseminates mailings to tens of thousands of customers in multiple states, and uses printers in multiple states to produce the mailings. The FTC Act initially stated "in commerce" and, after the Supreme Court interpreted that "as limited to interstate commerce and refused to read it expansively to mean 'affecting commerce,' " Congress then amended the Act to read " 'unfair or deceptive acts or practices in *or affecting*' commerce." [29] Traffic Jam, as a company using out-of-state printers to send advertisements to consumers across the country, fits within this expanded definition. [30]

The parties dispute whether § 45(a) is limited by § 45(n). Section 45(n) states that

> [t]he Commission shall have no authority ... to declare unlawful an act or practice on the grounds that such act or practice is *unfair* unless the act or practice causes or is likely to

cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. [31]

Traffic Jam argues that substantial evidence does not support jurisdiction under § 45(n) because the FTC made no showing of substantial injury. The FTC replies that § 45(n) is only for "unfair" practices, not "deceptive practices," and that this section therefore does not apply.

Unlike other portions of § 45, § 45(n) does not include the phrase "deceptive" and instead solely includes "unfair." "[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." [32] Therefore, the plain text of the statute supports the view that "deceptive" can be differentiated from "unfair." In following the plain text, we also align with other circuits on this issue. [33]

**\*6** Traffic Jam argues that this plain text reading of § 45(n) causes the FTC's authority to regulate deceptive acts to be untethered from any statutory limitation set forth by Congress and that it therefore violates the nondelegation doctrine.

"Congress may 'obtain[ ] the assistance of its coordinate Branches'—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." [34] This "delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.' " [35] Acts of Congress have rarely been held to be unconstitutional based on the intelligible-principle standard. [36] For example, in *National Broadcasting Co. v. United States*, [37] the Supreme Court upheld a delegation to regulate based on "public interest, convenience, or necessity." [38] Similarly, in *Yakus v. United States*, [39] the Supreme Court upheld a delegation to set commodity prices that are "generally fair and equitable and will effectuate the purposes of this Act." [40] In *Jarkesy*, [41] this court concluded that Congress had provided the SEC with "*no guidance* whatsoever" and therefore violated the nondelegation doctrine. [42]

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr....

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 9 of 39    PageID 637

Unlike in *Jarkesy*, Congress has provided the FTC with an intelligible principle: the FTC is directed to regulate "deceptive" acts, which, under a plain meaning, must be likely to cause deception.[43] Congress has placed a limit on the FTC, and this limit is sufficient under the nondelegation doctrine.

## B

We next address whether Traffic Jam's mailers violate the FTC Act.

Under the FTC's Policy Statement on Deception,[44] created in 1983, in deception cases (1) the FTC must show "a representation, omission or practice that is likely to mislead the consumer"; (2) this must be examined "from the perspective of a consumer acting reasonably in the circumstances"; and (3) "the representation, omission, or practice must be a 'material' one."[45] The question of materiality, which is the prong at issue here, focuses on "whether the act or practice is likely to affect the consumer's conduct or decision with regard to a product or service."[46] "This court reviews the Commission's factual determinations under the substantial evidence standard."[47]

**\*7** Traffic Jam argues that substantial evidence is lacking to support the materiality of its misrepresentations because no consumers were tricked into buying a car. Traffic Jam cites to out-of-circuit cases stating that a statement is material when it affects a decision to purchase. However, numerous consumer complaints support the FTC's contention that consumers visited dealerships as a result of the mailers when they would not have otherwise done so. There is substantial evidence of materiality.

## V

Traffic Jam contends that it is not subject to the TILA. Section 144 of the TILA[48] "applies to any advertisement to aid, promote, or assist directly or indirectly any consumer credit sale, loan, or other extension of credit subject to the provisions of this subchapter, other than an open end credit plan," with some exceptions not applicable to this case.[49] The FTC concluded that Traffic Jam violated § 144 and its implementing regulation, § 1026.24 of Regulation

Z,[50] which, as the FTC notes, "require[s] advertisements for closed-end credit to disclose certain terms when 'triggering terms' appear in the ad."

Traffic Jam argues that 15 U.S.C. § 1602(g) defines "creditor" as a person who both regularly extends credit and is the one to whom the debt arising from a consumer credit transaction is initially payable and that Regulation Z contains language limiting it to creditors. Traffic Jam argues that it is not a creditor under these provisions and § 144 must also be limited to creditors because the TILA "was enacted to enhance economic stabilization and competition among financial institutions and other firms engaged in the extension of consumer credit through the informed use of credit" and other sections of the TILA refer to creditors.

Although Traffic Jam is correct that § 1602(g) defines creditor and that some parts of the TILA are limited to creditors, § 144 applies by its plain text to all advertisers because the provisions discuss "*any advertisement*."[51] Additionally, Regulation Z's definition of "advertisement" does not mention the status of the advertiser.[52] The Federal Reserve's official interpretation of Regulation Z also makes this point explicitly.[53] Traffic Jam is subject to § 144 of the TILA.

## VI

We next address whether Traffic Jam forfeited its argument that the prohibitions in the FTC's order were unconstitutional. The FTC issued a cease-and-desist order which bars Traffic Jam Events and Jeansonne individually from (1) "participat[ing] in any business which involves, in whole or in part, advertising, marketing, promoting, distributing, offering for sale or lease, or selling or leasing motor vehicles"; (2) making misrepresentations about government financial assistance or any "prize, sweepstakes, lottery, or giveaway"; and (3) making statements about credit offers "without disclosing Clearly and Conspicuously" the terms required by the TILA and Regulation Z. It also requires compliance monitoring, reporting, and recordkeeping.

The FTC's complaint included a "Notice of Contemplated Relief," which included a prohibition on all advertising in the auto industry, and the FTC's complaint counsel submitted a proposed order that included the same provisions as the final order. Traffic Jam could have raised an objection in

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr...

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 10 of 39    PageID 638

its answer or in its opposition to the motion for summary decision. However, Traffic Jam did not specifically object during the administrative proceedings.

**\*8** As described above, in *Carr*, the Supreme Court examined whether a court should judicially impose an issue-exhaustion requirement if none exists in the agency's statutes or regulations,[54] considering (1) whether the agency proceedings were adversarial or inquisitorial, in particular "whether claimants bear the responsibility to develop issues for adjudicators' consideration";[55] (2) "that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise";[56] and (3) that "this Court has consistently recognized a futility exception to exhaustion requirements."[57] While the FTC may be "ill suited to address structural constitutional challenges,"[58] the agency has expertise in determining how narrow of an order could still accomplish the goal of preventing deceptive advertising going forward. Because the agency could have considered whether to revise its order if Traffic Jam had raised this argument below, raising it below would not have been futile.

Additionally, "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."[59] Further, "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."[60]

Because Traffic Jam failed to challenge the prohibitions in the FTC's order during the administrative proceeding, it has forfeited this claim. We therefore do not address the merits.

**VII**

Traffic Jam argues that substantial evidence does not support personal responsibility for Jeansonne because there is no evidence that he knowingly violated any FTC order or intentionally flouted the Act. "This court reviews the Commission's factual determinations under the substantial evidence standard"[61] and its legal conclusions de novo.[62]

As the Eleventh Circuit has explained, "[i]ndividuals may be liable for FTC Act violations committed by a corporate entity if the individual 'participated directly in the [deceptive] practices or acts or had authority to control them' " and if the FTC can "establish that 'the individual had some knowledge of the [deceptive] practices.' "[63] In *Cotherman v. FTC*,[64] this court declined to dismiss an order against individual respondents even though they did not have a present intention of reentering the business at a future date because "the respondents, in a calculated fashion, misled and deceived the unknowledgeable and unsophisticated[,] ... continued these practices until after the Commission had open its investigation against them[,] [and] have in the past been associated with the lending business in other connections."[65] Similarly, *Doyle v. FTC*[66] notes that an officer can be named as an individual in an FTC order when there is "something in the record suggesting that he would be likely to engage in these practices in the future as an individual."[67]

**\*9** Jeansonne was the president of Traffic Jam, oversaw all departments, had day-to-day control over corporate affairs, was personally involved in the at-issue mailings, and participated in the mailers' design, stating that the COVID mailers should not be watered down. Moreover, Traffic Jam has settled charges brought by multiple states in relation to its mailers, and Jeansonne has admitted his involvement in those settlements. Jeansonne's knowledge of these lawsuits shows he was aware that some would view his advertisements as deceptive.

Although Traffic Jam argues that there is no evidence that Jeansonne knowingly violated any FTC order or intentionally flouted the Act, this court has never required such a showing. It is sufficient that Jeansonne participated in and had the authority to control the practices found to be deceptive[68] and knew that multiple states viewed his prior actions as deceptive. He can therefore be held personally liable.

\* \* \*

The petition for review is DENIED.

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr...

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 11 of 39    PageID 639

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 1904566

---

### Footnotes

\*    This opinion is not designated for publication. See 5th Cir. R. 47.5.

1    15 U.S.C. §§ 41-58.

2    16 C.F.R. § 3.24(a)(2).

3    See *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 491 (5th Cir. 2021).

4    593 U.S. 83 (2021).

5    *Id.* at 85.

6    *Id.* at 88-89.

7    *Id.* at 92-93.

8    *Id.* at 93-94.

9    *Id.* at 95-96 (quoting *Sims v. Apfel*, 530 U.S. 103, 112 (2000) (plurality opinion)).

10   See *Cotherman v. FTC*, 417 F.2d 587, 594 (5th Cir. 1969).

11   *Carr*, 593 U.S. at 90 (quoting *Sims*, 530 U.S. at 110-11).

12   *Cf.* *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 180 (2023) (permitting plaintiffs to raise challenges to constitutionality of FTC ALJs in district court without first completing administrative proceedings).

13   See *United States v. Ponce*, 896 F.3d 726, 728 (5th Cir. 2018).

14   *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021); *Cotherman*, 417 F.2d at 592 ("Ordinarily an appellate court does not give consideration to issues not raised below ... (but) there may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." (alterations in original) (quoting *Hormel v. Helvering*, 312 U.S. 552, 556-57 (1941))).

15   561 U.S. 477, 492-98 (2010).

16   *Lucia v. SEC*, 585 U.S. 237, 248-51 (2018).

17   51 F.4th 616 (5th Cir. 2022), *rev'd*, 601 U.S. 416 (2024).

18   *Id.* at 631 (quoting *Collins v. Yellen*, 594 U.S. 220, 259-60 (2021)).

19   *Id.* at 631-32 (quoting *Collins*, 594 U.S. at 258 n.23).

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr...

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 12 of 39    PageID 640

20  *Id.* at 632.

21  *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416

22  *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau (Cmty. Fin. II)*, 104 F.4th 930 (5th Cir. 2024) (per curiam) (citing *Cmty. Fin. I*, 51 F.4th at 626-35), *petition for cert. filed*, 93 U.S.L.W. 3250 (U.S. Mar. 7, 2025) (No. 24-969).

23  *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

24  *See Withrow v. Larkin*, 421 U.S. 35, 58 (1975) ("The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation."); *Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir. 1982) (applying *Withrow* in the FTC context).

25  *Gibson*, 682 F.2d at 560 (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)).

26  *Cf. Brady v. United States*, 397 U.S. 742, 748 (1970) (explaining that a defendant may waive the right to a jury trial if the waiver is done voluntarily, knowingly, and intelligently).

27  *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 354 (5th Cir. 2008) (first alteration in original) (italics omitted) (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986)).

28  15 U.S.C. § 45(a) (emphasis added).

29  *Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), 511 F. Supp. 2d 742, 780 (S.D. Tex. 2005) (discussing *FTC v. Bunte Bros.*, 312 U.S. 349, 350-51 (1941)).

30  *See N. Tex. Specialty Physicians*, 528 F.3d at 355 ("The FTC reasoned that 'NTSP's actions to maintain physician fee levels, if successful, could be expected to affect the flow of interstate payments from out-of-state payors to NTSP physicians.' Payors also testified that they provide health-care coverage to national companies with employees in Texas, and that an increase in costs for health-care services in Fort Worth would affect the overall insurance costs of these national companies. If NTSP's efforts to maintain physicians' fees were successful, 'as a matter of practical economics,' the advantages of competition have been adversely affected for out-of-state employers and payors. The FTC had jurisdiction." (first quoting *N. Tex. Specialty Physicians*, 2005–2 Trade Cas. (CCH) ¶ 75,032, slip op. at 6 (F.T.C. 2005); and then quoting *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 331 (1991))).

31  15 U.S.C. § 45(n) (emphasis added).

32  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (alterations in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

33  *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245-46 (3d Cir. 2015) (discussing the overlap between unfairness and deception claims); *FTC v. LoanPointe, LLC*, 525 F. App'x 696, 700 (10th Cir. 2013) ("Under the FTC Act, a practice is deceptive if it entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. A practice is unfair if it 'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.' " (citation omitted) (first citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); and then quoting 15 U.S.C. § 45(n))).

Traffic Jam Events, L.L.C. v. Federal Trade Commission, Not Reported in Fed. Rptr....

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 13 of 39    PageID 641

34    *Gundy v. United States*, 588 U.S. 128, 135 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

35    *Id.* (alterations in original) (quoting *Mistretta*, 488 U.S. at 372).

36    *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443-44 (5th Cir. 2020) ("Recall that it is 'constitutionally sufficient if Congress [(1)] clearly delineates [its] general policy, [(2)] the public agency which is to apply it, and [(3)] the boundaries of th[at] delegated authority.' " (alterations in original) (quoting *Mistretta*, 488 U.S. at 372-73)); *id.* at 442 n.15 ("Some have suggested that the Court's intelligible-principle standard is really no hurdle at all."); *id.* at 442-43 ("[T]he Court has 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.' " (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001))).

37    319 U.S. 190 (1943).

38    *Id.* at 216.

39    321 U.S. 414 (1944).

40    *Id.* at 420, 426.

41    *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024).

42    *Id.* at 462.

43    *Deceptive Act*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("As defined by the Federal Trade Commission and most state statutes, conduct that is likely to deceive a consumer acting reasonably under similar circumstances.").

44    FED. TRADE COMM'N, FTC POLICY STATEMENT ON DECEPTION (Oct. 14, 1983), https://www.ftc.gov/public-statements/1983/10/ftc-policy-statement-deception.

45    *Id.* at 1.

46    *Id.*

47    *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 422 (5th Cir. 2008).

48    15 U.S.C. § 1664.

49    *Id.* § 1664(a)-(b).

50    12 C.F.R. § 1026.24.

51    15 U.S.C. § 1664(a) (emphasis added).

52    12 C.F.R. § 1026.2(a)(2).

53    *Id.* § 226.2(a)(2) (Supp.) ("All *persons* must comply with the advertising provisions in §§ 226.16 and 226.24, not just those that meet the definition of creditor in § 226.2(a)(17). Thus, home builders, merchants, and others who are not themselves creditors must comply with the advertising provisions of the regulation if they advertise consumer credit transactions.").

54    *Carr v. Saul*, 593 U.S. 83, 88 (2021).

55   *Id.* at 89.

56   *Id.* at 92.

57   *Id.* at 93.

58   *Id.* at 92.

59   *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

60   *Id.*

61   *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 422 (5th Cir. 2008).

62   *See N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 354 (5th Cir. 2008).

63   *FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228, 1233 (11th Cir. 2014) (alterations in original) (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), *overruled by, FTC v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019)); *see also FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 (10th Cir. 2005) ("To justify the imposition of injunctive relief against the individual, the FTC is required to show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control such acts or practices. A showing of participation or control justifies injunctive relief against an individual if in the public interest, notwithstanding the fact business operations and/or deceptive acts and practices may have ceased." (emphasis omitted) (citation omitted)).

64   417 F.2d 587 (5th Cir. 1969).

65   *Id.* at 595.

66   356 F.2d 381 (5th Cir. 1966).

67   *Id.* at 383 n.5 (quoting *The Lovable Co.*, 67 F.T.C. 1326 (1965)).

68   *See Freecom Commc'ns*, 401 F.3d at 1204.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1949488
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

WALMART, INC., Plaintiff-Appellee,

v.

CHIEF ADMINISTRATIVE LAW JUDGE OF
the OFFICE OF the CHIEF ADMINISTRATIVE
HEARING OFFICER, Chief Administrative
Hearing Officer, U.S. Attorney General, Senior
Official Performing the Duties of Director of The
U.S. Immigration and Customs Enforcement,
United States of America, Defendants-Appellants.

No. 24-11733
|
Filed: 07/16/2025

## Synopsis

**Background:** Employer brought action against United States,
Attorney General, chief administrative law judge (ALJ)
of Office of the Chief Administrative Hearing Officer
(OCAHO) within Executive Office for Immigration Review
(EOIR), and others, seeking injunctive relief and declaratory
judgment that Administrative Procedure Act (APA) provision
setting forth "good cause" removal procedure for ALJs
unconstitutionally interfered with President's removal power
under Article II. Parties cross-moved for summary judgment.
The United States District Court for the Southern District
of Georgia, No. 6:23-cv-00040-JRH-BWC, J. Randal Hall,
Chief Judge, 2024 WL 1258223, granted summary judgment
in favor of employer and permanently enjoined defendants
from continuing underlying ALJ proceedings in OCAHO
against employer for alleged violations of immigration-
related recordkeeping requirements. Defendants appealed.

**Holdings:** The Court of Appeals, Hull, Circuit Judge, held
that:

defendants' post-briefing change in position did not preclude
review of constitutionality of "good cause" removal standard;

"good cause" removal standard for OCAHO ALJs did not
interfere with President's removal power; and

even if "good cause" removal standard were unconstitutional,
it was severable from remainder of APA.

Vacated and reversed.

**Procedural Posture(s):** Motion for Summary Judgment;
Motion for Permanent Injunction.

**West Codenotes**

**Negative Treatment Reconsidered**
5 U.S.C.A. § 7521(a)

**Recognized as Unconstitutional**
12 U.S.C.A. § 4512

Appeal from the United States District Court for the Southern
District of Georgia, D.C. Docket No. 6:23-cv-00040-JRH-
BWC

**Attorneys and Law Firms**

Jeffrey Johnson, Bijan Aboutorabi, Jones Day, Washington,
DC, Joseph Edward Finley, Jones Day, Atlanta, GA, for
Plaintiff-Appellee.

Daniel J. Aguilar, DOJ-CIV, Civil Division, Appellate Staff,
Washington, DC, Kuntal V. Cholera, DOJ-CIV, Washington,
DC, Otto Woelke Leithart, U.S. Attorney Service - Southern
District of Georgia, U.S. Attorney's Office, Savannah, GA,
for Defendants-Appellants Chief Administrative Law Judge
of the Office of the Chief Administrative Hearing Officer, In
her official capacity as Chief Administrative Law Judge of
the Office of the Chief Administrative Hearing Officer, U.S.
Attorney General, in his Official Capacity as U.S. Attorney
General, Senior Official Performing the Duties of Director
of the U.S. Immigration and Customs Enforcement, in his
Official Capacity as Senior Official Performing the Duties of
Director of the U.S. Immigration and Customs Enforcement,
United Stated of America, Chief Administrative Hearing
Officer, in his Official Capacity as Chief Administrative
Hearing Officer.

Before Jordan, Jill Pryor, and Hull, Circuit Judges.

## Opinion

Hull, Circuit Judge:

**\*1** This appeal involves the constitutionality of 5 U.S.C.
§ 7521(a) of the Administrative Procedure Act ("APA"),
which contains a "good cause" removal procedure for

administrative law judges ("ALJs") serving in executive branch agencies. The ALJ in this case was appointed by the Attorney General and serves in the Department of Justice ("the Department"). Specifically, the ALJ works in the Department's Office of the Chief Administrative Hearing Officer ("OCAHO"), a component of the Executive Office for Immigration Review. The Department's ALJs in OCAHO adjudicate civil cases against employers for immigration law violations related to the employment of non-citizens and recordkeeping requirements. *See* 8 U.S.C. §§ 1324a, 1324b, 1324c.

Here, after multiple investigations, Immigration and Customs Enforcement ("ICE") in the Department of Homeland Security filed 20 complaints against Walmart, Inc., alleging 11,103 violations of § 1324a's recordkeeping requirements at 20 locations. The cases were assigned to the Chief ALJ in OCAHO.

Before the OCAHO ALJ considered the merits, Walmart filed this lawsuit in federal district court against five defendants, including the Attorney General and the Chief ALJ. Walmart alleged that the APA's § 7521(a) "good cause" removal procedure for ALJs unconstitutionally infringes upon the President's Article II executive power to take care that the laws are faithfully executed.

The district court declared the APA's § 7521(a) unconstitutional and permanently enjoined the Department and its Chief ALJ from adjudicating ICE's 20 complaints against Walmart. The district court refused to sever § 7521(a) from the rest of the statute.

After review and oral argument, we hold the APA's § 7521(a) is constitutional as applied to the Department's ALJs in OCAHO. We vacate the district court's permanent injunction and reverse its entry of summary judgment for Walmart.

We divide our opinion into six parts:

(1) we set forth the relevant background;

(2) we outline the APA's statutory framework for ALJs, which includes § 7521(a);

(3) we discuss the President's powers granted in Article II of the Constitution;

(4) while the Supreme Court has not addressed the APA's § 7521(a), we lay out the Supreme Court's Article II precedent that has held other statutory removal restrictions on the President's powers either constitutional or unconstitutional;

(5) we review some circuit decisions about the APA's § 7521(a); and

(6) we then apply the Supreme Court's Article II principles and explain why the APA's § 7521(a) is constitutional as applied to the Department's ALJs in OCAHO.

## I. BACKGROUND

### A. Walmart's Recordkeeping Duties

Through the Immigration and Nationality Act ("INA"), Congress provided a framework for allowing and regulating immigration into the United States. 8 U.S.C. § 1101 *et seq.* As part of that statutory scheme, Congress (1) authorized non-citizens to work in the United States in a variety of circumstances and (2) prohibited employers from hiring non-citizens who are not so authorized. *See, e.g.,* 8 U.S.C. §§ 1160(a)(1)-(2), 1184(c)(2)(E), 1254a(a)(1)-(2), 1324a(a)(1)-(2).

**\*2** Employers, like Walmart, must verify a new employee's identity and employment eligibility. *Id.* § 1324a(b)(1). Employees usually verify their eligibility for employment through the Form I-9. 8 C.F.R. § 274a.2(a)(2). Employees "must attest, under penalty of perjury," that they are a U.S. citizen or national, a lawful permanent resident, or a non-citizen with work authorization. 8 U.S.C. § 1324a(b)(2).

Employers must retain copies of these I-9 forms so that federal officials can inspect them. *Id.* § 1324a(b)(3). ICE investigates and inspects an employer's compliance with its I-9 recordkeeping obligations.

### B. ICE Investigates Walmart

Walmart uses electronic systems to complete and store employees' I-9s. Between 2018 and 2021, ICE inspected 20 Walmart facilities and identified 11,103 violations of Walmart's I-9 recordkeeping obligations under INA § 274A. *See* 8 U.S.C. § 1324a. By the end of 2021, ICE had issued a Notice and Intent to Fine ("NIF") for each of the 20 facilities.

After negotiations with Walmart, ICE revised some NIFs and sought a total civil fine of $24,245,830.65. Walmart then had the choice to either pay the penalty or timely request a hearing. *See* 8 U.S.C. § 1324a(e)(3)(A).

### C. Walmart Requests Hearing before ALJ

In November 2022, Walmart timely requested a hearing. ICE then filed 20 complaints against Walmart with OCAHO alleging immigration violations as to employment verification under § 1324a(a)(1)(B).[1] Walmart filed 20 answers and motions to dismiss, contesting the charges. Chief ALJ Jean King, appointed by the Attorney General to serve in OCAHO, was assigned to Walmart's cases, which involve only alleged recordkeeping violations of INA § 274A, 8 U.S.C. § 1324a.

### D. Walmart's Complaint in District Court

In June 2023, before the Chief ALJ ruled on the merits, Walmart filed a lawsuit in the district court alleging the APA's § 7521(a) "good cause" removal procedure for ALJs violates Article II of the Constitution. Walmart sued five defendants: (1) the Attorney General; (2) the Director of ICE; (3) OCAHO's Chief Administrative Hearing Officer; (4) Chief ALJ King of OCAHO; and (5) the United States.

Walmart made no claim that the Department's Chief ALJ assigned to its cases was improperly appointed or had failed in any of her ALJ duties. That's because, undisputedly, the Constitution in Article II grants Congress the power to vest appointment of ALJs in department heads. *See* U.S. Const. art. II, § 2, cl. 2. Walmart also does not contend that the Attorney General or the President seeks to remove the Chief ALJ.

Instead, in the district court, Walmart's sole claim was that the APA's § 7521(a) violates Article II by providing ALJs are removable by the Department only for good cause as established and determined by the Merit Systems Protection Board ("MSPB"). Because MSPB members are also removable only for cause under 5 U.S.C. § 1202(d), Walmart asserted that § 7521(a)'s removal restriction doubly shields the Department's ALJs from presidential accountability and violates Article II. Walmart objected to its cases being decided by an ALJ doubly shielded from the President's removal. Walmart asked for declaratory relief that § 7521(a) was unconstitutional.

**\*3** Walmart promptly moved for a preliminary injunction. Walmart's motion sought to stop the adjudication of ICE's complaints against Walmart by Chief ALJ King.

The defendants opposed Walmart's motion. The defendants emphasized, *inter alia*, that § 7521(a) is a lawful restriction on the President's ability to remove the Department's ALJs because those ALJs, as inferior officers, perform only adjudicatory roles, rather than investigatory, enforcement, or policymaking functions. The defendants also stressed that the decisions of the Department's ALJs are subject to plenary review by the Attorney General, who is appointed and removable by the President. Alternatively, the defendants argued that § 7521(a)'s removal restriction was easily severable from the rest of the APA statute.

Later, the parties agreed the district court should construe their pleadings as cross-motions for summary judgment.

### E. District Court's Order

After a hearing, the district court concluded that Congress's statutory removal protection in the APA's § 7521(a) for ALJs violates Article II because it subverts the President's ability to ensure that laws are faithfully executed. *See* U.S. Const. art. II, § 3. The district court acknowledged that ALJs are "inferior officers" but concluded the "good cause" removal restriction in § 7521(a) forced Walmart to have their rights adjudicated by ALJs, who are unconstitutionally shielded from the President's supervision, oversight, and removal at will.

The district court also determined "severability is not the proper solution here" and "the best solution is a permanent injunction instead of severability." The district court found that Walmart's "expos[ure] to an unconstitutional adjudication" constituted an irreparable harm, and the court permanently enjoined the defendants "from directly or indirectly continuing the [u]nderlying ALJ [p]roceedings conducted by [the Department's ALJ in] OCAHO to determine whether to impose civil penalties against Walmart for alleged violations of immigration-related recordkeeping requirements."

### F. The Defendants' Appeal

The defendants timely appealed. In the district court in 2023 and in all their briefs on appeal in 2024, the defendants argued that § 7521(a) was constitutional. The appeal is fully briefed.

But in April 2025, shortly before oral argument in May 2025, the defendants changed their position and, in a letter, declined to "press [their] merits defense of § 7521." The letter notified the Court that "the Acting Solicitor General has decided that the multiple layers of removal restrictions for [ALJs] in 5 U.S.C. § 7521 do not comport with the separation of powers and Article II and the United States will no longer defend them in litigation." On appeal, the defendants still argue § 7521(a)'s removal restriction should be severed.

Our review is unaffected by the defendants' new position on this constitutional, legal issue because § 7521(a) is a statute enacted by Congress, and parties cannot by agreement decide that the § 7521(a) statute is unconstitutional and unenforceable. *See Sanford's Est. v. Comm'r of Internal Revenue*, 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20 (1939) ("We are not bound to accept, as controlling, stipulations as to questions of law."). Issues of law are the province of the courts, not parties to a lawsuit. *See Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest." (quotation marks omitted)).

**\*4**  We thus proceed to the legal constitutional issues, beginning with the APA's statutory framework for ALJs to place § 7521(a)'s removal restriction in context.

## II. APA'S FRAMEWORK FOR ALJS

In 1946, Congress enacted the APA. *See* 5 U.S.C. §§ 551-59, 701-06. The APA regulates executive agencies' appointment, use, and removal of hearing "examiners"—now known as ALJs. *See id.* §§ 554-57; APA, Pub. L. No. 79-404, § 11, 60 Stat. 244 (1946) (original version). The APA's framework remains in place today, although many of its provisions have since been amended and recodified. *See* 5 U.S.C. §§ 554-557, 3105, 7521. The APA applies to the Department's appointment, use, and removal of ALJs. *See id.* §§ 3105, 7521(a).

### A. Appointment of ALJs

As discussed later, the Constitution grants Congress the power to vest the appointment of inferior officers in department heads. *See* U.S. Const. art. II, § 2, cl. 2. By statute, Congress has made the Attorney General "the head of the Department of Justice." 28 U.S.C. § 503.

And in the APA, Congress vested department heads, here the Attorney General, with the power to appoint ALJs. *See* 5 U.S.C. § 3105; *Rodriguez v. Soc. Sec. Admin.*, 118 F.4th 1302, 1310 (11th Cir. 2024) (holding that § 3105 provides the Commissioner of the Social Security Administration, as a department head, with authority to appoint ALJs).

### B. Duties of ALJs

One component of the Department is the Executive Office for Immigration Review ("EOIR"). The Attorney General directs, regulates, and supervises the EOIR. 6 U.S.C. § 521. The EOIR consists of several offices, including OCAHO, the Board of Immigration Appeals, the Office of the Chief Immigration Judge, and others. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 111, 100 Stat. 3359 (1986) (establishing OCAHO); 8 C.F.R. § 1003.0(a). This appeal involves only ALJs appointed by the Attorney General to serve in OCAHO.

The APA provides that hearings conducted under its adjudication provisions may be presided over by (1) the agency itself, (2) one or more members of the agency, or (3) an ALJ appointed under § 3105. *See* 5 U.S.C. §§ 554, 556(b), 3105. By statute, however, a hearing requested by an employer charged with recordkeeping violations as to its employees' eligibility "shall be conducted before an [ALJ]." 8 U.S.C. § 1324a(a), (e)(3)(B). Here, OCAHO's Chief ALJ was assigned to hear ICE's complaints that Walmart violated its recordkeeping obligations under INA § 274A, 8 U.S.C. § 1324a(a)(1)(B).

OCAHO's ALJs play a solely adjudicatory role. *See* 28 C.F.R. § 68.1. ALJs may not investigate or initiate hearings to determine if there has been a violation. 5 U.S.C. § 554(d)(2); *see* 28 C.F.R. § 68.31. Rather, ALJs preside over a hearing and may "administer oaths and affirmations," "issue subpoenas," "rule on offers of proof," "receive relevant evidence," "take depositions," "regulate the course of the hearing," "hold conferences," and "dispose of procedural requests." 5 U.S.C. § 556(c); *see* 28 C.F.R. § 68.28. An ALJ's exercise of those powers is "[s]ubject to published rules of the agency." 5 U.S.C. § 556(c).

After conducting the hearing, the ALJ must make an initial decision, unless the agency reserves the making of the initial decision for itself. *See id.* § 557(b). The sole function of the Department's ALJs is to adjudicate individual cases, not to exercise policymaking powers. *See* 28 C.F.R. § 68.1. By

statute, "[ALJs] may not perform duties inconsistent with their duties and responsibilities as [ALJs]." 5 U.S.C. § 3105.

**C. Attorney General's Plenary Review of ALJ Decisions**

 **\*5**  The APA provides two separate ways to trigger agency review of an ALJ's decision. *See id.* § 557(b). A party may appeal the ALJ's initial decision to the agency. *Id.* And, on its own motion, the agency itself may review the ALJ's decision. *Id.*

From its inception, the APA authorized agency heads, like the Attorney General, to review decisions by inferior adjudicative officers, like ALJs. *See id.* On review, "the agency has all the powers which it would have in making the initial decision." *Id.* Higher-level agency reconsideration is a standard way to achieve oversight and maintain accountability.

More precisely here, the executive head of OCAHO itself "has discretionary authority" to review the final orders of OCAHO's ALJs. 28 C.F.R. § 68.54(a). OCAHO's head is also required by statute to "promptly refer to the Attorney General for review any final order in cases arising under section 274A, 274B, or 274C of the INA if the Attorney General so directs." *Id.* § 68.55(a); *see also* 8 U.S.C. § 1324a(e)(7). On her own motion, too, the Attorney General can review or vacate a decision by an OCAHO ALJ. 28 C.F.R. § 68.55. OCAHO ALJs' exercise of their authority is fully reviewable by the Attorney General and is consistent with their status as inferior officers.

**D. Section 7521(a): For Cause Removal of ALJs**

As enacted in 1946, the APA provides that "examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission ... after opportunity for hearing and upon the record thereof." APA § 11, 60 Stat. 244 (original version). In 1978, Congress replaced the Civil Service Commission with the MSPB, but the APA's framework otherwise remains the same in 5 U.S.C. § 7521(a). *See* Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified at 5 U.S.C. § 1201).

Under § 7521(a), ALJs are removable (1) "by the agency in which the [ALJ] is employed," (2) "only for good cause," (3) "established and determined by the Merit Systems Protection Board," and (4) "on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a).

The decision to remove an ALJ must first be made "by the agency." *Id.* The agency initiates its action against the ALJ by filing a complaint against the ALJ with the Clerk of the MSPB. 5 C.F.R. § 1201.137(b). The agency's action against the ALJ to be removed is heard by an ALJ within the MSPB, whose initial decision, pursuant to 5 U.S.C. § 557, is subject to plenary review by the MSPB. 5 C.F.R. § 1201.140(a)(1)-(2). After a "finding of good cause as required by 5 U.S.C. § 7521" has been made by the MSPB, the agency may remove the ALJ. *Id.* § 1201.140(b).

Significantly, both at the time of the APA's enactment and now, the "good cause" standard, properly construed, is a low bar and not a high standard. *See Good Cause*, *Black's Law Dictionary* (4th ed. 1951) (defining "good cause" to include "any ground which is put forward by authorities in good faith and which is not arbitrary, irrational, unreasonable or irrelevant to the duties with which such authorities are charged"); *id.* (12th ed. 2024) (defining "good cause" as "[a] legally sufficient reason").

The agency may, for example, remove an ALJ for (1) failing to perform adequately, (2) misconduct, (3) refusing to follow binding legal authority, or (4) failing to follow agency policies, procedures, or instructions. *See Morrison v. Olson*, 487 U.S. 654, 692, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) ("good cause" encompasses "misconduct"); *id.* at 724 n.4, 108 S.Ct. 2597 (Scalia, J., dissenting) (explaining that "for cause" includes "the failure to accept supervision"); *see also Soc. Sec. Admin. v. Anyel*, 58 M.S.P.R. 261, 265, 269 (1993) (recognizing that removal may be appropriate when an ALJ "ignore[s] binding agency interpretations of law" and that a "large proportion" of "significant" adjudicatory errors can constitute "good cause"); *In re Chocallo*, 1 M.S.P.R. 605, 610 (1980) (allowing removal of an ALJ for refusing to comply with an appellate agency order).

 **\*6**  Simply put, the MSPB's role in this context is solely to verify that the agency has "good cause" for removal by reviewing the agency's "good cause" determination. 5 U.S.C. § 7521(a). The scope of MSPB's review is narrow. If the MSPB finds by a preponderance of the evidence that the agency demonstrated "good cause" for removing the ALJ, the MSPB must authorize the ALJ's removal. 5 C.F.R. §§ 1201.140(b), 1201.56(b)(1)(ii).

Of note too, Congress has established three exceptions to the MSPB procedure for removing ALJs. First, an agency head may remove an ALJ without the involvement of the MSPB

if "he determines that removal is necessary or advisable in the interests of national security." 5 U.S.C. § 7532(b); *see id.* § 7521(b)(A). Second, an agency may release an ALJ as part of a reduction in force, without involvement of the MSPB. *See id.* §§ 3502, 7521(b)(B). Third, ALJs are subject to disciplinary proceedings before the MSPB for violating certain civil-service laws, and the discipline imposed in those proceedings can include removal. *See id.* §§ 1215, 7521(b)(C).

**E. Section 1202(d): For Cause Removal of MSPB Members**

In holding § 7521(a) unconstitutional, the district court relied on the fact that MSPB members, who review an ALJ's removal, have their own removal protection in 5 U.S.C. § 1202(d). The MSPB consists of three members appointed by the President for a seven-year term with Senate consent. *See id.* §§ 1201, 1202(a). However, the President may remove MSPB members "only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d). The district court concluded that § 1202(d) creates a second layer of removal restrictions on the President as to the ALJs in OCAHO. As discussed later, the constitutionality of § 1202(d)'s for-cause removal restriction as to MSPB members is being challenged elsewhere. *See Trump v. Wilcox*, 775 F.Supp.3d 215 (D.D.C. 2025), *stay granted*, ––– U.S. ––––, 145 S. Ct. 1415, ––– L.Ed.2d –––– (2025).

Having covered the APA's framework for ALJs, we next review the powers Article II vests in the President.

### III. ARTICLE II

**A. Take Care Clause**

Article II of the Constitution defines the President's power over executive agencies and officers. Article II "vest[s]" the "executive Power" of the government in the President. U.S. Const. art. II, § 1, cl. 1. The Take Care Clause mandates that the President "take Care that the Laws be faithfully executed." *Id.* § 3.

"[B]ecause it would be 'impossib[le]' for 'one man' to 'perform all the great business of the State,' the Constitution assumes that lesser executive officers will 'assist the supreme Magistrate in discharging the duties of his trust.' " *Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020) (second alteration in original) (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)). The President's ability to "select those who were to act for him under his direction" is "essential" to his responsibility to take care that the laws be faithfully executed. *Myers v. United States*, 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

**B. Appointments Clause**

The President is therefore empowered to appoint "Officers of the United States" to assist the President in fulfilling his duties. U.S. Const. art. II, § 2, cl. 2. Under Article II's Appointments Clause, the President, "by and with the Advice and Consent of the Senate," may appoint such "Officers." *Id.*

**\*7** Importantly though, that same Appointments Clause in the Constitution also provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* (emphases added). The Appointments Clause thus "very clearly divides all its officers into two classes: principal officers and inferior officers." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. ––––, ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2025 WL 1773628, at *7 (June 27, 2025) (quotation marks omitted).

The first type of "Officers"—those appointed by the President with Senate consent—are commonly referred to as "principal" officers. *See Edmond v. United States*, 520 U.S. 651, 659-60, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). By contrast, an "inferior Officer"—whose appointment may be vested by Congress in a department head—is one who is "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate," *i.e.*, principal officers. *United States v. Arthrex, Inc.*, 594 U.S. 1, 13, 141 S.Ct. 1970, 210 L.Ed.2d 268 (2021) (internal quotation marks omitted).

As authorized by the Constitution, Congress in the APA did vest the appointment of ALJs in executive agency heads. *See* 5 U.S.C. § 3105. The Attorney General appoints the Department's ALJs and directs and supervises them. *See id.*; 28 U.S.C. § 503. No one disputes that Chief ALJ King was constitutionally appointed and is an "inferior Officer." This appeal is only about the APA's § 7521(a) removal restriction as to the Department's ALJs.

**C. Removal Power**

While Article II expressly references appointments, it is silent about removal of officers. Nonetheless, the President's executive power necessarily includes the "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513-14, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). "[T]o hold otherwise would make it impossible for the President ... to take care that the laws be faithfully executed." *Myers*, 272 U.S. at 164, 47 S.Ct. 21. "As [James] Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.' " *Free Enter. Fund*, 561 U.S. at 492, 130 S.Ct. 3138 (quoting 1 Annals of Cong. 463 (1789)). "[I]t is only the authority that can remove such officials from that they must fear and, in the performance of [their] functions, obey." *Seila Law*, 591 U.S. at 213-14, 140 S.Ct. 2183 (citation modified).

Accordingly, as a "general rule," the President has the "unrestricted" power to "remove those who assist him in carrying out his duties," even though Article II does not expressly speak to the President's removal power. *Id.* at 215, 140 S.Ct. 2183 (quotation marks omitted). The Supreme Court, however, has told us that presidential power is not without limit. In our tripartite system, Congress's constitutional power to vest the appointment of inferior officers in department heads "carries with it authority" to vest department heads with the power to remove those inferior officers and to "prescribe incidental regulations controlling and restricting [department heads] in the exercise of the power of removal." *Myers*, 272 U.S. at 161, 47 S.Ct. 21; *see also United States v. Perkins*, 116 U.S. 483, 485, 6 S.Ct. 449, 29 L.Ed. 700 (1886) ("The constitutional authority in [C]ongress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as [C]ongress may enact in relation to the officers so appointed."); *Morrison*, 487 U.S. at 689 n.27, 108 S.Ct. 2597 (noting that the Constitution does not prevent Congress from "imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive' power").

 **\*8** In this same vein, the Supreme Court already has enumerated "two" explicit exceptions to the President's removal power, which we describe below. *See Seila Law*, 591 U.S. at 218, 140 S.Ct. 2183.

**D. The Supreme Court's Two Exceptions**
1. Multi-Member Agencies. Congress may impose removal restrictions on members of multi-member expert agencies

that (1) "do not wield substantial executive power," and (2) perform only "quasi-judicial" or "quasi-legislative" functions. *Id.* at 215-18, 140 S.Ct. 2183. ALJs, of course, are not multi-member agencies.

2. Inferior Officers. The second removal exception applies to inferior officers, such as those appointed by a department head. *Id.* at 217-18, 140 S.Ct. 2183; U.S. Const. art. II, § 2, cl. 2. Under this exception, Congress is permitted to impose removal restrictions on certain inferior officers that perform "limited duties" and have "no policymaking or administrative authority." *Seila Law*, 591 U.S. at 217-18, 140 S.Ct. 2183.

The Supreme Court has already held that ALJs are inferior officers. *See Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 138 S.Ct. 2044, 201 L.Ed.2d 464 (2018). Nonetheless, the Court has not addressed the constitutionality of the APA's § 7521(a) removal restriction as to ALJs.

To set the table for that constitutional question, we outline Supreme Court precedent that does apply Article II to other statutory removal restrictions, enacted by Congress, for other executive officers—both principal and inferior. An in-depth review of these decisions helps discern the Supreme Court's Article II principles that we must apply here.

**IV. SUPREME COURT PRECEDENT**

**A. *Perkins*: Navy Officer — Constitutional Removal Restriction**
The first relevant case, *Perkins*, involved a Navy officer who was honorably discharged. 116 U.S. at 483, 6 S.Ct. 449. Perkins entered the Naval Academy as a cadet engineer and graduated in 1881. *Id.* In 1883, the Secretary of the Navy informed Perkins that "as he was not required to fill any vacancy in the naval service happening during the preceding year, he was thereby honorably discharged." *Id.*

Perkins sued to recover his salary, citing statutes barring the peacetime removal of naval officers except (1) upon a court-martial, or (2) "for misconduct." *Id.* at 483-85, 6 S.Ct. 449. The Supreme Court upheld Congress's removal restrictions. *Id.* at 484-85, 6 S.Ct. 449.

The Supreme Court recognized that, as permitted by Article II, Congress expressly vested the appointment of cadet engineers in the Secretary of the Navy as a department head. *Id.* at 484, 6 S.Ct. 449. The Supreme Court held that "when

[C]ongress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id.* at 484-85, 6 S.Ct. 449 (emphases added). The Supreme Court further held that "[t]he constitutional authority in [C]ongress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as [C]ongress may enact in relation to the officers so appointed." *Id.* at 485, 6 S.Ct. 449. Because Perkins was not dismissed pursuant to a court-martial or for misconduct, as required by statute, the Supreme Court held that he was "still in office" and entitled to his pay. *Id.*

## B. *Myers*: First-Class Postmaster — Unconstitutional Removal Restriction

*9  Next, in *Myers* in 1926, the Supreme Court recognized the President's broad power to remove executive branch officials. 272 U.S. at 161-64, 47 S.Ct. 21. President Wilson appointed Myers, with Senate consent, as first-class postmaster for a four-year term. *Id.* at 106, 47 S.Ct. 21. When Myers refused to resign, he "was removed from office by order of the Postmaster General, acting by direction of the President." *Id.* Myers sued to recover his salary. *Id.*

Myers relied on an 1876 statute that provided that "[p]ostmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law." *Id.* at 107, 47 S.Ct. 21 (quoting 19 Stat. 80, 81, c. 179 (Comp. St. § 7190)). Because the Senate did not consent to the President's removal, the Supreme Court observed that under the 1876 statute, Myers was entitled to recover his salary, assuming the statute's Senate consent requirement was valid. *Id.* at 107-08, 47 S.Ct. 21.

The Supreme Court held that the 1876 removal statute was unconstitutional. *Id.* at 176, 47 S.Ct. 21. It explained that Congress (1) previously had provided that postmasters were to be appointed by the Postmaster General as a department head, but (2) later required "certain classes" of postmasters to be appointed by the President with Senate consent. *Id.* at 163, 47 S.Ct. 21. Until and unless Congress elected to "vest [first-class postmasters'] appointment in the head of the department they [would] be subject to removal by the President alone." *Id.* Article II grants the President power to appoint with Senate consent, but the President is not required to have Senate consent to remove. *Id.* at 164, 47 S.Ct. 21.

The Supreme Court distinguished *Perkins* on the basis that its holding as to inferior officers was "limited to the vesting by Congress of the appointment of an inferior officer in the head of a department." *Id.* at 162, 47 S.Ct. 21 (emphasis added). The Supreme Court explained that when, as in *Myers*, Congress "does not choose to [e]ntrust the appointment of such inferior officers to less authority than the President with the consent of the Senate, it has no power of providing for their removal." *Id.* Put differently, as to inferior officers, when Congress provides that the President (as opposed to a department head) shall appoint an inferior officer, Congress "may not obtain the power and provide for the removal of such officer except on that condition." *Id.*

Because Congress vested the power to appoint the postmaster in the President, the Supreme Court held that the 1876 statute's Senate consent requirement "by which the unrestricted power of removal of first-class postmasters is denied to the President is in violation of the Constitution." *Id.* at 176, 47 S.Ct. 21.

## C. *Humphrey's Executor*: FTC Commissioners — Constitutional Removal Restriction

In 1935, the Supreme Court recognized an exception to the rule of unrestricted presidential removal for officers appointed by the President. In *Humphrey's Executor v. United States*, the Supreme Court upheld a statute that insulated the Commissioners of the Federal Trade Commission ("FTC") from presidential removal except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. 602, 619-20, 630-32, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

President Hoover nominated Humphrey as an FTC member for a seven-year term, and the Senate confirmed him. *Id.* at 618, 55 S.Ct. 869. The FTC Act provided that the five FTC members were to be appointed by the President with Senate consent. *Id.* at 619-20, 55 S.Ct. 869. In 1933, President Roosevelt removed Humphrey when he declined to resign. *Id.* at 618-19, 55 S.Ct. 869.

*10  The Supreme Court concluded that the FTC Act limited the President's removal power to only the three listed causes —none of which were the basis for Humphrey's removal. *Id.* at 626, 55 S.Ct. 869. The Supreme Court held that the FTC Act's removal restriction for FTC Commissioners was constitutional. *Id.* at 629, 55 S.Ct. 869.

In *Humphrey's Executor*, the Supreme Court distinguished *Myers* on the basis that "[a] postmaster is an executive officer restricted to the performance of executive functions." *Id.* at

627, 55 S.Ct. 869. In contrast, the FTC was created "to carry into effect legislative policies embodied in the statute" and "to perform other specified duties as a legislative or as a judicial aid," and thus could not "in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 628, 55 S.Ct. 869.

The Supreme Court determined that *Myers* "goes far enough to include all purely executive officers. It goes no farther; much less does it include an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President." *Id.* at 627-28, 55 S.Ct. 869. The Supreme Court held that the President's power to make the removal did not encompass "officers of the kind here under consideration." *Id.* at 631-32, 55 S.Ct. 869. The Supreme Court emphasized that presidential removal power is not "illimitable" but instead "will depend upon the character of the office."[2] *Id.* at 629, 631, 55 S.Ct. 869.

**D. *Wiener*: War Claims Commission — Constitutional Removal Restriction**
Subsequently, in 1958, the Supreme Court reaffirmed *Humphrey's Executor* in *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). President Truman nominated Wiener as a member of the War Claims Commission, and the Senate confirmed him in 1950. *Wiener*, 357 U.S. at 350, 78 S.Ct. 1275. The Commission was composed of three members appointed by the President with Senate consent. *Id.*

Congress did not provide the means for removing a Commissioner. *Id.* In 1953, President Eisenhower removed Wiener upon his refusal to resign. *Id.* In accordance with the "philosophy" of *Humphrey's Executor*, the Supreme Court held that the President could not remove a member of "an adjudicatory body like the War Claims Commission." *Id.* at 356, 78 S.Ct. 1275.

**E. *Morrison*: Independent Counsel — Constitutional Removal Restriction**
Thirty years later, in 1988, the Supreme Court addressed the removability of inferior officers in *Morrison*. 487 U.S. at 670-71, 108 S.Ct. 2597. *Morrison* concerned the Ethics in Government Act (the "Ethics Act"), which allowed for "the appointment of an 'independent counsel' to investigate and ... prosecute certain high-ranking [g]overnment officials for violat[ing] federal criminal laws." *Id.* at 660, 108 S.Ct. 2597. The Ethics Act required the Attorney General to apply

for appointment of an independent counsel with the "Special Division," a court created "for the purpose of appointing independent counsels." *Id.* at 661, 108 S.Ct. 2597 (quoting 28 U.S.C. § 49). The independent counsel had the "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." *Id.* at 662, 108 S.Ct. 2597 (quoting 28 U.S.C. § 594(a)).

**\*11** The Ethics Act provided that an independent counsel "may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause" or certain other conditions that impaired performance. *Id.* at 663, 108 S.Ct. 2597 (quoting 28 U.S.C. § 596(a)(1)).

In 1986, the Special Division appointed Morrison as independent counsel to investigate allegations of federal criminal violations by Olson, the Assistant Attorney General for the Office of Legal Counsel. *Id.* at 665, 667, 108 S.Ct. 2597. Independent Counsel Morrison obtained subpoenas on Olson and others, who moved to quash, claiming that the independent counsel provisions of the Ethics Act—both appointment and removal—were unconstitutional. *Id.* at 668, 108 S.Ct. 2597. There is no indication that the President sought to remove Independent Counsel Morrison. *See id.*

The Supreme Court first upheld the constitutionality of Congress's appointment procedure. *Id.* at 670-71, 108 S.Ct. 2597. The Supreme Court reasoned that the independent counsel was an inferior officer whose appointment could be vested in the Special Division as a court of law because she was (1) subject to removal by the Attorney General, (2) empowered to "perform only certain, limited duties," and (3) had limited jurisdiction. *Id.* at 671-72, 676-77, 108 S.Ct. 2597.

The Supreme Court then turned to removal. *Id.* at 685, 108 S.Ct. 2597. The Court acknowledged that it relied on the terms "quasi-legislative" and "quasi-judicial" to distinguish *Humphrey's Executor* (FTC) and *Wiener* (War Claims Commission) from *Myers* (First-Class Postmaster). *Id.* at 689, 108 S.Ct. 2597. The Court stated, however, that its "present considered view" was that the removal restriction's constitutionality could not turn entirely on whether the official was "purely executive." *Id.* Rather, the proper inquiry was whether the restriction interfered with the President's "executive power" and duty to "take care that the laws be faithfully executed." *Id.* at 689-90, 108 S.Ct. 2597 (emphasis added). This more functional test goes beyond merely looking

at the removal protection and considers other ways in which the President can control the inferior officer's actions.

The Supreme Court then concluded that the "good cause" restriction on the President's removal did not "unduly trammel[ ] on executive authority." *Id.* at 691, 108 S.Ct. 2597. Despite having "executive" functions, the independent counsel still was "an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Id.* The Supreme Court also noted that the President, through the Attorney General, had "several means of supervising or controlling" the independent counsel, including the power to remove her for "good cause." *Id.* at 692, 695-96, 108 S.Ct. 2597. At bottom, the removal restriction did not "sufficiently deprive[ ] the President of control over the independent counsel to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws." *Id.* at 693, 108 S.Ct. 2597.

**F.** *Free Enterprise Fund*: **PCAO Board —**
**Unconstitutional Removal Restriction, but Severable**
In *Free Enterprise Fund*, the Supreme Court again considered Congress's ability to restrict the President's power to remove inferior officers. 561 U.S. at 483-84, 130 S.Ct. 3138. In 2002, Congress enacted the Sarbanes-Oxley Act, which created the Public Company Accounting Oversight Board ("PCAOB" or "the Board"). *Id.* at 484, 130 S.Ct. 3138. Congress granted the PCAOB extensive regulatory powers over the accounting industry. *See id.* at 484-85, 130 S.Ct. 3138. The PCAOB's five members were appointed to staggered five-year terms by the Securities and Exchange Commission ("SEC"). *Id.* at 484, 130 S.Ct. 3138.

 **\*12** The PCAOB is a powerful combination of governmental powers. It legislates—by promulgating "auditing and ethics standards." *Id.* at 485, 130 S.Ct. 3138. It conducts law enforcement functions and exercises prosecutorial discretion. *Id.* It performs routine inspections of accounting firms, demands documents, and initiates investigations and disciplinary proceedings. *Id.* It also adjudicates individual proceedings. *Id.* The PCAOB can issue rules and impose sanctions, although both of those actions are subject to SEC approval and alteration. *Id.* at 486, 130 S.Ct. 3138.

Congress gave the SEC the ability to remove PCAOB members, in accordance with 15 U.S.C. § 7217(d)(3), "for good cause shown." *Id.*; 15 U.S.C. §§ 7211(e)(6), 7217(d)

(3). Section 7217(d)(3) laid out precise categories. To remove a Board member, the SEC was required to find " 'on the record' and after 'notice and opportunity for a hearing,' that the Board member" (1) "willfully violated any provision of th[e] [Sarbanes-Oxley] Act, the rules of the Board, or the securities laws," (2) "willfully abused ... authority," or (3) "failed to enforce compliance with any such provision or rule." *Free Enter. Fund*, 561 U.S. at 486, 130 S.Ct. 3138 (citation modified).

Although no statute restricts the removal of SEC Commissioners themselves, the Supreme Court noted that all parties agreed the SEC Commissioners could not be removed by the President except for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 487, 130 S.Ct. 3138 (quotation marks omitted). The Supreme Court thus "decide[d] the case with that understanding." *Id.* This resulted in "a new situation not yet encountered by the Court"—a President was restricted from removing principal officers (the SEC Commissioners), who in turn were restricted from removing inferior officers (the PCAOB members), who "determine[d] the policy and enforce[d] the laws of the United States." *Id.* at 483-84, 130 S.Ct. 3138.

The case began when the PCAOB inspected an accounting firm, "released a report critical of its auditing procedures, and began a formal investigation." *Id.* at 487, 130 S.Ct. 3138. The accounting firm and Free Enterprise Fund, an organization of which the firm was a member, then sued in federal district court. *Id.* The plaintiffs argued that (1) the appointment of PCAOB members by the SEC violated the Appointments Clause, and (2) the removal restriction for PCAOB members deprived the President of sufficient control over the PCAOB. *Id.* at 487-88, 130 S.Ct. 3138. There is no indication that the President sought removal of any PCAOB member during the pendency of the proceedings. *See id.* at 485-88, 130 S.Ct. 3138.

The Supreme Court rejected Free Enterprise Fund's Appointments Clause challenge. *Id.* at 510, 130 S.Ct. 3138. The Supreme Court concluded that PCAOB members are inferior officers, so Congress could permissibly vest their appointment in SEC Commissioners as heads of a department. *Id.* at 510-13, 130 S.Ct. 3138.

As for the removal restriction, the Supreme Court first noted that *Morrison* (independent counsel) addressed the consequences of only "one level of good-cause tenure." *Id.* at 495, 130 S.Ct. 3138. The Supreme Court then

explained that the "second level of tenure protection" for SEC Commissioners prevented the President, or anyone directly responsible to him, from being able to hold the Board accountable. *Id.* at 496-98, 130 S.Ct. 3138. Because the Board could exercise "executive power without the Executive's oversight," the removal restriction on the Board's members "subvert[ed] the President's ability to ensure that the laws are faithfully executed." *Id.* at 498, 130 S.Ct. 3138.

The Supreme Court emphasized that "this [SEC] case presents an even more serious threat to executive control than an 'ordinary' dual for-cause standard." *Id.* at 502, 130 S.Ct. 3138. That is because Congress enacted an "unusually high" and "rigorous" standard, providing for removal of PCAOB members only upon one of three specific conditions and only after notice and an opportunity for a hearing. *Id.* at 503, 130 S.Ct. 3138. For example, the Supreme Court noted, Congress did not give the SEC the authority to remove Board members "for violations of *other* laws that do not relate to the [Sarbanes-Oxley] Act, the securities laws, or the Board's authority." *Id.*

**\*13** The Supreme Court also emphasized that the SEC's authority to oversee executive activities carried out by the PCAOB was not "plenary." *Id.* at 503-04, 130 S.Ct. 3138. The Supreme Court noted that the Sarbanes-Oxley Act did not empower the SEC "to start, stop, or alter individual Board investigations," which are "executive activities." *Id.* at 504, 130 S.Ct. 3138. The Supreme Court stressed that the PCAOB had "significant independence in determining its priorities" without the SEC's "preapproval or direction." *Id.* at 505, 130 S.Ct. 3138. Neither the President nor anyone directly responsible to him had control over the PCAOB. *See id.*

Two other features of *Free Enterprise Fund* are especially apt here. Tellingly, the Supreme Court cautioned that its holding "does not address that subset of independent agency employees who serve as administrative law judges." *Id.* at 507, 130 S.Ct. 3138 n.10 (emphasis added). As the Supreme Court noted, "unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions ... or possess purely recommendatory powers." [3] *Id.*

In addition, the Supreme Court did not hold that the executive power granted to and exercised by the PCAOB violated the Constitution itself. *Id.* at 508, 130 S.Ct. 3138. Instead, invoking precedent instructing it to "limit the solution to the problem," the Supreme Court severed the unconstitutional

removal restriction from the remainder of the statute. *Id.* (citation modified). The Court reasoned that it was not "evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will." *Id.* at 509, 130 S.Ct. 3138 (quotation marks omitted). "Concluding that the removal restrictions [we]re invalid le[ft] the Board removable by the Commission at will, and le[ft] the President separated from Board members by only a single level of good-cause tenure"—the removal restriction for SEC Commissioners. *Id.*

### G. *Lucia*: SEC ALJs are "Officers of the United States"
The next decision did not address removal restrictions, but it did involve SEC ALJs, so we include it. In *Lucia*, the Supreme Court held that SEC ALJs are "Officers of the United States." 585 U.S. at 241, 138 S.Ct. 2044 (quoting U.S. Const. art. II, § 2, cl. 2). *Lucia* concerned a constitutional challenge to an ALJ who had been appointed by SEC staff members. *Id.* at 243, 138 S.Ct. 2044.

The Supreme Court held that the appointment was unconstitutional. The Court found that precedent dictated that the SEC ALJs be appointed by a department head, a court, or the President. *Id.* at 244-49, 138 S.Ct. 2044. Although the government asked the Court to address the constitutionality of the statutory removal restriction as to ALJs—the same § 7521(a) at issue here—the Court declined to do so. *Id.* at 244, 138 S.Ct. 2044 n.1.

The Supreme Court majority did not expressly state whether ALJs are principal or inferior "Officers," but its reference to the trio who may appoint—the President, a court of law, or a head of department—indicates ALJs are inferior officers. *Id.* at 244, 138 S.Ct. 2044; *see also id.* at 261-62, 138 S.Ct. 2044 (Breyer, J., concurring in the judgment in part and dissenting in part) ("The majority ... holds that the Commission's [ALJs] are inferior 'Officers of the United States.' ").

### H. *Seila Law*: CFPB Single Director — Unconstitutional Removal Restriction, but Severable
**\*14** More recently, the Supreme Court held that the statutory restriction on the President's removal of the Director of the Consumer Financial Protection Bureau ("CFPB") was unconstitutional. *See Seila Law,* 591 U.S. at 204-05, 140 S.Ct. 2183. The CFPB is an independent agency tasked with "implementing and enforcing a large body of financial consumer protection laws." *Id.* at 206, 140 S.Ct. 2183 (citation modified). Congress "place[d] the CFPB under the

leadership of a single Director," as opposed to "a traditional independent agency headed by a multimember board or commission." *Id.* at 207, 140 S.Ct. 2183.

The Director of the CFPB is appointed by the President with Senate consent. *Id.*; 12 U.S.C. § 5491(b)(2). The Director serves a five-year term, "during which the President may remove the Director from office only for 'inefficiency, neglect of duty, or malfeasance in office.' " *Seila Law*, 591 U.S. at 207, 140 S.Ct. 2183 (quoting 12 U.S.C. § 5491(c)(1), (3)). There is no indication that the President had sought to remove the CFPB Director. *See generally id.*

In 2017, the CFPB issued a civil investigative demand to Seila Law, a law firm, to determine whether the firm had engaged in unlawful acts. *Id.* at 208, 140 S.Ct. 2183. When Seila Law refused to comply, the CFPB petitioned the district court to enforce the demand. *Id.* In defense, Seila Law argued that the CFPB's leadership by a single Director removable only for cause violated the Constitution. *Id.*

The Supreme Court concluded that its precedents recognized the "general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.' " *Id.* at 215, 140 S.Ct. 2183 (quoting *Free Enter. Fund*, 561 U.S. at 513-14, 130 S.Ct. 3138). Significantly, the Supreme Court also affirmed that "two exceptions" remained: (1) "one for multimember expert agencies that do not wield substantial executive power," as recognized in *Humphrey's Executor*, and (2) "one for inferior officers with limited duties and no policymaking or administrative authority," as recognized in *Perkins* and *Morrison*. *Id.* at 215-18, 140 S.Ct. 2183.

The Supreme Court held that CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violate[d] the separation of powers." *Id.* at 213, 140 S.Ct. 2183. Distinguishing the five-member FTC in *Humphrey's Executor*, the Supreme Court noted that (1) the CFPB was led by a single Director, not a non-partisan body of experts like the FTC, and (2) the CFPB Director had broader authority to promulgate regulations, seek monetary penalties, and award legal and equitable relief in administrative adjudications. *Id.* at 218-19, 140 S.Ct. 2183. Distinguishing the independent counsel in *Morrison*, the Supreme Court pointed out that the CFPB Director was "not an inferior officer" and the Director's duties were far from limited. *Id.* at 219-20, 140 S.Ct. 2183.

The Supreme Court noted that the CFPB was a "new situation"—an independent agency led by a single Director that exercised "significant executive power." *Id.* at 220, 140 S.Ct. 2183 (quotation marks omitted). The Supreme Court "decline[d]" to "extend" its precedents to this situation that "ha[d] no basis in history and no place in our constitutional structure." *Id.*

After concluding that the CFPB Director's statutory removal protections violated the Constitution, the Supreme Court nevertheless held that the protections were severable. *Id.* at 234-35, 140 S.Ct. 2183. The Supreme Court concluded that it was "far from evident that Congress would have preferred no CFPB to a CFPB led by a Director removable at will by the President." *Id.* at 237, 140 S.Ct. 2183. The Supreme Court ultimately remanded the case for consideration of whether the civil investigative demand had been validly ratified by an "Acting Director" of the CFPB who was not subject to the removal restriction. *Id.* at 232-33, 238, 140 S.Ct. 2183; *see also id.* at 254-55, 140 S.Ct. 2183 (Thomas, J., concurring in part and dissenting in part).

### I: *Collins*: FHFA Director — Unconstitutional Removal Restriction

**\*15** In *Collins v. Yellen*, the Supreme Court reaffirmed its *Seila Law* holding and struck down as unconstitutional Congress's removal restriction for the single Director of the Federal Housing Finance Agency ("FHFA"). 594 U.S. 220, 226-27, 141 S.Ct. 1761, 210 L.Ed.2d 432 (2021). As with the CFPB in *Seila Law*, the FHFA was led by one Director who was appointed by the President with Senate consent for a five-year term and could be removed by the President "for cause." *Id.* at 229, 251, 141 S.Ct. 1761; 12 U.S.C. § 4512(a), (b). There was no challenge to the Director's appointment or any indication that the President had attempted to remove, or even suggested removal of, the FHFA Director. *See generally Collins*, 594 U.S. at 228-37, 141 S.Ct. 1761.

The plaintiffs in *Collins* were three shareholders in the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). *Id.* at 228, 235, 141 S.Ct. 1761. The shareholders brought suit after the FHFA and the Department of the Treasury adopted a "third amendment" to an agreement between the agencies that required Fannie Mae and Freddie Mac to pay the Department of Treasury. *Id.* at 220-21, 227, 233-34, 141 S.Ct. 1761. Challenging this action, the shareholders asserted that § 4512's removal restriction was unconstitutional. *Id.* at 235-36, 141 S.Ct. 1761.

On that constitutional issue, the Supreme Court held that *Seila Law* was "all but dispositive," and the removal restriction violated the separation of powers. *Id.* at 250, 141 S.Ct. 1761. The Supreme Court reiterated the Constitution prohibited "even modest restrictions on the President's power to remove the head of an agency with a single top officer." *Id.* at 256, 141 S.Ct. 1761 (quotation marks omitted).

Although § 4512's removal restriction was unconstitutional, the Supreme Court remanded the case for the lower courts to decide the proper remedy for the constitutional violation. *Id.* at 260-61, 141 S.Ct. 1761. As to the remedy, the agencies requested the retrospective relief of having the third amendment adopted by the Director "completely undone." *Id.* at 257, 141 S.Ct. 1761. However, the Court explained that the FHFA Director was lawfully appointed, there was no basis for concluding that the Director "lacked the authority to carry out the functions of the office," and there was "no reason to hold that the third amendment must be completely undone." *Id.* at 257-59, 141 S.Ct. 1761.

The Supreme Court also explained:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out.

*Id.* at 258-59. As to the remedy, the Court provided two hypothetical examples of when an unconstitutional statutory removal restriction could "clearly cause harm": (1) if "the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal," or (2) if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he

would remove the Director if the statute did not stand in the way." *Id.* at 259-60, 141 S.Ct. 1761.

Finding this case was "less clear-cut," the Supreme Court remanded the case to the lower courts to determine whether the unconstitutional removal restriction in § 4512 had already caused compensable harm to the shareholders. *Id.* at 260-61, 141 S.Ct. 1761.

**J. *Trump v. Wilcox*: NLRB and MSPB Members — Stay of Injunction Prohibiting President's Removal**

**\*16** Albeit only an interlocutory ruling, the Supreme Court's decision in *Trump v. Wilcox* is relevant because it involves the MSPB and the suggested demise of *Humphrey's Executor*. 145 S. Ct. 1415. Without "qualifying cause," the President removed Gwynne Wilcox as a member of the National Labor Relations Board ("NLRB") and Cathy Harris as a member of the MSPB. *Id.*; *see also id.* at 1418 (Kagan, J., dissenting). The district court enjoined the President's removal, but the Supreme Court stayed the district court's order, which left the President's removal of Wilcox and Harris in place. *Id.* at 1415 (majority opinion).

Congressional statutes insulated Wilcox and Harris from presidential removal except for good cause. Specifically, Congress provided that NLRB members "may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). As discussed earlier, Congress provided that MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

The Supreme Court majority instructed that the President "may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents." *Wilcox*, 145 S. Ct. at 1415. The Supreme Court explained that the stay reflected its judgment that "the Government [was] likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* The Court did not decide "whether the NLRB or MSPB falls within such a recognized exception" and left that question for later resolution. *Id.*

The dissent, however, emphasized that the Court's *Humphrey's Executor* (FTC) precedent "forecloses" the Court's decision to grant a stay because the NLRB and MSPB "are multi-member bodies of experts, balanced along partisan lines, with 'quasi-legislative or quasi-judicial' (not 'purely

executive') functions" and, just like the FTC, their members can be protected from removal. *Id.* at 1416-18 (Kagan, J., joined by Sotomayor, J. and Jackson, J., dissenting). The dissent stated that the Court's order was "nothing short of extraordinary" because it "allow[ed] the President to overrule *Humphrey's* by fiat." *Id.* at 1418-19. The dissent maintained that by granting relief on the basis that Wilcox and Harris exercised "considerable" executive power, the majority was "reducing *Humphrey's* to nothing and depriving members of the NLRB, MSPB, and many other independent agencies of tenure protections." *Id.* at 1419.

Until the Supreme Court finally rules, we must consider the § 1202(d) MSPB removal statute constitutional and in force.

### K. Two Appointments Clause Cases

Two more Supreme Court decisions warrant discussion because they involve inferior officers. *See Kennedy*, 606 U.S. at —— – ——, —— S.Ct. ——, 2025 WL 1773628, at *7-8; *Arthrex*, 594 U.S. at 14-17, 141 S.Ct. 1970. *Arthrex* and *Kennedy* did not involve a removal restriction, but their discussion of the Appointments Clause underscores the importance in this case of the fact that the Department's ALJs are inferior officers whose work is subject to review and direction by a principal officer (the Attorney General) who is appointed and removable by the President.

In *Arthrex* in 2021, the Supreme Court held the Constitution did not allow Congress to vest the appointment of Administrative Patent Judges ("APJs") in the Secretary of Commerce because their decisions and work were not reviewed by a higher executive officer. 594 U.S. at 14-17, 141 S.Ct. 1970.

Congress in 2011 established the Patent Trial and Appeal Board ("PTAB"), an "executive adjudicatory body" within the Patent and Trademark Office ("PTO"), which is an executive agency within the Department of Commerce. *Id.* at 7-8, 141 S.Ct. 1970. The PTAB would sit in panels of at least three members drawn from the Director of the PTO, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and the over 200 APJs. *Id.* The Secretary of Commerce appointed PTAB's members (except for the Director of the PTO), including the APJs. *Id.*

**\*17** Among other duties, the PTAB conducted *inter partes* review, whereby the PTAB would "reconsider whether existing patents satisfy the novelty and nonobviousness requirements for inventions." *Id.* The PTO Director

"designate[d] at least three members of the PTAB (typically three APJs) to conduct" the *inter partes* proceeding. *Id.* at 9, 141 S.Ct. 1970. The PTAB then "assume[d] control of the process," which "resemble[d] civil litigation in many respects" and issued "a final written decision." *Id.* A dissatisfied party could request rehearing by the PTAB but had no other recourse within the executive branch. *Id.*

The PTO Director had certain administrative oversight over the APJs. *Id.* at 14, 141 S.Ct. 1970. But neither the PTO Director nor any other principal officer in the executive branch had any authority or supervision over "the one thing that makes the APJs officers exercising 'significant authority' in the first place—their power to issue decisions on patentability." *Id.*

The Supreme Court held that APJs could not be appointed by the Secretary of Commerce as inferior officers. *Id.* at 13-14, 141 S.Ct. 1970. That is because, as mentioned earlier, inferior officers must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 13, 141 S.Ct. 1970 (quotation marks omitted). But "no principal officer at any level within the Executive Branch" directed and supervised the work of APJs. *Id.* at 14, 141 S.Ct. 1970. This "insulation of PTAB decisions from any executive review" prevented the President from overseeing the PTAB or "attribut[ing] [its] failings" to those he could oversee and therefore violated Article II. *Id.* at 17, 141 S.Ct. 1970.

More recently, the Supreme Court in *Kennedy* held the Constitution did allow Congress to vest the appointment of the Preventive Services Task Force (the "Task Force"), a 16-member advisory body, in the Secretary of HHS, a department head. 606 U.S. at ——, —— S.Ct. ——, 2025 WL 1773628, at *8. The issue in *Kennedy* was whether the Task Force members were principal or inferior officers. *Id.* at ——, —— S.Ct. ——, 2025 WL 1773628, at *7. If principal officers, their appointment by the HHS Secretary was unconstitutional. If inferior officers, Congress had the power to vest their appointment in the HHS Secretary and their appointment was constitutional.

In ruling the Task Force members were inferior officers, the Supreme Court emphasized that the Task Force members "have no power to render a final decision on behalf of the United States unless permitted to do so by" the HHS Secretary. *Id.* at ——, —— S.Ct. ——, 2025 WL 1773628, at *11. The Task Force formulates and publishes

recommendations about preventive health services. *Id.* at ____ – ____, ____ S.Ct. ____, 2025 WL 1773628, at *4-5. In 2010, Congress required health insurers to cover without cost sharing all preventive services that received an "A" or "B" grade from the Task Force. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *5. That insurance coverage requirement does not take effect immediately upon the Task Force's recommendation; rather, the statute provides for an interval of at least one year during which the Secretary of HHS can review and block the Task Force's recommendation. *Id.*

Until 2023, the Director of the Agency for Healthcare Research and Quality ("AHRQ"), another entity within HHS, appointed Task Force members. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *6. In 2023, however, the HHS Secretary ratified the appointments of all existing Task Force members, and the Secretary has since continued to appoint new Task Force members. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *4, *6. Congress has not restricted the removal of Task Force members. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *9.

Ultimately, the Supreme Court held that the Task Force members were inferior officers under Article II whose appointment could be vested in the HHS Secretary as a department head. *Id.* at ____, ____, ____ S.Ct. ____, 2025 WL 1773628, at *8, *12. The Supreme Court concluded that the Task Force's work is "directed and supervised" by the Secretary through two main sources. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *8. One was the Secretary's power to remove the Task Force members at will. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *9. The Court reasoned that "[t]he Secretary's authority to remove Task Force members at will in turn enables him to supervise and direct them" because "[w]hen a Task Force member makes a decision that the Secretary disagrees with, the Secretary may remove that member." *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *10.

**\*18** The second but independent source of the Secretary's direction and supervision over the Task Force officers was the Secretary's power to block a Task Force recommendation during the one-year period before insurers are required to cover a preventive service. *Id.* The Supreme Court clarified that "[a]t-will removal is one means of ensuring supervision and direction. But in evaluating inferior-officer status, the Court has also examined whether the relevant officer has the power to render a final decision on behalf of the United States

without review by a principal officer." *Id.* (quotation marks omitted). Because the Task Force members "have no power to render a final decision on behalf of the United States unless permitted to do so" by the HHS Secretary, the Supreme Court held the members are inferior officers. *Id.* at ____, ____ S.Ct. ____, 2025 WL 1773628, at *11 (quotation marks omitted).

As in *Kennedy*, the decisions of the Department's ALJs, as inferior officers, are not final and are subject to review by the Attorney General as a principal officer.

Having surveyed relevant Supreme Court precedent, we turn to the few circuit decisions that have addressed, to some extent, the APA's § 7521(a) removal restriction.

## V. CIRCUIT PRECEDENT

### A. Eleventh Circuit Precedent

While our circuit has not ruled on the constitutionality of § 7521(a), we have ruled on constitutional challenges to (1) the appointment of ALJs and Appeals Council members of the Social Security Administration ("SSA"), and (2) the for-cause removal restriction, in 42 U.S.C. § 902(a)(3), for the single SSA Commissioner. *See Rodriguez*, 118 F.4th at 1305-06.

In the district court, Rodriguez's lawsuit sought retrospective relief and a vacatur of the denial of his SSA disability benefits. *Id.* at 1307. After an SSA ALJ denied Rodriguez benefits, the Appeals Council denied review. *Id.* The district court granted summary judgment in favor of the SSA, and Rodriguez appealed. *Id.* at 1307-08.

As to appointment of SSA ALJs, Congress authorized the SSA Commissioner to "appoint as many [ALJs] as are necessary" as well as all "additional officers ... necessary to carry out the functions" of the SSA. *Id.* at 1309; *see also* 5 U.S.C. § 3105; 42 U.S.C. § 904(a)(1). The *Rodriguez* Court held that Congress's procedure for appointment of SSA ALJs by the Commissioner (as a department head) was constitutional. *Rodriguez*, 118 F.4th at 1309-13. We explicitly ruled that ALJs and Appeals Council members were "inferior officers." *Id.* at 1310-13. We also rejected Rodriguez's argument that Appeals Council members were principal officers, reasoning that Appeals Council members are supervised by the Commissioner and "subject to the Commissioner's authority and control." *Id.* at 1311-13.

As to the removal of the SSA Commissioner, § 902(a)(3) restricted removal to "a finding by the President of neglect of duty or malfeasance in office." *Id.* at 1313; 42 U.S.C. § 902(a)(3). This Court explained that the parties agreed that the Commissioner's for-cause removal protection was unconstitutional. *Rodriguez,* 118 F.4th at 1313-14. We noted that the Supreme Court's decisions in *Collins* and *Seila Law* had struck down similar for-cause removal provisions "protect[ing] a single agency head with significant executive power." *Id.* Based on that precedent, this Court agreed with the parties and concluded that § 902(a)(3)'s removal restriction as to the SSA Commissioner was unconstitutional. *Id.*

Nevertheless, the *Rodriguez* Court held that the § 902(a)(3) removal restriction was severable, as the statute was otherwise "capable of fully independent function." *Id.* at 1314 (quoting *Kaufmann v. Kijakazi,* 32 F.4th 843, 849 (9th Cir. 2022)). It was not evident that "Congress would have preferred, as an alternative to a Commissioner who is removable at will, no Social Security Administration at all." *Id.* (quoting *Kaufmann,* 32 F.4th at 849). Also, § 902(a)(3) did not implicate the Commissioner's appointment and thus did not affect his authority to act. *Id.*

**\*19** Leaving the door open, the *Rodriguez* Court elected not to address the constitutionality of the APA's § 7521(a) "good cause" removal restriction for SSA ALJs and Appeals Council members. *Id.* at 1314-15. We explained that "there is no question that the ALJ and the Appeals Council members in [Rodriguez's] case were properly appointed," and "Rodriguez has not pointed to any harm he suffered from" the removal restriction in § 7521(a). *Id.* at 1315. As to harm, this Court reasoned, "[t]here is nothing in the record which suggests, for example, that the Commissioner or the President were considering dismissing or terminating the [SSA] ALJ who adjudicated Mr. Rodriguez's case (or the Appeals Council members who denied review) but were prevented from doing so by the for-cause removal provisions." *Id.*

In sum, Rodriguez had sought retrospective relief—the vacatur of the denial of benefits—but he had not shown any harm from the alleged unconstitutional removal restriction. *Id.* at 1307-08, 1315. Effectively, because no remedy was available to Rodriguez in any event, it was unnecessary for us to decide the constitutional issue. *Id.* at 1315.

This case is different from *Rodriguez.* ICE's 20 cases against Walmart have not been adjudicated. At the outset, Walmart

contested proceeding before an ALJ who it claimed was unconstitutionally insulated from the President's removal at will. Walmart sought only prospective relief.

Furthermore, here the district court actually has declared that the APA's § 7521(a) is unconstitutional. Based on that holding, the district court permanently enjoined the Attorney General and the ALJ, among others, from proceeding to adjudicate ICE's 20 complaints against Walmart. Simply vacating the district court's remedy without addressing the merits of the constitutional issue would not be appropriate here. *See Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 447, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ("Because it appears reasonably likely that the First Amendment issue was necessary to the decisions below, we believe that it would be inadvisable to vacate and remand without addressing that issue on the merits."). We thus proceed to decide the constitutional issue. [4]

One final task before doing so. Although the Supreme Court and our Court have not ruled on the constitutionality of the APA's § 7521(a), a few circuits have. We review those circuit decisions before proceeding to our own analysis.

**B. Other Circuit Precedent is Divided**

Two circuits have held that the APA's § 7521(a) removal restriction for ALJs does not violate Article II. *See Decker Coal Co. v. Pehringer,* 8 F.4th 1123, 1133 (9th Cir. 2021); *Rabadi v. U.S. Drug Enforcement Admin.,* 122 F.4th 371, 375-76 (9th Cir. 2024); *Leachco, Inc. v. Consumer Prod. Safety Comm'n,* 103 F.4th 748, 749-51 (10th Cir. 2024). Another circuit doubted that the challenger could establish a constitutional violation but held only that the challenger, who sought retrospective relief, could not show the § 7521(a) restriction caused harm. *See Calcutt v. Fed. Deposit Ins. Corp.,* 37 F.4th 293, 317-18 (6th Cir. 2022), *rev'd on other grounds,* 598 U.S. 623, 143 S.Ct. 1317, 215 L.Ed.2d 557 (2023).

**\*20** In contrast, the Fifth Circuit has held that § 7521(a) violates Article II. *See Jarkesy v. Sec. & Exch. Comm'n,* 34 F.4th 446, 449-50 (5th Cir. 2022), *aff'd on other grounds,* 603 U.S. 109, 144 S.Ct. 2117, 219 L.Ed.2d 650 (2024). We review the circuit split.

In *Decker Coal,* the Ninth Circuit upheld the constitutionality of § 7521(a)'s "good cause" removal restriction as to ALJs in the Department of Labor ("DOL"). 8 F.4th at 1126,

1129-30, 1133. Like the Department's ALJs, the DOL ALJs are protected from removal under § 7521(a) except "for good cause established and determined" by the MSPB. *Id.* at 1129-30. In turn, under § 1202(d), MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* at 1130.

A DOL ALJ ordered Decker Coal to pay Pehringer's claim for black lung benefits. *Id.* at 1127-28. Decker Coal appealed to the Benefits Review Board ("BRB"), which affirmed. *Id.* at 1128-29. On appeal to the Ninth Circuit, Decker Coal challenged the constitutionality of § 7521(a). *Id.* at 1129-30.

For several reasons, the Ninth Circuit concluded § 7521(a) was constitutional because "the President ha[d] sufficient control over DOL ALJs to satisfy the Constitution." *Id.* at 1133-35.

First, the Ninth Circuit determined that the DOL ALJ "was performing a purely adjudicatory function" and distinguished the DOL ALJ from the PCAOB members in *Free Enterprise Fund* on the basis that "[u]nlike PCAOB members, who exercise policymaking and enforcement functions, an ALJ cannot sua sponte initiate investigations or commence a [ ] case." *Id.* at 1133.

Second, the Ninth Circuit reasoned that the President still had meaningful control over DOL ALJs because the ALJs' decisions can be "readily overturn[ed]" by the BRB, an agency subject to the President's "direct control." *Id.* at 1134-35. Further, BRB members "serve[d] at the pleasure of the Secretary of Labor," and "the Secretary of Labor is subject to at-will removal by the President," meaning the President could order the Secretary to replace BRB members or ask the BRB to remand a case to an ALJ. *Id.* at 1135.

Third, the Ninth Circuit distinguished *Free Enterprise Fund* on the ground that § 7521(a)'s "broad" "good cause" requirement for DOL ALJs' removal was "a lesser impingement on presidential authority" than the "unusually high" removal restriction for the PCAOB members. *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 505, 130 S.Ct. 3138).

The Ninth Circuit did not stop there. It also held that even if § 7521(a)'s "good cause" protection for ALJs was unconstitutional, "only one level of protection" needed to be severed. *Id.* at 1136. Because there was "no link" between the ALJ's decision and the allegedly unconstitutional

removal restriction, the Ninth Circuit "refuse[d] to unwind the decisions below." *Id.* at 1137-38.

Thereafter, in *Leachco*, the Tenth Circuit held that Leachco was not entitled to a preliminary injunction on its claim that § 7521(a)'s removal restriction is unconstitutional. 103 F.4th at 749-51. After the Consumer Product Safety Commission ("CPSC") initiated an administrative proceeding against it, Leachco filed a complaint in federal district court, seeking declaratory and injunctive relief. *Id.* at 751. Leachco asserted constitutional challenges to the removal restrictions for the presiding ALJ and the CPSC Commissioners. *Id.* Leachco moved for a preliminary injunction preventing the CPSC from pursuing its still-ongoing administrative action. *Id.* The district court denied the motion, and Leachco brought an interlocutory appeal. *Id.*

**\*21** Setting aside the constitutional issue, the Tenth Circuit concluded that Leachco had not shown the alleged unconstitutional removal restrictions were causing future irreparable harm, a requirement for a preliminary injunction. *Id.* at 753. Then, discussing the merits, the Tenth Circuit stated (in a heading) that "The Removal Protections of CPSC ALJs are also Constitutional." *Id.* at 763. The Tenth Circuit determined that (1) the CPSC ALJ performed "a purely adjudicatory function," (2) Congress did not require the CPSC to use ALJs, and (3) § 7521(a)'s "good cause" removal restriction was a "lesser impingement" than the "complex" standard in *Free Enterprise Fund*. *Id.* at 764 (quotation marks omitted). Ultimately, the Tenth Circuit stated only that "[t]he precedential support for the constitutionality of the CPSC's structure necessarily helps inform our determination that Leachco has failed to establish irreparable harm." *Id.* at 765.

In *Calcutt*, the Sixth Circuit also held that, under *Collins*, Calcutt could not sufficiently demonstrate the § 7521(a) removal restriction on the Federal Deposit Insurance Corporation ("FDIC") ALJs had "inflicted compensable harm" on him. 37 F.4th at 317-18 (quotation marks and alterations omitted). The FDIC ALJ found that Calcutt's conduct met the conditions for removal from his banking position and assessed civil penalties. *Id.* at 309. Calcutt appealed to the FDIC Board and sought retrospective relief —vacatur of the ALJ's findings and conclusions. *Id.* Calcutt argued, *inter alia*, that § 7521(a)'s restriction on the ALJ's removal was unconstitutional. *Id.* After the FDIC Board upheld the ALJ's decision, Calcutt petitioned for the Sixth Circuit's review. *Id.*

The Sixth Circuit stated that it "doubt[ed] Calcutt could establish a constitutional violation" because *Free Enterprise Fund* "explicitly exclude[d] ALJs from its prohibition on multiple levels of for-cause removal protection." *Id.* at 318-19. The Sixth Circuit also ruled that Calcutt failed to show that "an unconstitutional removal restriction caused harm." *Id.* at 318 (quotation marks and alterations omitted). The Sixth Circuit specifically rejected Calcutt's argument that absent § 7521(a), the FDIC ALJ "would have been more responsive to executive-branch policy." *Id.*

In *Jarkesy*, the Fifth Circuit (1) concluded that § 7521(a)'s "good cause" removal restriction is unconstitutional as applied to SEC ALJs, and (2) vacated the SEC's judgment imposing monetary penalties against the defendants. 34 F.4th at 449-50, 464. The SEC brought a within-agency enforcement action against defendants Jarkesy and Patriot28, LLC. *Id.* at 450. An ALJ found that Jarkesy and Patriot28 committed securities fraud. *Id.* The SEC affirmed the ALJ's decision and ordered Jarkesy and Patriot28 to pay nearly $1 million in civil penalties and disgorgement. *Id.*

Defendants Jarkesy and Patriot28 petitioned for review in the Fifth Circuit, challenging, among other things, the constitutionality of § 7521(a)'s removal restriction for SEC ALJs. *Id.* at 450-51. In holding § 7521(a) unconstitutional, the Fifth Circuit reasoned that even as "inferior officers," SEC ALJs were "sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions." *Id.* at 464. The Fifth Circuit observed that "SEC ALJs exercise considerable power over administrative case records by controlling the presentation and admission of evidence; they may punish contemptuous conduct; and often their decisions are final and binding." *Id.* (emphasis added).

The Fifth Circuit stressed that "if the President wanted an SEC ALJ to be removed, at least two layers of for-cause protection st[ood] in the President's way." *Id.* at 465. That is because members of both the MSPB and the [SEC] have for-cause protection from removal by the President." *Id.* The Fifth Circuit emphasized that "even if ALJs' functions are more adjudicative than [the] PCAOB members [in *Free Enterprise Fund*], the fact remains that two layers of insulation impedes the President's power to remove [SEC] ALJs." *Id.*

**\*22** For this and other reasons, the Fifth Circuit vacated the SEC's judgment imposing monetary penalties against Jarkesy and Patriot28. As the Fifth Circuit's *Jarkesy* decision came

before the remedy discussion in *Collins*, the Fifth Circuit did not address whether Jarkesy and Patriot28 had shown actual harm caused by § 7521(a)'s removal restriction.

In dissent in *Jarkesy*, a Fifth Circuit judge concluded that SEC ALJs' removal restriction was constitutional because they "perform[ed] an adjudicative function." *Id.* at 475 (Davis, J., dissenting). The dissent reasoned that SEC ALJs' powers were solely adjudicative in nature. *Id.* at 477-78. The dissent emphasized that the Supreme Court in *Free Enterprise Fund* "expressly declined to address" ALJs and observed that many ALJs perform adjudicative functions rather than enforcement or policymaking functions. *Id.* at 476.

Independently, the Fifth Circuit majority also held, among other things, that the SEC's use of intra-agency adjudications without juries to impose monetary penalties violated the Seventh Amendment. *Id.* at 449, 451 (majority opinion).

On writ of certiorari, the Supreme Court affirmed that Seventh Amendment jury holding and the vacatur of the SEC's monetary judgment against Jarkesy and Patriot28. *Jarkesy*, 603 U.S. at 120-21, 140-41, 144 S.Ct. 2117. The Supreme Court stated that "[s]ince the answer to the jury trial question resolves this case, we do not reach the ... removal issue[ ]." *Id.* at 121, 144 S.Ct. 2117.

To recap, while four circuits have addressed § 7521(a)'s removal restriction for ALJs, the decisions involved different executive agencies. *See Decker Coal,* 8 F.4th at 1126 (DOL ALJs); *Leachco,* 103 F.4th at 751 (CPSC ALJs); *Calcutt,* 37 F.4th at 317-18 (FDIC ALJs); *Jarkesy,* 34 F.4th at 449-50 (SEC ALJs). None of these circuit decisions are about ALJs in the Department of Justice. This illustrates that while there are numerous ALJs in the government, they all handle different subject matters and have different supervisors in different agencies. Our case, though, is limited to the Department's ALJs in OCAHO, whose jurisdiction is limited to adjudicating cases arising under INA §§ 274A, 274B, and 274C. *See* 8 U.S.C. §§ 1324a(e)(3)(A), 1324b(e)(1), 1324c(e)(2)(B).

## VI. ANALYSIS

By sparing no expense in the foundational discussion above, our case-specific analysis of the constitutionality of the APA's § 7521(a), as applied to the Department's ALJs, will enjoy the luxury of brevity.

No doubt, the "general rule" is that under Article II the President has the "unrestricted" power to remove executive officers. *See Seila Law*, 591 U.S. at 215, 140 S.Ct. 2183. To date, the Supreme Court has enumerated only two narrow exceptions to this Article II rule: (1) "one for multimember expert agencies that do not wield substantial executive power," *id. at* 218, 140 S.Ct. 2183; *see also Humphrey's Ex'r*, 295 U.S. at 631-32, 55 S.Ct. 869, and (2) "one for inferior officers with limited duties and no policymaking or administrative authority," *Seila Law*, 591 U.S. at 218, 140 S.Ct. 2183; *see also Morrison*, 487 U.S. at 691, 108 S.Ct. 2597.

We are not concerned with the first exception. In the district court and on appeal, neither party previously asserted that ALJs are members of multimember expert agencies under *Humphrey's Executor* or single directors of independent agencies. *See Seila Law*, 591 U.S. at 213, 140 S.Ct. 2183 (single Director of CFPB); *Collins*, 594 U.S. at 251, 141 S.Ct. 1761 (single Director of FHFA).

**\*23** As to the second exception, the parties still agree that the Department's ALJs are inferior officers properly appointed by the Attorney General. So the constitutional question becomes whether they have "limited duties and no policymaking or administrative authority" as required by the second exception. *Seila Law*, 591 U.S. at 218, 140 S.Ct. 2183; *Morrison*, 487 U.S. at 691, 108 S.Ct. 2597; *see also Wilcox*, 145 S. Ct. at 1415 (acknowledging "narrow exceptions" to the President's Article II removal power).

Under the second exception, the pivotal Article II inquiry remains whether the APA's § 7521(a) removal restriction unconstitutionally interferes with the President's necessary power to take care that the laws are faithfully executed. *See Myers*, 272 U.S. at 164, 47 S.Ct. 21; *Morrison*, 487 U.S. at 689-90, 108 S.Ct. 2597. In other words, does the ultimate exercise of executive power remain within the purview of the President or those directly accountable to the President? *See Morrison*, 487 U.S. at 689-90, 108 S.Ct. 2597.

After thorough consideration, and applying the Supreme Court's governing analysis and largely the same factors considered by other circuits, we conclude the APA's § 7521(a) removal restriction is constitutional for the reasons below.

### A. ALJs' Limited Duties

The first reason is that the Department's ALJs in OCAHO have "limited duties and no policymaking or administrative authority." *See Seila Law*, 591 U.S. at 218, 140 S.Ct. 2183. They perform "adjudicative rather than enforcement or policymaking functions." *See Free Enter. Fund*, 561 U.S. at 507 n.10, 130 S.Ct. 3138.

As recounted earlier, the Department's ALJs in OCAHO hear and adjudicate cases brought against employers for violating sections 274A, 274B, and 274C of the INA. *See* 8 U.S.C. §§ 1324a(e)(3)(B), 1324b(e)(2), 1324c(d)(2)(B). They are empowered to conduct only adjudicative tasks such as issuing subpoenas, ruling on evidentiary issues, holding settlement conferences, disposing of procedural requests, and making or recommending decisions. *See* 5 U.S.C. § 556(c). An ALJ's exercise of these duties is limited by the "published rules of the agency." *Id.* The Department's ALJs are not authorized to exercise any other duties or responsibilities—they cannot initiate investigations or bring an enforcement action. *See id.* § 554(d)(2); 28 C.F.R. § 68.1.

These limitations and enumerations of the ALJs' limited powers make clear that the ALJs' duties are, in fact, only adjudicative functions. And to the extent that the outcomes of individual adjudications may ultimately shape policy, this is incidental to ALJs' function as adjudicators. We do not think *Jarkesy* is persuasive on this point, for the Fifth Circuit majority incorrectly concluded that SEC ALJs "perform[ed] substantial executive functions," 34 F.4th at 463, even though they performed "solely adjudicative functions." *Id. at* 477 (Davis, J., dissenting).

### B. Attorney General's Plenary Review of ALJ Decisions

The second reason, and critically here, is that the adjudicative decisions made by the Department's ALJs in OCAHO are subject to direct and plenary review by a higher official who can be removed at will by the President. The Attorney General can review an ALJ's decision on her own motion, even without an aggrieved party's appeal. *See* 5 U.S.C. § 557(b); 8 U.S.C. § 1324a(e)(7); 28 C.F.R. § 68.55. The Attorney General is in no way bound by the ALJ's decision but instead retains complete freedom of decision as though she had heard the evidence herself.

**\*24** At bottom, the Department's ALJs in OCAHO have essentially no power to render a final decision on behalf of the United States unless permitted to do so by the Attorney General. The APA gives the Attorney General fulsome and direct means of countermanding and controlling an ALJ's

exercise of authority. The President can direct the Attorney General to vacate or overturn a decision by an ALJ in OCAHO. [5]

At-will removal of an ALJ is not the only way to prevent an unconstitutional restraint of the President's executive power. *De novo* review of ALJ decisions by officials politically accountable to the President, and those officials' ability to overrule ALJs' decisions, is another valid way to ensure the President can perform his constitutional duty to take care that the laws are faithfully executed.

### C. The Constitution Grants Congress a Role in the Appointment of Inferior Officers

Our third reason stems from the fact that the Constitution itself grants Congress a role in the appointment of inferior officers. Specifically, the Constitution grants Congress the power to vest "the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. This is not a case where Congress vested the appointment of an inferior officer in the President and then tried to restrict the President's removal. Rather, Congress vested the appointment of ALJs in a department head, the Attorney General. This explicit constitutional appointment role granted to Congress implies at least some authority in Congress to regulate the removal of inferior officers so appointed by that department head. *See Myers*, 272 U.S. at 161, 47 S.Ct. 21; *Perkins*, 116 U.S. at 485, 6 S.Ct. 449.

In enacting § 7521(a)'s removal restriction, Congress balanced two competing objectives and did not exceed its constitutional role in this regard. Congress first sought to ensure that the executive agency retains full power over policy. The APA accordingly gives agencies, including the Department's head, plenary power to review and reverse ALJ decisions. 5 U.S.C. § 557(b). And the department head here is removable at will by the President. This plenary authority ensures the President's ability to control and supervise executive decisions.

Congress also sought, through "good cause" removal for ALJs, to promote the actual and perceived fairness of executive agency hearings. A party contesting an agency's action might reasonably question the fairness of an ALJ who can be fired at will merely for a decision adverse to the agency, or a party. Congress rationally "deem[ed] [it] best for the public interest" to "limit and restrict" the President's

power to remove ALJs at will. *Perkins*, 116 U.S. at 485, 6 S.Ct. 449. As the Supreme Court has explained, Congress's power to impose reasonable restrictions on the President's ability to remove inferior officers flows from its constitutional authority to "vest[ ] the appointment of inferior officers in the heads of departments." *Id.* (emphasis added).

**\*25** In other words, because the Department's ALJs cannot be removed by the Attorney General on a whim or for untoward reasons, ALJs may conduct adjudications impartially and without threats of at-will removal. Yet the plenary review afforded to the Attorney General ensures that a politically accountable executive department head is still ultimately responsible for the ALJs' decisions, and, as such, the President is able to faithfully execute the law.

### D. Second Layer of Removal Restriction—*Free Enterprise Fund*

Walmart contends that the separate § 1202(d) removal restriction as to MSPB members—what is termed the "second" or "double" layer of restrictions—renders the Department's ALJs' good cause removal protections in § 7521(a) unconstitutional under *Free Enterprise Fund*, 561 U.S. at 488, 496, 130 S.Ct. 3138. The Fifth Circuit relied heavily on *Free Enterprise Fund* in ruling that § 7521(a), given § 1202(d)'s removal restriction on MSPB members, constitutes an unconstitutional removal restriction on the President. *See Jarkesy*, 34 F.4th at 465.

Of course, in *Free Enterprise Fund*, the Supreme Court took pains to carve ALJs out of its ruling. It explained in a footnote that:

> [O]ur holding also does not address that subset of independent agency employees who serve as administrative law judges. Whether administrative law judges are necessarily "Officers of the United States" is disputed. And unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions, *see* §§ 554(d), 3105,

or possess purely recommendatory powers.

*Free Enter. Fund,* 561 U.S. at 507 n.10, 130 S.Ct. 3138 (citation modified). The Court went on to note that ALJs are not "similarly situated" to the PCAOB members at issue in *Free Enterprise*. *Id.* at 506, 130 S.Ct. 3138 ("[T]he dissent fails to support its premonitions of doom; none of the positions it identifies are similarly situated to the Board."). We find this dicta persuasive and worthy of consideration. *See Schwab v. Crosby,* 451 F.3d 1308, 1325 (11th Cir. 2006) (explaining that "dicta from the Supreme Court is not something to be lightly cast aside"). [6]

Walmart urges that because the Supreme Court has since clarified that ALJs are inferior officers, *see Lucia,* 585 U.S. at 248-51, 138 S.Ct. 2044, [7] we ought to ignore *Free Enterprise Fund*'s disclaimer that its holding does not address ALJs, and apply a blanket ban on dual for-cause protection. But *Free Enterprise Fund* did not hold that a two-layer removal restriction is inherently unconstitutional. Indeed, the Court in *Free Enterprise* explained that "the language providing for good-cause removal is only one of a number of statutory provisions that, working together, produce a constitutional violation." 561 U.S. at 509, 130 S.Ct. 3138. This case is nothing like the facts and circumstances of *Free Enterprise Fund* for three critical reasons.

For starters, the Supreme Court emphasized that the Sarbanes-Oxley Act's removal restriction for PCAOB members was "unusually high," "rigorous," and a "more serious threat to executive control than an 'ordinary' dual for-cause standard." *Id.* at 502-03, 130 S.Ct. 3138. The removal restriction there allowed for removal of PCAOB members upon only one of three specific conditions and did not even permit removal for violations of *other* laws that d[id] not relate to the [Sarbanes-Oxley] Act, the securities laws, or the Board's authority." *Id.* at 486, 503, 130 S.Ct. 3138. These protections, coupled with the for-cause protections of the Department head who had the sole power to remove PCAOB members, constituted an "unprecedented" level of protection, and therefore "present[ed] an even more serious threat to executive control than an ordinary dual for-cause standard." *Id.* at 502-03, 130 S.Ct. 3138 (internal quotations omitted).

**\*26** In contrast, § 7521(a) imposes a straightforward "good cause" removal restriction. *See* 5 U.S.C. § 7521(a). As the Court in *Free Enterprise Fund* implicitly acknowledged, the

removal restriction in § 7521(a) is not "unusually high" or "rigorous." *See Free Enter. Fund,* 561 U.S. at 506, 130 S.Ct. 3138 ("Nor do the employees referenced by the dissent enjoy the same significant and unusual protections from Presidential oversight as members of the Board."). Also, unlike the removal restriction in *Free Enterprise Fund,* § 7521(a) is consistent with longstanding historical practice. Congress has protected ALJs from removal at will since it enacted the APA 77 years ago. *See* APA § 11 (original version). The removal procedure in § 7521(a) is far from a "novel structure" with a "lack of historical precedent" like the unconstitutional removal procedure for PCAOB members. *See Free Enter. Fund,* 561 U.S. at 505, 130 S.Ct. 3138 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

A second key distinguishing factor in *Free Enterprise Fund* is the duties that Congress gave to the PCAOB. *Free Enterprise Fund*'s holding specifically addressed the constitutionality of "two levels of protection from removal for those who nonetheless exercise significant executive power." *See id.* at 514, 130 S.Ct. 3138 (emphasis added). The PCAOB members perform substantial executive duties, including promulgating standards and regulations, performing inspections, and initiating investigations and proceedings. *Id.* at 485-86, 130 S.Ct. 3138. Those are far from the duties of the Department's ALJs, which are adjudicative and significantly more limited in scope. ALJs have no regulatory authority, no ability to perform inspections or investigations, and cannot initiate a proceeding. 5 U.S.C. §§ 556(c), 3105.

The third factor distinguishing *Free Enterprise Fund* is that the SEC's power to supervise the PCAOB and alter its actions was not "plenary." *See Free Enter. Fund,* 561 U.S. at 504, 130 S.Ct. 3138. The PCAOB was "empowered to take significant enforcement actions ... largely independently of the [SEC]." *Id.* Congress gave the SEC only "latent" supervisory authority—it did not permit the SEC "to start, stop, or alter" the PCAOB's investigations. *Id.*

The Court in *Free Enterprise* expressed particular concern that the Commission lacked adequate oversight of the Board's independent decisions to initiate and pursue investigations and theorized that "restrict[ing] the Board's enforcement powers, so that it would be a purely recommendatory panel" might render the removal protections constitutional. *See id.* at 509, 130 S.Ct. 3138. The Court acknowledged that many ALJs exercise this type of purely recommendatory power. *See*

Walmart, Inc. v. Chief Administrative Law Judge of Office of..., --- F.4th ---- (2025)
2025 WL 1949488
Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 36 of 39    PageID 664

*id.* at 507, 130 S.Ct. 3138 n.10; *see also Jarkesy*, 34 F.4th at 478 (Davis, J., dissenting). This includes the Department's ALJs, who issue orders that are effectively recommendations, subject to the review of the Chief Administrative Hearing Officer and the Attorney General. As noted, the Chief Administrative Hearing Officer has the opportunity to modify, vacate, or remand the OCAHO ALJ's order before it becomes final. *See* 28 C.F.R. § 68.54(d)(1). And the Attorney General enjoys the plenary power to review and overturn a Department ALJ's decision on her own motion. *See* 5 U.S.C. § 557(b); 8 U.S.C. § 1324a(e)(7); 28 C.F.R. § 68.55. The Department's ALJs are therefore not empowered to undertake their duties "largely independently" of the Attorney General. *See Free Enter. Fund*, 561 U.S. at 504, 130 S.Ct. 3138. The Attorney General's supervisory role is the opposite of "latent"—an ALJ's decision can be completely undone by the Attorney General, who is accountable to the President.

### E. Other Supreme Court Decisions Support § 7521(a)'s Constitutionality

The other Supreme Court cases addressing removal restrictions support our conclusion that § 7521(a) is constitutional. For example, even in its recent decisions, the Supreme Court has continued to reaffirm the two "narrow" exceptions to the President's removal power. *See Seila Law*, 591 U.S. at 204, 218, 140 S.Ct. 2183 ("[W]e need not and do not revisit our prior decisions allowing certain limitations on the President's removal power."); *Wilcox*, 145 S. Ct. at 1415. This, of course, includes the exception for inferior officers with limited duties and sufficient accountability. *See Seila Law*, 591 U.S. at 218, 140 S.Ct. 2183.

 **\*27** Indeed, this case is similar to the independent counsel scheme held constitutional in *Morrison*. Like the independent counsel, the Department's ALJs (1) are "inferior officer[s] under the Appointments Clause," (2) have "limited jurisdiction," and (3) "lack[ ] policymaking or significant administrative authority." *See Morrison*, 487 U.S. at 691, 108 S.Ct. 2597. Again like the independent counsel, the President, through the Attorney General, has sufficient "means of supervising or controlling" the Department's ALJs and retains the ultimate responsibility for their work. *See id.* at 696, 108 S.Ct. 2597.

Noteworthy, too, the Supreme Court's more recent *Seila Law*, *Collins*, and *Wilcox* decisions involved removal restrictions for principal officers, such as the single Directors of the CFPB and FHFA, *see Seila Law*, 591 U.S. at 207, 140 S.Ct. 2183; *Collins*, 594 U.S. at 229, 141 S.Ct. 1761, and the members

of the multi-member NLRB and MSPB, *see Wilcox*, 145 S. Ct. at 1415. The duties, functions, and responsibilities of those principal officers are far different than those of the Department's ALJs. As the Supreme Court observed, those officers exercise "significant" or "considerable" executive power. *See Seila Law*, 591 U.S. at 218-20, 140 S.Ct. 2183 (holding that the single Director of the CFPB exercised "significant executive power," including the authority to promulgate regulations and seek monetary penalties); *Collins*, 594 U.S. at 250, 141 S.Ct. 1761 (applying *Seila Law*'s holding to the single Director of the FHFA); *Wilcox*, 145 S. Ct. at 1415 (observing that "the NLRB and MSPB exercise considerable executive power").

Conversely, the Department's ALJs undisputedly are inferior officers. *See Lucia*, 585 U.S. at 243-44, 138 S.Ct. 2044. They do not exercise "significant" or "considerable" executive power. *See Seila Law*, 591 U.S. at 207, 140 S.Ct. 2183; *Wilcox*, 145 S. Ct. at 1415. The ALJs' duties are purely adjudicative in nature, and the ALJs' exercise of those duties is subject to agency policy. Unlike the principal officers in *Seila Law*, *Collins*, and *Wilcox*, the actions of the Department's ALJs are subject to plenary review and vacatur by a high-level principal officer directly accountable to the President.

Of note too, this case is more analogous to the Supreme Court's *Perkins* than *Myers*. In *Perkins*, the Secretary of the Navy, as a department head, appointed the cadet officer—an inferior officer—and the Supreme Court upheld Congress's statutory removal restriction. *See Perkins*, 116 U.S. at 484-85, 6 S.Ct. 449. In *Myers*, Congress vested the appointment of first-class postmasters in the President, (not a department head), but its unconstitutional removal restriction required Senate consent to the President's removal of that postmaster. *See Myers*, 272 U.S. at 107, 162-63, 47 S.Ct. 21. In this case, like *Perkins*, Congress vested the appointment of ALJs in the Attorney General as a department head. *See* 5 U.S.C. § 3105. Unlike *Myers*, § 7521(a) contains no requirement of Senate consent for removal of an ALJ. *See id.* § 7521(a).

On balance, these other Supreme Court decisions support our holding that the APA's § 7521(a), as applied to the Department's ALJs, does not unconstitutionally infringe upon the President's Article II powers.

### F. Conclusion

In holding § 7521(a) constitutional, we respect the Constitution's carefully calibrated separation of powers. Even

though the Constitution is silent about removal of executive branch officers, the Supreme Court has instructed that Article II's Take Care Clause and Appointments Clause grant the President the broad power to remove executive branch officers. But importantly here, the Constitution in Article II also explicitly grants Congress a say in how inferior officers, including the Department's ALJs, are appointed. The constitutional authority of Congress to vest the appointment of inferior officers implies authority to limit and regulate the removal of those inferior officers so appointed. Striking down § 7521(a)'s straightforward "good cause" removal restriction on inferior officers with such limited duties as ALJs would upset the Constitution's balance of governmental power.

## VII. SEVERABILITY

**\*28**  One final observation. Although the defendants in April 2025 withdrew their merits argument that § 7521(a) is constitutional, the defendants "continue[ ] to argue that the district court's judgment [and permanent injunction] should be reversed because ... the proper remedy is severance." We agree with the defendants that even if § 7521(a) were unconstitutional, we still would reverse because the "good cause" restriction in § 7521(a) is easily severable from the rest of the APA.

It is well established that " 'one section of a statute may be repugnant to the Constitution without rendering the whole act void.' " *Seila Law*, 591 U.S. at 233, 140 S.Ct. 2183 (quoting *Loeb v. Columbia Twp. Trs.*, 179 U.S. 472, 490, 21 S.Ct. 174, 45 L.Ed. 280 (1900)). "[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of th[e] court to so declare, and to maintain the act in so far as it is valid" in order to avoid "nullify[ing] more of a legislature's work than is necessary." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (citation modified); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). Under this severability doctrine, when such a conflict occurs, courts should analyze whether it is appropriate to "sever" or excise "any problematic portions while leaving the remainder intact." *Free Enter. Fund*, 561 U.S. at 508, 130 S.Ct. 3138 (quotation marks omitted).

Severing the unconstitutional portion of a statute is not appropriate in every instance. The Supreme Court instructs that severing the unconstitutional provision is appropriate

only when (1) the remaining valid portion of the statute is "[ ]capable of functioning independently," and (2) it is evident that the legislature would have preferred "what is left ... to no statute at all." *Alaska Airlines*, 480 U.S. at 684, 107 S.Ct. 1476; *Ayotte*, 546 U.S. at 330, 126 S.Ct. 961.

The Supreme Court has opted to sever the offending provision in previous removal protection cases, *see Free Enterprise Fund*, 561 U.S. at 508-10, 130 S.Ct. 3138; *Seila Law*, 591 U.S. at 237, 140 S.Ct. 2183, and our circuit has followed suit, *see Rodriguez*, 118 F.4th at 1314. Applying the severability test here, we alternatively would hold that even if the APA's § 7521(a) removal restriction was unconstitutional as applied to the Department's ALJs, and regardless of whether we were to require Walmart to show the type of harm identified in *Collins*, the removal protection would be severable.

First, were we to find the removal protection unconstitutional, we need only sever one level of protection and leave the Department's ALJs removable at will by the Attorney General, who also is removable at will. The surviving § 7521(a) removal statute then would state: "An action may be taken against an [ALJ] appointed under section 3105 of this title by the agency in which the [ALJ] is employed." 5 U.S.C. § 7521(a). Severing the MSPB's "good cause" determination in § 7521(a) would not render the rest of the APA framework incapable of functioning.

Second, it is not evident that Congress would have preferred no ALJs at all, as opposed to ALJs removable at will by the Attorney General. *See Free Enter. Fund*, 561 U.S. at 508-09, 130 S.Ct. 3138; *Alaska Airlines*, 480 U.S. at 684, 107 S.Ct. 1476; *see also Seila Law*, 591 U.S. at 234, 237, 140 S.Ct. 2183 (recognizing the preference for "limit[ing] the solution to the problem" and Congress's preference that courts use a "scalpel rather than a bulldozer" to remedy constitutional defects); *Rodriguez*, 118 F.4th at 1314 ("[N]othing in the text, structure, or history of the statute makes it evident that Congress would have preferred, as an alternative to a Commissioner who is removable at will, no Social Security Administration at all."). Walmart speculates that Congress would not have vested ALJs with authority in the absence of their current removal protections. But the Supreme Court rejected this precise argument with respect to the statute in *Seila Law*, finding that the legislative history "confirm[ed] that Congress preferred an independent CFPB to a dependent one; but they shed little light on the critical question whether Congress would have preferred a dependent CFPB to *no agency at all*." 591 U.S. at 236, 140 S.Ct. 2183 (emphasis in original). The Court opted

Walmart, Inc. v. Chief Administrative Law Judge of Office of..., --- F.4th ---- (2025)
2025 WL 1949488
Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 38 of 39    PageID 666

to sever the removal protection rather than "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Id.* at 237, 140 S.Ct. 2183. Here too, we would sever the offending provision.

### VIII. CONCLUSION

**\*29**  For all these reasons, we vacate the district court's permanent injunction against the defendants and reverse its entry of summary judgment in favor of the plaintiff Walmart.

**VACATED AND REVERSED.**

**All Citations**

--- F.4th ----, 2025 WL 1949488

---

### Footnotes

1    By statute, after receiving NIFs, an employer may timely request a hearing regarding the alleged violations of § 1324a. *See* 8 U.S.C. § 1324a(e)(3)(A). If no hearing is requested, the Attorney General then may impose a final, unappealable order against the employer for civil money penalties for the immigration paperwork violations. *See id.* § 1324a(e)(3)(B). But if an employer timely requests a hearing, and no settlement is reached, ICE then files complaints against the employer for the alleged violations to be litigated civilly before the ALJ in OCAHO. *See id.* § 1324a(e)(3)(A); 8 C.F.R. § 274a.9(e).

2    *Humphrey's Executor* involved the multi-member FTC, and the constitutionality of statutory removal restrictions as to multi-member agencies, like the MSPB, is being challenged elsewhere. *See infra* Section IV.J.

3    In *Free Enterprise Fund*, the Supreme Court also stated that "[w]hether administrative law judges are necessarily 'Officers of the United States' is disputed." *Free Enter. Fund*, 561 U.S. at 507 n.10, 130 S.Ct. 3138. As discussed later, the Supreme Court answered this question in *Lucia*, where it confirmed that ALJs are "Officers" for purposes of the Appointments Clause. *See Lucia*, 585 U.S. at 241, 138 S.Ct. 2044.

4    In this case, no party contends the President must first remove an ALJ before a district court may enjoin proceeding before an unconstitutionally insulated ALJ. In fact, the Supreme Court has decided the constitutionality of several statutory removal restrictions on the President's removal of an executive officer in the executive branch without first requiring removal of, or a threat to remove, the officer. *See Morrison*, 487 U.S. at 689-91, 108 S.Ct. 2597; *Free Enter. Fund*, 561 U.S. at 496-98, 130 S.Ct. 3138; *Seila Law*, 591 U.S. at 218-20, 140 S.Ct. 2183; *Collins*, 594 U.S. at 250, 141 S.Ct. 1761. In *Collins*, after the Supreme Court declared § 4512 unconstitutional, the Court then considered removal threats only as to remedy and whether harm was caused by the unconstitutional restriction. *See Collins*, 594 U.S. at 257-60, 141 S.Ct. 1761.

5    Unlike this case, the statutory scheme in *Decker Coal* did not require the DOL to employ ALJs to adjudicate relevant claims. *See Decker Coal*, 8 F.4th at 1133-34. The Ninth Circuit identified this as an additional factor supporting § 7521(a)'s constitutionality. *Id.* While the statutory scheme here does require the use of OCAHO ALJs, *see* 8 U.S.C. § 1324a(e)(3)(B), that does not make the "good cause" removal restriction for ALJs unconstitutional because the Department's ALJs cannot issue final decisions.

6    As noted earlier, the constitutionality of the § 1202(d) removal restriction on the President's Article II power to remove multi-member agency heads, such as NLRB and MSPB members, was recently at issue before the Supreme Court. *See Wilcox*, 145 S. Ct. at 1415. Thus, the ultimate outcome of that constitutional challenge potentially may obviate Walmart's second layer argument here.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:24-cv-00950-O    Document 49    Filed 07/29/25    Page 39 of 39    PageID 667

7   As in *Free Enterprise*, the Court in *Lucia* explicitly declined to address the constitutionality of ALJs' removal protections. *See Lucia, 585 U.S. at 244 n.1, 138 S.Ct. 2044*.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.